**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| **CYRIL VETTER** *and* **VETTER COMMUNICATIONS CORP** | * * * * * |  |
| **VERSUS** | * * * | **CIVIL ACTION: 3:23-cv-1369** |
| **ROBERT RESNIK** *individually and d/b/a* **RESNIK MUSIC GROUP** | * * * |  |

## COMPLAINT

Cyril Vetter and Vetter Communications Corp ("Vetter Communications"), by and through the undersigned counsel, bring this action against Robert Resnik, individually and doing business as Resnik Music Group, for a declaration of sole copyright ownership of the musical work "Double Shot (Of My Baby's Love)" ("Double Shot"), authored by Mr. Vetter and his friend, the late Don Smith, and which, according to Bruce Springsteen, is "the greatest fraternity rock song of all time." Fittingly, this action requires the Court to interpret what are arguably the greatest safeguards Congress has ever afforded authors under copyright law: statutory renewals and reversions. Both renewals and reversions serve to protect authors by ensuring they can recapture copyrights previously granted away. By providing authors with a path to recapture their copyrights, Congress has afforded the creative class a vital second chance to benefit from the fruits of their labor. This action stems from the defendant's attempt to deny the plaintiffs the full benefit of that second chance. As further detailed herein, the plaintiffs are the owners of recaptured rights in the Double Shot copyright. Notwithstanding the plaintiffs' recaptured rights, the defendant refuses to relinquish claim to the Double Shot copyright outside of the United States and purports to retain

1

the exclusive right to exploit the work in all foreign countries. This refusal raises an important and judicially unexplored question—that is, what effect do renewals and reversions have outside of the United States?

It would be hard to overstate the significance of this question. Given the predominantly digital nature of modern media consumption, and the fact that the internet largely ignores geographic boundaries, it is impractical (if not impossible) to limit the most common exploitations of copyright to the United States alone. As such, the defendant's refusal grossly limits the licensing and exploitation opportunities available to the plaintiffs, fundamentally impairing the safeguards constructed by Congress. At its core, this action asks the Court to ensure that such safeguards remain intact.

## NATURE OF THE ACTION

1. Congress has long appreciated that authors frequently divest themselves of their copyrights through "unremunerative" transfers. That is to say, authors are often compelled to assign or license away their rights for relatively little (or even nothing) in return.

2. It is not that creative individuals inherently lack business acumen, it is that the creative *industries* typically benefit from massive bargaining power disparities.

3. Furthermore, many creative works are bargained away at the nadir of their value—before the work has been commercially exploited and, thus, before the work's commercial value can be established.

4. Congress has sought to protect "divested" authors from the natural consequences of these economic realities by giving them a second chance to benefit from the fruits of their labor.

5. Up until the passage of the 1976 Copyright Act (the "1976 Act"), this second chance came by way of dual, independent terms of copyright protection.

6.     Relevant here, the Copyright Act of 1909 (the "1909 Act") provided for an initial term of copyright protection of 28 years with the option to renew such protection for an additional 28 years at the conclusion of the initial term.

7.     Although the initial term of copyright protection was envisioned by Congress as freely alienable, the renewal term was intended to be an inalienable right belonging solely to the author (or the author's heirs).

8.     Despite these legislative aims, following the enactment of the 1909 Act, music publishers and others in the copyright industries would often require authors to sign contracts that assigned both the original term *and* the renewal term of their copyright protection.

9.     This controversial practice received a qualified 6-3 stamp of approval from the Supreme Court in *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943).

10.    Specifically, the majority held that where an author agrees to assign the right to the renewal term prior to the vesting thereof, such assignment is a contingent one, and is enforceable against the author provided that the author is living when such renewal rights eventually vest. Conversely, if the author is not living at the time those rights vest, the contingent assignment of the renewal term is ineffective and unenforceable against the author's heirs.

11.    On the heels of the *Fred Fisher* decision, Congress began the process of revising the 1909 Act—a process that would not be completed until 1976.

12.    Congress ultimately eschewed the dual terms of copyright protection in the 1976 Act in favor of a unitary term of protection based on the life of the author.

13.    And with that choice, Congress had to devise a new mechanism to provide authors (and their heirs) with a second chance to benefit fully from the fruits of their labor.

3

14. Sections 203 and 304 of the 1976 Act (17 U.S.C. §§ 203, 304) were crafted to provide this second chance through a "termination" or "reversion" right that may be exercised by an author (or the author's heirs) to recapture a copyright previously bargained away.

