UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CYRIL VETTER** *and* **VETTER COMMUNICATIONS CORP** | * * * | **CIVIL ACTION: 3:23-CV-1369** |
| **VERSUS** | * * | **Chief Judge Shelly D. Dick** |
| **ROBERT RESNIK** *individually and d/b/a* **RESNIK MUSIC GROUP** | * * * * * | **Magistrate Erin Wilder-Doomes** |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

NOW INTO COURT, come Defendants, Robert Resnik *individually* and *d/b/a* Resnik Music Group, by its attorneys, and in support of their Motion to Dismiss Plaintiffs' Complaint, states as follows:

The Court should dismiss the Complaint against Defendants because both of the Counts it alleges are unsustainable as a matter of law. Without any legal authority on which to base their claims, Plaintiffs erroneously assert that (1) a copyright termination effectuated pursuant to 17 U.S.C. §304 has extra-territorial effect; and (2) a reversion of copyright to an author's heirs upon the author's death prior to the commencement of the renewal term also has extraterritorial effect. The Complaint therefore fails to state a claim upon which relief can be granted, and dismissal is required under Rule 12(b)(6), Fed. R. Civ. Pro.

As discussed more fully below, the Complaint consists largely of legal conclusions and statements of legal argument that are in direct conflict with well-settled principles of U.S. copyright law. Plaintiffs invoke the "oft-misunderstood" principle of territoriality in copyright law, for example, Complaint at ¶ 35, but it is only Plaintiffs who misunderstand

1

it, and who seek to persuade this Court to follow them down their erroneous and completely unsupported path. The Court should decline the Plaintiffs' invitation.

Similarly, the Complaint fabricates a fictitious dispute between the so-called "pro-grantee theory" of copyright termination rights and Plaintiffs' own "non-geographical" view, Complaint at ¶¶ 23-31, as if there were really two legitimate viewpoints. But there is only one legitimate view, and it is unambiguously set forth in the language Congress wrote into Section 304(c)(6)(E) of the Copyright Act: statutory termination under Section 304 "shall not affect" rights that arise under "foreign law." Congress has spoken. Plaintiffs refuse to listen to Congress, but this Court should not make the same mistake.

Just as Congress has spoken as to the effect of statutory termination on foreign rights – *i.e.*, termination has no effect on foreign rights – the U.S. Supreme Court has spoken as to the effect of an author's early death on that author's prior grants of foreign rights. In *Stewart v. Abend,* 495 U.S. 207 (1990), the foundational case that Plaintiffs mysteriously fail to reference in their citation-heavy Complaint, the Supreme Court held that the heirs of a deceased author recapture *only* the unvested, contingent renewal-term rights that such author may have granted before dying prior to the vesting of those rights. Because foreign countries do not impose a renewal formality, as the U.S. once did, an author's grant of rights in those countries is fully vested and un-contingent at the time it is made. There are no unvested rights for the author's heirs to recapture. To hold otherwise, as plaintiffs urge this Court to do, is to ignore the express rationale of the Supreme Court in *Stewart*, and improperly read that decision as a broad and unfettered license to undo *all* copyright grants ever made by an author who pre-deceases the start of the renewal term of his or her work. That is not the holding of *Stewart*.

# FACTS

The factual allegations of the Complaint, together with the documents attached thereto and referenced therein, allege in essence that Plaintiff Cyril Vetter and his friend Don Smith created the song *Double Shot (of my Baby's Love)* ("Song") in the summer of 1962, Complaint, ¶¶ 51-53, and the two co-authors assigned all worldwide rights in it to Windsong Music under an agreement between Windsong Music, on the one hand, and Mr. Smith and Mr. Vetter, on the other hand, ("1963 Assignment"). *Id.* ¶¶ 57-58. In 1966, Windsong obtained a U.S. copyright registration for the Song. *Id.* ¶63. Mr. Smith died in 1972. *Id.* ¶65. Plaintiff Vetter and Mr. Smith's successors in interest obtained a renewal of the U.S. copyright in the Song in 1994, resulting in a copyright renewal certificate dated Nov. 28, 1994 ("Renewal") *Id.* ¶73. Mr. Vetter's company, Vetter Communications Corp. acquired the Smith heirs' rights in the spring of 1996. *Id.* ¶76.