15. Section 203 applies to works transferred following the enactment of the 1976 Act (and is therefore *not* directly implicated in this action), whereas Section 304 applies to works that were transferred under the 1909 Act (and *is* therefore directly implicated in this action).

16. Subsection 304(c) provides (in relevant part) that the grant of a transfer or license of the renewal copyright (or any right under it) executed before January 1, 1978, is subject to termination 56 years from the date the copyright was originally secured.

17. Fearing that authors might be forced to bargain away this termination right (and a repeat of the *Fred Fischer* decision), Congress left nothing to chance; both Sections 203 and 304 make the termination right exercisable "notwithstanding any agreement to the contrary."

18. Incredibly powerful as it is, the termination right is not without its limitations. These limitations are the byproduct of years of negotiation and legislative maneuvering.

19. To begin, "works made for hire" are expressly excluded from the reversion regime under both Sections 203 and 304.

20. Likewise, both Sections 203 and 304 provide for a "derivative works exception" through which any derivative work prepared under the authority of the original grant may continue to be utilized under the terms thereof, termination notwithstanding.

21. Lastly, whereas Congress could have made reversion automatic, it instead made a deliberate choice to require that the author (or the author's heirs) effect termination within a limited window of time by providing notice to the grantee (or its successor-in-title) and recording that notice with the Copyright Office.

22. In addition to the foregoing limitations, however, the copyright industries have long insisted that there is a *geographical* limitation to termination rights.

23. Under this theory (the defendant's adoption and assertion of which has brought about this action), when an author effects a grant of rights in a copyrighted work "throughout the world" or "on a worldwide basis" (as was done with Double Shot), the termination of said grant reverts to the author (or the author's heirs) *only* the right to exploit the work in the United States.

24. Put differently, this theory posits that if the original grant includes rights to exploit the copyright in countries other than the United States, those rights are *forever* lost.

25. There are two grounds upon which this theory appears to rest, neither of which has been judicially tested or analyzed in any significant way.

26. The first ground is textual. Specifically, both Sections 203 and 304 state that a statutory termination right "affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws." 17 U.S.C. §§ 203(b)(5), 304(c)(6)(E).

27. For those who subscribe to a "pro-grantee" interpretation of the 1976 Act: (i) the phrase "under this title" imposes an inherent geographical limitation on reversion such that only rights specifically enumerated in the 1976 Act itself are recaptured; and (ii) the phrase "in no way affects rights arising under any other … foreign laws" means that the right to claim, exploit, and enforce a recaptured copyright outside of the United States does not revert.

28. This interpretation, which has been embraced and asserted by the defendant without reservation, reflects a critically flawed reading and understanding of the 1976 Act.

29. First, concerning the phrase "arising under this title," the plaintiffs firmly reject the notion that this phrase has any geographical implications for an author's termination rights. In fact, the language of Sections 203 and 304 says *nothing* about geography.

30. The plaintiffs find support for their position in the Supreme Court's decision in *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013), which held that the phrase "under this title" as used in relation to the 1976 Act's first sale doctrine (17 U.S.C. § 109(a)) has no geographical significance whatsoever, and simply means "in accordance with" or "in compliance with" the Copyright Act.

31. Like the respondent in *Kirtsaeng*, the defendant's geographical interpretation is rife with uncertainty and complexity, whereas the plaintiffs' nongeographical reading is simple, promotes a traditional copyright objective, and makes word-by-word linguistic sense.

32. Second, concerning the phrase "in no way affects rights arising under any other Federal, State, or foreign laws," the plaintiffs likewise reject the interpretation of this language as a reference to foreign copyright protection or as a restriction on an author's ability to exercise control over a recaptured work throughout the world.

33. Foreign protection for United States works "arises" not from a multiplicity of foreign copyrights around the world, but rather when treaty partners agree to recognize copyrights that "arise" in accordance with the Copyright Act (i.e., original works of authorship fixed in a tangible medium of expression).

34. Read in proper context, the "in no way affects" language serves not as a geographic limitation, but instead to distinguish between the types of rights contained in the original grant that are subject to reversion (copyright rights) and those that are not (contractual rights, personal property rights, etc.).

6

35. In addition to these text-based arguments, the second ground offered in support of a geographically feeble termination right is the (oft-misunderstood) legal principle of territoriality.