Later in 1996, Windsong Music executed and recorded the 1996 Assignment, which purports to "reduce to writing" a transfer of Mr. Vetter's rights to Windsong in a September 27, 1996 assignment by and between Cyril Vetter and Windsong Music Publishers, Inc. ("1996 Assignment) *Id.* ¶¶77-78. Plaintiffs dispute the validity of that assignment. *Id.* ¶79. Mr. Vetter subsequently served and recorded a termination notice under 17 U.S.C. §304, dated March 20, 2019 from counsel for Mr. Vetter to Windsong Music and Lyresong Music, Inc. ("Termination Notice"). *Id.* ¶¶84-85. The Termination Notice claimed May 3, 2022 as the effective termination date of Windsong's rights in the Song under the 1963 Assignment. *Id.* ¶85. Plaintiffs allege that Mr. Vetter "retook ownership of his authorship

3

share" of the Song once the termination became effective, *id.* ¶92, and allege further that Defendants' counsel did not dispute the Termination Notice. *Id.* ¶102. Defendants' counsel did, however, communicate to Plaintiffs' counsel that under U.S. copyright law "a termination of transfer notice only terminates a transfer in the United States. All rights outside the United states do not revert, so [Defendants] retain the copyright to [the Song] outside of the United States for the life of the copyright." *Id.* ¶105.

## ARGUMENT

### I. Governing Legal Standards

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true the well-pleaded factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). In so doing, however, the Court need not give credence to plaintiff's conclusory allegations or legal conclusions offered as pleadings. *Johnson v. Harris County,* 83 F. 4th 941, 945 (5th Cir. 2023). Indeed, the court should begin by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. 679.

Here, the following allegations of the Complaint are no more than legal conclusions or legal argument, and are therefore not entitled to any presumption of truth: ¶¶1, 2, 3, 4, 5, 7, 9, 10, 13, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 74, 79, 87, 92, 109, 110, 111, 112, 113, 114, 118, 119, 121, 122, 123.

With respect to the remaining factual allegations, when determining the sufficiency of a claim for Rule 12(b)(6) purposes, "consideration is limited to the factual allegations in plaintiffs' . . . complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be

4

taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

Here, the documents attached to or incorporated by reference into the Complaint are the 1963 Assignment (ECF Doc. 1-2), Renewal, (ECF Doc. 1-3), the 1996 Assignment (ECF Doc. 1-4), a Document Recordation Cover Sheet from the U.S. Copyright Office attaching an agreement dated Sept. 28, 1996 by and between Windsong Music Publishers Inc. and Lyresong Music, Inc. (ECF Doc. 1-5), a postal mailing card addressed to Windsong Music, postmarked March 25, 2019 (ECF. Doc. 1-6), a postal mailing card addressed to Lyresong Music, Inc. postmarked April 9, 2019 (ECF. Doc. 1-7), and a certificate of recordation from the U.S. Copyright Office dated March 26, 2019, attaching the Termination Notice (ECF Doc. 1-8). Plaintiffs have also identified the initial U.S. copyright registration for the work at issue, Reg. No. EU000038895 (Complaint, ¶ 63). There are no matters relevant to this motion on which judicial notice need be taken.

## II. THE PLAIN LANGUAGE OF THE COPYRIGHT ACT, AND ALL APPLICABLE CASE LAW, REQUIRE DISMISSAL OF COUNT TWO OF THE COMPLAINT

As the Supreme Court has frequently held, "Congress' intent is found in the words it has chosen to use." *See, e.g., Harbison v. Bell,* 556 U.S. 180, 198 (2009)(Thomas, J. concurring) citing *West Virginia Univ. Hospitals, Inc. v. Casey,* 499 U.S. 83, 98(1991)("The best evidence of [Congress'] purpose is the statutory text adopted by both Houses of Congress and submitted to the President"). *See also Scorpio Music S.A. v. Willis*, 2012 WL 1598043 (S.D. Cal. 2012) at *2 ("Courts must presume that a legislature says in a statute what it means and means in a statute what it says there") (music termination case),

5

quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992)[1]. Here, Section 304(c) of the Copyright Act, 17 U.S.C. 304(c), squarely refutes Plaintiffs' argument in Count Two that Plaintiffs' timely service and recordation of the Termination Notice under that Section "returned" to Plaintiffs "all" worldwide rights in the Song. Complaint, ¶119. There is no authority whatsoever to support this position, which is refuted by the statutory text, the case law, and the treatises.