36. Specifically, supporters of the "pro-grantee" view argue that, because copyright is "territorial" in nature, termination rights born of United States law can have no effect in foreign territories. The same is true, those supporters argue, regarding Section 23 renewal rights under the 1909 Act.

37. In other words, because renewals and reversions are statutory creations under United States law, an American author who recaptures ownership of a copyright by way of renewal under the 1909 Act, or reversion under the 1976 Act, will only be recognized as the owner of such copyright in the United States and *not* in any foreign territory. The plaintiffs reject this misguided view root and branch.

38. While it is true that copyright laws generally do not have extraterritorial operation, the territoriality principle is hardly absolute.

39. In fact, courts routinely relegate territoriality principles when confronted with questions of copyright authorship and ownership. Those questions have traditionally been answered by the laws of the country of a copyright's origin, or at times, the country with the most significant relationship to the work.

40. There is no compelling reason why renewals and reversions should be viewed through a different lens.

41. With respect to Double Shot, the United States is both the country of origin as well as the *only* jurisdiction with any relationship to the work. It simply cannot be that the laws of foreign countries—countries that have no relationship whatsoever to Double Shot—should determine who has the right to exploit the work following renewal and reversion.

7

42. Nor can it be that Congress ever intended renewal or reversion rights to irreversibly splinter the ownership of domestic copyrights throughout the world.

43. Returning then to the principal question at issue in this action: what right do the plaintiffs have as the owners of recaptured rights in the Double Shot copyright to exploit the work outside of the United States?

## PARTIES

44. Mr. Vetter is a citizen of Louisiana who resides in this judicial district. Mr. Vetter co-authored Double Shot with his friend, the late Don Smith.

45. Vetter Communications is a corporation organized under Louisiana law and has its principal place of business in this judicial district. Among other things, Vetter Communications serves as the publishing rights administrator (doing business as Vetter Music Publishing) for certain copyrights owned by Mr. Vetter.

46. Upon information and belief, Mr. Resnik is a citizen and resident of Florida. Mr. Resnik does business as a music publisher, including in this judicial district, individually and under the assumed business name "Resnik Music Group."

## JURISDICTION & VENUE

47. The plaintiffs' request for declaratory and injunctive relief is brought pursuant to 28 U.S.C. §§ 2201(a), 2202; this Court has original subject matter jurisdiction over all claims herein pursuant to 28 U.S.C. §§ 1331, 1338(a).

48. The defendant is subject to personal jurisdiction before this Court because he has purposefully directed relevant business activities toward the state of Louisiana, including repeated solicitations directed at the plaintiffs regarding their interests in Double Shot. Such activities have had, and continue to have, a direct and foreseeable impact on commerce in the state of Louisiana.

49. Alternatively, upon information and belief, the defendant is subject to personal jurisdiction before this Court because the defendant has transacted, and continues to transact, continuous, systematic, and routine business in the state of Louisiana.

50. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the events and omissions giving rise to this claim occurred in this judicial district.

## FACTS COMMON TO ALL CLAIMS

51. One afternoon in the summer of 1962, Mr. Vetter and Mr. Smith convened around the piano in the garage of Lenny Capello's parents' house in the Fairfields neighborhood of Baton Rouge, Louisiana.

52. At ages 19 and 20 respectively, Mr. Vetter and Mr. Smith both had a sense of humor that was reflective of their college age.

53. The two spent that afternoon playfully writing a song filled with as many double entendres as they could possibly squeeze in. Double Shot was born.

54. A month or so later, they traveled downriver to Cosimo Mattassa's studio in the French Quarter of New Orleans.

55. Mr. Smith was playing in Dick Holler's band at the time, and so he recruited Dick and his rhythm section to make the record. Lenny Capello (of parents' garage fame) would sing lead vocals. Mr. Vetter and Mr. Smith would sing background.

56. Their recording of Double Shot found its way to Al Silver, the co-owner of the Ember Music record label in New York City ("Ember Music"), as well as James McCullough, the owner of Windsong Music Publishers, Inc. ("Windsong").

57. On or about January 3, 1963, without legal representation or any understanding of the music publishing industry, Mr. Vetter and Mr. Smith entered into an agreement with Windsong

9

which *inter alia* transferred one hundred percent of their respective interests in the Double Shot copyright to Windsong (the "1963 Assignment"). *See* **Exhibit A.**

58. The 1963 Assignment included a transfer of the exclusive rights to Double Shot throughout the world for the full term of copyright protection, including a contingent assignment of all renewal period rights under the 1909 Act.