Here, as courts have held, "the statutory text could not be any clearer" that the Termination Notice can only result in the recapture of U.S. rights, not foreign rights.[2] Specifically, Section 304(c)(6)(E) of the 1976 Act, which governs the Termination Notice, provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title [Title 17 of the United States Code], and *in no way affects rights arising under any other Federal, State, or foreign laws*." (Emphasis added).

This statutory language recognizes the principles of territoriality and national treatment, which the U.S. and its treaty partners worldwide have recognized since the dawn of international copyright relations. Contrary to the Plaintiffs' unsupported speculations in the Complaint, *see, e.g.* ¶¶ 29-43, the territoriality principle recognizes that copyright

---

[1] The Judgment in *Scorpio Music S.A. v. Willis,* available on PACER (S.D. Cal., 11-cv-1557, ECF 215, dated March 27, 2015), confirms that the service of an effective copyright termination notice only returns to an author his or her share of U.S. rights in the terminated work. *See, e.g.* ¶ 3 ("[author] has recaptured *in the United States*, as of the following respective Effective Dates of Termination, the following percentages of the *U.S. copyrights* in the 33 musical compositions at issue in this action")(emphasis added).

[2] *Siegel v. Warner Bros. Entertainment, Inc.,* 542 F.Supp.2d 1098, 1140 (C.D. Cal. 2008), *rev'd in part on other grounds sub nom. Larson v. Warner Bros. Entertainment, Inc.,* 504 Fed. Appx. 586 (9th Cir. 2013).

protection in one country does not extend to or affect protection in any other country, while the principle of national treatment requires each country, in applying its own laws, to treat authors of foreign nations the same as its own authors.

In the U.S. these principles have been adopted through domestic law in conformity with two primary international copyright agreements, the Berne Convention,[3] and the Universal Copyright Convention (UCC).[4]

The United States first joined the Universal Copyright Convention in 1952. The Berne Convention dates back to the nineteenth century, and the most recent official version was signed in 1971 (and amended in 1979)[5] but was not joined by the United States until 1988.[6]

Plaintiffs here ignore the key fact that neither of these treaties is self-executing. Instead, the Copyright Act is the sole source of authority for the rights of authors in the United States, and to avoid any doubt on that point 17 U.S.C. §104(c) provides that "[n]o right or interest in a work eligible for protection under this title may be claimed by virtue

---

[3] The Berne Convention for the Protection of Literary and Artistic Works, July 24, 1971, as amended, September 28, 1979, 25 U.S.T. 1341, 1161 U.N.T.S. 30 [hereinafter Berne], *available at* https://www.wipo.int/treaties/en/ip/berne/

[4] Universal Copyright Convention as Revised at Paris, July 24, 1971, 973 U.N.T.S. 178 [hereinafter UCC], *available at https://www.unesco.org/en/legal-affairs/universal-copyright-convention-revised-24-july-1971-appendix-declaration-relating-article-xvii-and*; Universal Copyright Convention, September 6, 1952, 6 U.S.T. 2731, 216 U.N.T.S. 132, *available at* https://www.unesco.org/en/legal-affairs/universal-copyright-convention-appendix-declaration-relating-article-xvii-and-resolution-concerning

[5] *See* Berne, *supra* note 3. .