59. Windsong's purchase price for the worldwide rights in Double Shot? One dollar. Unremunerative, indeed.

60. Ember Music released the Dick Holler recording of Double Shot in early 1963. It received some airplay in Columbia, South Carolina, where Dick's band was playing a residence at the Army/Navy Club.

61. Around the same time, the Swinging Medallions—a South Carolina-based party band—started playing Double Shot at fraternity parties across the region.

62. The band eventually recorded their own "cover" version of Double Shot, which became a slow spreading, but undeniable hit.

63. Once it became a hit, Windsong filed for copyright registration of Double Shot (the "Original Copyright") with the Copyright Office on or about May 2, 1966.

64. This registration (cataloged as EU0000938895) secured federal copyright protection under the 1909 Act, which would subsist for 28 years following the registration date, with a possible renewal term of protection for an additional 28 years.

65. Tragically, Mr. Smith would not get to see the longevity and popularity of his creation. He died on February 16, 1972, in a plane crash on his way to an oilfield job site in Northwest Louisiana.

66. Four years later, Congress finally made good on its decades-long effort to revise and replace the 1909 Act.

67. The 1976 Act made several changes to the law that are relevant to this action.

68. One such change was the abandonment of the 1909 Act's dual term system of copyright protection in favor of a unitary term based on the life of the author.

69. However, this change was not retroactive, meaning that all works created prior to the enactment of the 1976 Act remain subject to renewal under the 1909 Act's dual term system.

70. Congress did, however, extend the renewal term for such works by 19 years (the "Extended Renewal Term") for a total duration of protection of 75 years (i.e., 28 + 28 + 19).

71. Additionally, Congress enacted the Section 304 termination right to provide authors (and their heirs) with the opportunity to receive the benefits of the Extended Renewal Term.

72. The 1976 Act went into effect on January 1, 1978.

73. On November 28, 1994, Mr. Vetter along with Laura Smith Perkins and Harper Jones (as Mr. Smith's heirs) obtained a renewal copyright (the "Renewal Copyright") for Double Shot (cataloged as RE0000679557). *See* **Exhibit B**.

74. Per the *Fred Fisher* decision, because Mr. Vetter was alive at the time the renewal rights vested, his contingent transfer to Windsong of his interest in the Renewal Copyright per the 1963 Assignment was effective.

75. However, because Mr. Smith was not alive, the contingent transfer of his interest in the Renewal Copyright (the "DS Renewal Copyright Interest") in the 1963 Assignment was unenforceable against his heirs.

76. In the spring of 1996, Vetter Communications purchased and acquired the DS Renewal Copyright Interest from Ms. Perkins and Mr. Jones.

11

77. On October 16, 1996, with no notice to Mr. Vetter, Windsong recorded a document dated September 27, 1996 (the "1996 Assignment") with the Copyright Office purporting to "reduce to writing" the transfer of Mr. Vetter's interest in the Renewal Copyright. *See* **Exhibit C**.

78. The 1996 Assignment was signed on Mr. Vetter's behalf by the owner of Windsong purporting to act as Mr. Vetter's "appointed attorney."

79. There appears to be no legitimate basis for the 1996 Assignment as, per the *Fred Fisher* decision, the transfer of Mr. Vetter's interest in the renewal term was accomplished through the 1963 Assignment and did not need to be "reduced to writing" again.

80. Also on October 16, 1996, Windsong recorded a document dated September 28, 1996, with the Copyright Office which ostensibly assigns fifty percent of Windsong's interest in the Renewal Copyright to Lyresong Music, Inc. ("Lyresong"). *See* **Exhibit D**.

81. In 1998, Congress passed the Copyright Term Extension Act, which added 20 years to the Extended Renewal Term for a total of 39 years.

82. Beginning in 2015, the defendant began contacting Mr. Vetter's daughter, Gabrielle Vetter (who manages most of the music publishing duties for Vetter Communications), to inquire about purchasing the plaintiffs' interest in Double Shot.

83. Those efforts were and remain both unsolicited and unsuccessful.

84. On March 20, 2019, Mr. Vetter (through counsel) transmitted a Section 304 termination notice (the "Notice of Termination") to Windsong and Lyresong.

85. The Notice of Termination informed Windsong and Lyresong that, effective May 3, 2022 (the "Reversion Date"), Mr. Vetter was terminating "all authorship/ownership rights originally granted and conveyed" pursuant to the 1963 Assignment (the "Recaptured Copyright Interest").