[6] Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853–2861 (Oct. 31, 1988), *codified at* 17 U.S.C. §101 *et seq*.

of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto." The same is true for each other Berne or UCC member. Thus the U.S. Copyright Act, together with the implementing legislation of each other member country, creates multiple and separate copyright interests in each country, rather than a single overarching international master copyright that each country is required to honor.[7] Plaintiffs' contrary assertion in ¶33 of the Complaint, *i.e.* that foreign protection for U.S. works "arises" from the U.S. Copyright Act, or from membership in an international treaty, is therefore flatly wrong. Copyright protection arises from the domestic law of each country in which protection is claimed.  *See, e.g.,* Article 36 of the Berne Convention (Paris text, 1971):

> (1) Any country party to this Convention undertakes to *adopt,* in accordance with its constitution, *the measures necessary to ensure the application of this Convention*.
>
> (2) It is understood that, at the time a country becomes bound by this Convention, it will be in a position *under its domestic law* to give effect to the provisions of this Convention.

(emphasis added).[8]

Consequently, copyright protection in a Berne or UCC member country arises under the *domestic* law of each member country.  The treaties merely establish certain

---

[7] For an example of application of this multiple copyrights principle, see *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 228 USPQ 423 (2d Cir. 1985)(Japanese toys subject to U.S. law when distributed in U.S.).

[8] *See* U.S. Copyright Office, https://copyright.gov/international-issues/: "Original works of expression that are eligible for copyright protection are protected under national copyright laws. Protection against unauthorized use in a particular country depends on the national laws of that country; in other words, copyright protection depends on the national laws where protection is sought."

requirements that the domestic laws must satisfy. Copyright in France, for example, does not arise under the Berne convention itself, but under French law – certainly it does not arise under U.S. law.[9] Therefore, the language of the copyright termination provision in Section 304(c)(6)(E) really does mean what it says: "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title[, Title 17 of the United States Code], and *in no way affects rights arising under any other Federal, State, or foreign laws*." Because the foreign rights in the Song do not arise under Title 17 of the U.S. Code, but under the domestic laws of each member country, the termination of U.S. rights under Section 304 "in no way affects" those foreign rights, and Plaintiffs' Count Two fails as a matter of law.

Without exception, the case law and the treatises confirm this conclusion. In *Siegel v. Warner Bros. Entertainment, Inc.*, for example, the Central District of California held as a matter of law that the statutory termination of a copyright grant in the Superman comic character did *not* result in the recapture of any foreign rights. As noted above, the court began by holding that "the statutory text could not be any clearer on this subject," and then continued:

> Through this section [304(c)(6)(E), Congress expressly limited the reach of what was *gained* by the terminating party through exercise of the termination right; specifically, the terminating party only recaptured the *domestic* rights (that is, the rights arising under title 17 to the United States Code) of the grant to the copyright in question. Left expressly intact and undisturbed were any of the rights the original grantee or its successors in interest had gained over the years from the copyright through other sources of law, notably the right to exploit the work abroad that would be governed by the copyright laws of foreign nations. Thus, the statute explains that

---

[9] Plaintiffs' tortured argument of this point at ¶33 of the Complaint would yield the absurd result that *no* right in a U.S. work could ever actually "arise" under "foreign" law, in which case Congress' express language to address such rights would be a nullity. That cannot be the case, courts must not interpret a statute in a way that renders any of its language meaningless.

9

> termination "in no way affects rights" the grantee or its successors gained "under foreign laws."

*Siegel* at 1140 (emphasis original).

The *Siegel* court cited the leading copyright treatises in support:

> Professor Nimmer states: A grant of copyright "throughout the world" is terminable only with respect to uses within the geographic limits of the United States. Because copyright has no extraterritorial operation, arguably American law is precluded from causing the termination of rights based upon foreign copyright laws. A response to this argument is that the nonextraterritoriality of copyright is irrelevant because the question here is one of contract law, not copyright law, in that it concerns the effect of a contract granting certain rights. The contract law of one nation may be applicable in another nation under the latter's conflict-of-laws rule. The conclusive answer to this problem lies in the text of the termination provisions of the Copyright Act, which expressly provide that statutory termination "in no way affects rights arising under ... foreign laws"—that is, under foreign copyright (not contract) laws. Thus, even if the conflicts rule of a foreign nation were to call for application of the American termination rule as a rule of contract law, that rule by its own terms excepts from termination the grant of those rights arising under foreign copyright laws.