86. The Notice of Termination was received by Windsong on March 25, 2019 (*see* **Exhibit E**), and by Lyresong on April 9, 2019 (*see* **Exhibit F**).

87. The Notice of Termination was properly recorded in the Copyright Office on March 26, 2019. *See* **Exhibit G.**

88. At no point did Windsong or Lyresong challenge or contest the Notice of Termination, including the scope of the Recaptured Copyright Interest identified therein.

89. On August 20, 2019, the owner of Windsong emailed Ms. Vetter (with the defendant copied) informing her that the company and its assets had been sold and assigned to the defendant.

90. The notice from Windsong acknowledged that the interest purchased by the defendant was time-limited, stating, "We have enjoyed working with you, and feel that [Mr. Resnik] will be a real asset to Double Shot for the next 2 years."

91. On February 17, 2022, with the Reversion Date fast approaching, the defendant contacted Ms. Vetter to again solicit a sale of the plaintiffs' interest in Double Shot. The defendant's solicitation was again unsuccessful.

92. On the Reversion Date, after nearly 60 years, Mr. Vetter retook ownership of his authorship share of Double Shot by way of the Recaptured Copyright Interest.

93. At the end of 2022, the plaintiffs were approached by a licensing representative of American Broadcasting Companies, Inc. ("ABC") to request an expanded license for a synchronization use of Double Shot on an episode of the show *Moonlighting*.

94. Although the *Moonlighting* episode had originally aired in 1987, ABC was seeking to expand the original music license to include *inter alia* worldwide digital broadcasts and on-demand streams.

95. The plaintiffs provided ABC with a quote for the requested use indicating sole and exclusive ownership of Double Shot throughout the world.

96. However, ABC's licensing representative indicated to the plaintiffs that the defendant was still claiming a twenty-five percent ownership interest in Double Shot.

97. In response, the plaintiffs provided the licensing representative with copies of the Notice of Termination, who then forwarded the same to the defendant.

98. Even after receiving a copy of the Notice of Termination, the defendant continued to insist that he owned a twenty-five percent interest.

99. On March 6, 2023, the undersigned counsel contacted the defendant's counsel, to inquire about the basis for the defendant's claim. The defendant's counsel requested and received a copy of the Notice of Termination to review.

100. On March 7, 2023, the defendant's counsel (with the defendant copied) acknowledged the effectiveness of the Notice of Termination but asserted that the defendant would continue to have the sole and exclusive right to exploit Double Shot outside of the United States.

101. Hours later, the defendant's counsel retracted any acknowledgment of the effectiveness of the Notice of Termination—taking the position that the 1996 Assignment was a "novation" of the 1963 Assignment and was therefore not subject to termination.

102. On March 10, 2023, the defendant's counsel reversed course and indicated that the defendant did not intend to "dispute" the Notice of Termination.

103. However, even in ostensibly acknowledging the effectiveness of the Notice of Termination, the defendant's counsel reiterated the defendant's claim to the exclusive rights to Double Shot outside of the United States.

104. The defendant continues to assert that neither Mr. Vetter (by way of the Recaptured Copyright Interest) nor Vetter Communications (by way of acquisition of the DS Renewal Copyright Interest) have any right to exploit Double Shot outside of the United States.

105. As recently as July 29, 2023, the defendant's counsel emailed the plaintiffs directly to articulate the defendant's position, stating:

> FYI, under the U.S. Copyright law, a termination of transfer notice only terminates a transfer for the United States. All rights outside of the United States do not revert so Mr. Resnik/Windsong Music retain the copyright to "Double Shot" outside of the United States for the life of copyright. On and after the effective date of termination, Vetter Music only acquired rights to the song for the United States and it has no authority or right to claim or license the song outside of the United States or to collect any X-U.S. (foreign) income from the song.

106. The defendant's refusal to acknowledge the plaintiffs as the sole owners of Double Shot throughout the world has prevented the plaintiffs from engaging in routine licensing transactions (including the *Moonlighting* license) and impaired the plaintiffs' royalty collection activities (including CMRRA royalties in Canada).

**COUNT ONE**
DECLARATION OF RIGHTS IN THE
DS RENEWAL COPYRIGHT INTEREST

107. All previous allegations concerning or otherwise implicating the DS Renewal Copyright Interest are re-alleged and incorporated into this Count as though fully set forth below.

108. Although the 1963 Assignment purported to grant Mr. Smith's interest in the Renewal Copyright to Windsong, because Mr. Smith was not living at the time such Renewal Copyright vested, the grant thereof under the 1963 Assignment was ineffective.