*Siegel* at 1140-1141, quoting M. Nimmer & D. Nimmer, 3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11–19.

*Siegel* also cited Professor Patry's treatise in support:

> Accordingly, where a U.S. author conveys worldwide rights and terminates under either section [203 or 304], grants in all other countries remain valid according to their terms or provisions in other countries' laws.

*Id.*, quoting W. Patry, 7 PATRY ON COPYRIGHT § 25:74.

The *Siegel* court forcefully rejected the argument, made by Plaintiffs here, that copyright termination allowed a copyright owner to recapture foreign rights:

> This argument misses the fact that all plaintiffs have gained from the termination right is a recapturing of the *domestic* copyright in the Superman material published in *Action Comics,* Vol. 1. Defendants continue to hold, unaffected, separate rights to that copyright arising under *foreign* copyright laws.

*Id.* (emphasis original).

10

The court recognized that "such an open effort to extend the reach of U.S. copyright law overseas, as plaintiffs' reading of the statute avows, would be in direct contradiction to not only the plain terms of the statute" and would stand "in stark juxtaposition to the longstanding rule 'that the copyright laws [of this country] have no application beyond the U.S. border.'" *Id.* (citing *Los Angeles News Serv. v. Reuters Tv. Intern.,* 340 F.3d 926, 931 (9th Cir.2003)).  The *Siegel* court concluded by stating:

> Accordingly, the Court holds that the termination notice affects only the *domestic* portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to Detective Comics of the copyright in the Superman material contained in *Action Comics,* Vol. 1. The termination notice is *not* effective as to the remainder of the grant, that is, defendants' exploitation of the work abroad under the aegis of foreign copyright laws.

*Id.* (emphasis original)

The other courts that have addressed the issue have consistently followed the *Siegel* analysis.  The Second Circuit in *Fred Ahlert Music Corp. v. Warner Chappell Music, Inc.*, 155 F.3d 17 (2d Cir. 1998), for example, recognized that the statutory termination of rights in a musical composition used in the film *Sleepless in Seattle* only resulted in the recapture of the "domestic rights in the Song." *Id.* at 20.

 Similarly, in *Clancy v. Jack Ryan Enterprises, Ltd.,* 2021 WL 488683 (D. Md. 2021), which involved termination rights in the Tom Clancy novel *The Hunt for Red October*, the District of Maryland recently quoted extensively from *Siegel* as it emphasized the limits that Congress placed on the scope of statutory termination rights:

> Congress placed certain limitations on what authors (or their heirs) could gain from exercising the termination right. See  *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1140 (C.D. Cal. 2008). The "termination of a grant under this section affects only those rights covered by the grants that arise under this title [*i.e.*, U.S. copyright law], and in no way affects rights arising under...foreign laws." 17 U.S.C. § 203(b)(5).

11

> Therefore, the worldwide grant of copyright is only subject to termination insofar as its U.S. component is concerned, but not subject to termination in the rest of the world. *See* [*Siegel at* 1144] (holding that a termination notice for Superman "affects only the *domestic* portion of [the] worldwide grant," but "*not* effective as to the remainder of the grant, that is, defendants' exploitation of the work abroad under the aegis of foreign copyright laws.") (emphasis in original); *see also* 3 NIMMER ON COPYRIGHT § 11.02(B)(2) (A grant of copyright "throughout the world" is terminable only with respect to uses within the geographic limits of the United States.).
>
> Therefore, the purported effect of plaintiff's Termination Notice can only apply to the domestic copyright in *Hunt*, not its foreign copyrights.

*Id.* at *46.

Therefore, Count Two of the complaint, seeking a declaration that Plaintiffs' Termination Notice recaptured both domestic *and foreign* rights in the Song, must be dismissed.