109. As a completely new property estate, the DS Renewal Copyright Interest vested in Mr. Smith's heirs clear of all rights, interests, or licenses granted under the Original Copyright.

15

110. Vetter Communications purchased the DS Renewal Copyright Interest from Mr. Smith's heirs and is therefore entitled to all rights pertaining thereto.

111. The defendant has openly challenged the geographic scope of those rights—claiming that the rest of the world will not recognize the Renewal Copyright as a new property interest nor Vetter Communications as an owner of Double Shot by way of the DS Renewal Copyright Interest. The defendant's position is without merit.

112. It is irrelevant that other countries do not protect their copyrights in dual, independent terms. The laws of the United States as the country of origin (and also as the country with the only relationship to the work) must determine who owns the rights to Double Shot.

113. This Court has the authority to declare Vetter Communications the sole owner of the DS Renewal Copyright Interest throughout the world, and to restrain the defendant from making any exploitation of the same, including with respect to the *Moonlighting* license.

114. In the absence of a declaration from this Court, the defendant's claim to international rights as described herein will continue to cause irreparable harm by clouding the legitimacy of, and otherwise impairing, the plaintiffs' right to exploit Double Shot.

**COUNT TWO**
DECLARATION OF RIGHTS IN THE
RECAPTURED COPYRIGHT INTEREST

115. All previous allegations concerning or otherwise implicating the Recaptured Copyright Interest are re-alleged and incorporated into this Count as though fully set forth below.

116. Unlike Mr. Smith, because Mr. Vetter was living at the time the Renewal Copyright vested, the contingent grant thereof under the 1963 Assignment was effective against him.

117. As such, simultaneously with the vesting thereof, Mr. Vetter's interest in the Renewal Copyright was transferred to Windsong per the 1963 Assignment.

118. Mr. Vetter's grant of rights to Windsong was subject to termination under Section 304 of the 1976 Act. The Notice of Termination was timely and effective for this purpose.

119. Because the 1963 Assignment granted Windsong ownership of Mr. Vetter's share of the Renewal Copyright "throughout the entire world," termination of that grant returned, and the Recaptured Copyright Interest now includes, *all* rights that were transferred away pursuant to the grant, not merely a geographical sliver thereof.

120. The defendant has openly challenged the geographic scope of those rights—claiming that the rest of the world will not recognize the Section 304 reversion nor Mr. Vetter as an owner of Double Shot by way of the Recaptured Copyright Interest. The defendant's position is without merit.

121. It is irrelevant that other countries do not afford copyright reversions to their own domestic authors. The laws of the United States as the country of origin (and also as the country with the only relationship to the work) must determine who owns the rights to Double Shot.

122. This Court has the authority to declare Mr. Vetter the sole owner of the Recaptured Copyright Interest throughout the world, and to restrain the defendant from making any exploitation of the same, including with respect to the *Moonlighting* license.

123. In the absence of a declaration from this Court, the defendant's claim to international rights as described herein will continue to cause irreparable harm by clouding the legitimacy of, and otherwise impairing, the plaintiffs' right to exploit Double Shot.

**RELIEF REQUESTED**

124. Based on the foregoing, the plaintiffs respectfully request that this Court enter judgment against the defendant as follows:

(i) Declaring that Vetter Communications is the sole owner of all right, title, and interest throughout the world in the DS Renewal Copyright Interest.

(ii) Declaring that Mr. Vetter is the sole owner of all right, title, and interest throughout the world in the Recaptured Copyright Interest.

(iii) Declaring that the defendant has no right to exploit Double Shot anywhere in the world and permanently enjoining the defendant from doing the same.

(iv) Awarding costs and attorneys' fees incurred in connection with this action.

(v) Awarding such other relief as this Court deems proper.

Respectfully submitted,

**WELLS & KAPPEL, LLP**

/s/ Timothy Kappel
Timothy R.W. Kappel, LA Bar No. 32881 (Lead Attorney)
1615 Poydras Street, Suite 900
New Orleans, Louisiana 70112
Telephone: (504) 905-2012
Email: tkappel@wellskappel.com

Shelby B. Gebb (pro hac vice application forthcoming)
616 E Street NW
Washington, D.C. 20004
Telephone: (202) 440-7344
Email: sgebb@wellskappel.com

*Counsel for Cyril Vetter and Vetter Communications Corp.*