## III. SUPREME COURT PRECEDENT REQUIRES THE DISMISSAL OF COUNT ONE OF THE COMPLAINT

Plaintiffs' proposed interpretation of the Supreme Court's holding in *Stewart v. Abend*,[10] which they rely on (without citing by name) as the basis of their claim under Count One, is equally misguided and equally devoid of authority. Just as the plain statutory language of Section 304 limits the effect of copyright termination to U.S. rights, see above, the recapture of previously-granted rights under *Stewart* is also limited to U.S. rights. Under *Stewart* (and its predecessor *Fred Fisher Music v. M. Witmark & Sons, see* Complaint at ¶74)[11], as the Complaint correctly observes at ¶¶108-109, the U.S. renewal

---

[10] 495 U.S. 207, 14 USPQ2d 1614 (1990).

[11] The Complaint merely makes a vague reference to "the *Fred Fisher* decision," in connection with the principle that an author's grant of renewal rights is not valid if the author does not live into the start of the renewal term. The reference is presumably to *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643 (1943), but

12

right cannot be transferred by the author prior to the start of the renewal term because the renewal term is a "new estate" in which the author has only a contingent expectancy to assign during the first term.[12] If the author is not living when the renewal period begins, the heirs take the renewal "clear of all rights, interests or licenses granted under the original copyright."[13]

Thus, the initial assignee always takes the renewal interest from the author subject to the risk that the author will die, the expectancy will not vest, and the heirs will instead be the owners of the new estate when it comes into being. Significantly, the Supreme Court makes clear that the heirs' ownership after the author's death is not the result of the author's grant being voided, set aside, or superseded in any way, but simply the result of the contingent nature of the rights held by the author during the first term:

> "These results follow not because the author's assignment is invalid but *because he had only an expectancy to assign*; and his death, prior to the renewal period, terminates his interest in the renewal which by §24 [of the 1909 Act, now §304(a)(1)] vests in the named classes."[14]

---

that case holds only that an author can assign the renewal right before it vests: "We conclude, therefore, that the Copyright Act of 1909 does not nullify agreements by authors to assign their renewal interests." *Id.* at 648. The *Fred Fisher* ruling was revisited in 1993 by the Supreme Court's decision in *Stewart v. Abend*, which actually reaches the holding to which the Complaint refers, regarding the effect of the author's death prior to renewal. Plaintiffs apparently do not want this Court to read *Stewart*, and with good reason: it is fatal to their argument under Count One.

[12] *Stewart.* at 219–20.

[13] *Id.* at 218 (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471, 89 USPQ 564 (2d Cir. 1951)); *see also* 17 U.S.C. §304(a)(1)(C)(ii).

[14] *Stewart*, 495 U.S. at 219 (quoting *Miller Music v. Charles N. Daniels, Inc.,* 362 U.S. 373, 375, 125 USPQ 147 (1960))(emphasis added).

13

For this reason, *Stewart* holds that an author's grant of U.S. renewal term rights will be of no value to the grantee unless the author survives past the start of the renewal term.

With respect to foreign rights, however, the above analysis does not apply. *See, e.g., Rohauer v. Killiam Shows, Inc.*[15], which clearly contemplates that foreign rights do not revert to the author's estate under the principle articulated in *Stewart*. In *Rohauer*,[16] the Southern District of New York observed that the heirs of a filmmaker had no rights in the United Kingdom, even though they held U.S. rights by virtue of the *Stewart* principle, after the author died prior to the commencement of the renewal term.[17] Thus, following the original grantor's death, "Rohauer was at that moment vested only with rights to the work in the United States" (at 735). *Rohauer'*s holding is correct. The principle of territoriality under copyright law and the rationale of *Stewart* itself require the conclusion that the reversion of U.S. renewal-term rights to the author's estate under *Stewart* does not affect a transferee's continued ownership of foreign rights. This result is consistent with the treatment of reversions under Section 304 of the 1976 Act, which as discussed above "affects only those rights covered by the grant[s] that arise under this title [i.e., the U.S. Copyright Act], and in no way affects rights arising under any other Federal, State, or foreign laws."[18]

---

[15] 379 F. Supp. 723, 183 USPQ 592 (S.D.N.Y. 1974).

[16] *Rohauer v. Killiam Shows, Inc.*, 379 F. Supp. 723, 183 USPQ 592 (S.D.N.Y. 1974).

[17] *Id.* at 734–35.

[18] 17 U.S.C. §§203(b)(5), 304(c)(6)(E).

Under the explicit reasoning of *Stewart,* therefore, a grant by which an author assigns worldwide rights, including initial-term and renewal-term U.S. rights, is a valid grant when made and remains a valid grant even after the author's death during the initial term. As to the U.S. renewal term, however – and *only* as to the U.S. renewal term -- *Stewart* holds that it is only a grant of an unfulfilled expectancy. As to all other rights conveyed by the author, *i.e.,* foreign rights, the effect of the grant should remain unchanged, because the foreign rights granted are *not mere expectancies* but valid full-term rights under the copyright laws of other countries, fully vested in the author for their entire duration *ab initio*. Thus, as to these rights, the author has more than "only an expectancy to assign" at the time the assignment is made, and the result of *Stewart* will not extend beyond the "contingent" U.S. renewal rights. Only the U.S. renewal rights are "expectancies" and they are therefore the only rights that fall under the reasoning of *Stewart*, by the terms of *Stewart* itself.

The analysis set out above is also consistent with the well-settled principle that copyright is territorial, discussed *supra*, with U.S. copyright law having no reach outside U.S. borders.[19] Moreover, the outcome of a renewal rights dispute in this case would be the same whether a court applies foreign or U.S. law to the issue of foreign-rights ownership. The *Stewart* rationale does not apply under the laws of other countries for the

---

[19] *See, supra* at 6-7. *See also*, *Twin Books Corp. v. Walt Disney Co.,* 83 F.3d 1162, 1167, 38 USPQ2d 1847 (9th Cir. 1996); *Subafilms Ltd. v. MGM-Pathe Commc'ns Co.,* 24 F.3d 1088, 1095, 30 USPQ2d 1746 (9th Cir. 1994) (en banc) ("The 'undisputed axiom' . . . that the United States' copyright laws have no application to extraterritorial infringement predates the 1909 Act . . . .").

15

simple reason that foreign copyright laws do not mandate the creation of a "new estate" midway through the term of protection.[20]

Further, even if a court, in the United States or elsewhere, applied U.S. law to determine the ownership of foreign rights in a U.S. work after the reversion of the renewal term to the heirs, the reasoning of *Stewart* requires that U.S. law respect the author's assignment of foreign rights. There is no clear statutory basis for setting aside the author's grant of vested, *non*contingent rights, no matter what country's law those rights arise under. Despite the fact that un-vested, contingent rights have a different status under the unique renewal structure of the 1909 U.S. Copyright Act, U.S. law does not require or imply that the same analysis should apply in other countries, where the rights granted are neither contingent nor un-vested.

## CONCLUSION

Based on the above reasons and authorities, Defendants respectfully submit that the Complaint should be dismissed with prejudice in all respects.

**PROVOSTY & GANKENDORFF, LLC**

          /s/ Edgar D. Gankendorff
Edgar D. Gankendorff (LA Bar #20550)
Christophe B. Szapary (LA Bar #25890)
650 Poydras Street, Suite 2700
New Orleans, Louisiana  70130
Telephone: 504-410-2795

---

[20] This was recognized by the leading commentator of the nineteenth century. EATON S. DRONE, A TREATISE ON THE LAW OF PROPERTY IN INTELLECTUAL CREATIONS IN GREAT BRITAIN AND THE UNITED STATES 326 (1879) ("The question arises, whether an assignment of copyright made under [the Act of 1831] divests the author, or his widow and children, of the right to the second term of protection thus provided for, and whether the assignee becomes vested with that right. *This question cannot arise in England, because the statute of that country does not provide for such extension.*" (emphasis added)).

                              Facsimile: 504-410-2796
                              *Attorneys for Defendant*

AND

**REITLER KAILAS & ROSENBLATT, LLP**
Robert W. Clarida (*pro hac vice applied for*)
T.A. Brian D. Caplan (*pro hac vice applied for*)
885 Third Avenue, 20th Floor
New York New York 10022
Telephone: (212) 209-3059
bcaplan@reitlerlaw.com
rclarida@reitlerlaw.com
*Attorneys for Defendants*