## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

CYRIL E. VETTER AND                                    CIVIL ACTION
VETTER COMMUNICATIONS
CORPORATION

VERSUS                                                 23-1369-SDD-EWD

ROBERT RESNIK *individually and*
*d/b/a* RESNIK MUSIC GROUP

## <u>RULING</u>

This matter is before the Court on the *Motion to Dismiss*[1] filed by Defendant, Robert Resnik, individually and d/b/a Resnik Music Group ("Defendant"). Plaintiffs, Cyril E. Vetter and Vetter Communications Corporation (collectively, "Plaintiffs"), filed an *Opposition*,[2] to which Defendant filed a *Reply*.[3] Plaintiffs then filed a *Sur-Reply*.[4] For the following reasons, the motion will be denied.

### I.   BACKGROUND

#### A. Facts

This case arises from a disagreement regarding the rights to the foreign exploitation of a musical work co-written by Plaintiff, Cyril E. Vetter ("Vetter"). Plaintiffs' lawsuit alleges the following facts. In 1962, Vetter and his friend Don Smith ("Smith") co-authored a song entitled "Double Shot (Of My Baby's Love)" (the "Song").[5] In 1963, Vetter and Smith assigned all of their interests in the Song to Windsong Music Publishers, Inc.

---

[1] Rec. Doc. 12.
[2] Rec. Doc. 17.
[3] Rec. Doc. 23.
[4] Rec. Doc. 27.
[5] Rec. Doc. 1, ¶¶ 51–53.

("Windsong").[6] In exchange for the agreed-upon price of one dollar, Windsong purchased exclusive rights to the Song throughout the world for the full term of copyright protection, as well as a "contingent assignment of all renewal period rights" under the Copyright Act of 1909.[7] This transfer of rights to Windsong will be referred to throughout this ruling as the "Initial Assignment."

In 1966, after the Song gained some popularity, Windsong obtained a U.S. copyright registration for the Song (the "Original Copyright").[8] The registration, secured under the Copyright Act of 1909, was to subsist for twenty-eight years with a possible renewal term for an additional period of the same length.[9]

Smith died in 1972.[10] In 1994 (after the twenty-eight-year term of Windsong's Original Copyright ended), Smith's heirs and Vetter obtained a renewal copyright in the Song (the "Renewal Copyright").[11] However, as mentioned above, Smith and Vetter both transferred their renewal interests to Windsong in the Initial Assignment in 1963.[12] Under Supreme Court precedent, the parties agree that such a renewal interest assignment is only enforceable against an author if he is living when those rights vest; in other words, an author's grant of the renewal interest is "contingent" upon the author being alive at the commencement of the renewal period.[13] Accordingly, Plaintiffs concede that Vetter's promise of his Renewal Copyright interest to Windsong in the Initial Assignment was

---

[6] *Id.* at ¶ 57. The signed agreement effecting this transfer is attached to the Complaint (*see* Rec. Doc. 6-1).
[7] *Id.* at ¶¶ 58, 59. For context, a "renewal copyright" under the Copyright Act of 1909 is essentially a new term of copyright protection that can be obtained after the term of the original copyright expires. Renewal copyrights will be explained in more detail below.
[8] *Id.* at ¶ 63.
[9] *Id.* at ¶ 64.
[10] *Id.* at ¶ 65.
[11] *Id.* at ¶ 73. The renewal certificate is attached to the Complaint (*see* Rec. Doc. 6-2).
[12] Rec. Doc. 17, pp. 2–3.
[13] *See Stewart v. Abend*, 495 U.S. 207, 220 (1990) ("if the author dies before the commencement of the renewal period, the assignee holds nothing."). *See also* Rec Doc. 1, ¶ 108; Rec. Doc. 12-1, p. 14.

enforceable because Vetter was alive at the time the renewal rights vested.[14] Conversely, because Smith was not alive at the time the renewal rights vested, the parties agree that the transfer of Smith's renewal rights to Windsong in the Initial Assignment was unenforceable; as a result, those rights "vested in Mr. Smith's heirs clear of all rights, interests, or licenses granted under the Original Copyright."[15] Therefore, although Vetter's interest in the Renewal Copyright had been validly transferred to Windsong,[16] Smith's renewal interest vested in Smith's heirs clear of all rights granted to Windsong through the Initial Assignment.

Accordingly, as of 1994, Windsong held a fifty percent interest in the Renewal Copyright (by way of the Initial Assignment of Vetter's renewal interest), and Smith's heirs held the other fifty percent (because of Smith's death before the renewal interest vested). In 1996, Plaintiff Vetter Communications Corporation ("Vetter Communications") purchased Smith's heirs' renewal copyright interest.[17] Later that year, Windsong transferred fifty percent of its renewal interest in the Song to another company, Lyresong Music, Inc. ("Lyresong").[18] Thus, as of 1996, interest in the Renewal Copyright was held by Vetter Communications (50%), Windsong (25%), and Lyresong (25%). Throughout this ruling, these interests will be referred to as a given party's "Renewal Copyright Interest."

---

[14] Rec. Doc. 1, ¶ 74.

[15] *Id.* at ¶¶ 108, 109. *See also* Rec. Doc. 12-1, pp. 12–13, where Defendant acknowledges the correctness of this part of the Complaint.

[16] Evidently, in 1996, Windsong executed a document (attached to the Complaint at Rec. Doc. 6-3) purporting to "reduce to writing" the transfer of Vetter's renewal interest to Windsong. *See* Rec. Doc. 1, ¶¶ 77–79; Rec. Doc. 12-1, p. 3. Plaintiffs contend there was "no legitimate basis" for this 1996 assignment because the transfer of Vetter's renewal interest had already been accomplished by the Initial Assignment and Vetter's survival of the term of the Original Copyright. The Court finds it unnecessary to address Plaintiff's contention because, whether or not the 1996 document is valid, the parties appear to agree upon the ultimate fact that Vetter's renewal interest went to Windsong.

[17] Rec. Doc. 1, ¶ 76.

[18] *Id.* at ¶ 80. This document is attached to the Complaint (*see* Rec. Doc. 6-4).

In 2019, Vetter transmitted a termination notice to Windsong and Lyresong pursuant to Section 304 of the Copyright Act of 1976 (the "Notice of Termination").[19] As will be discussed, this is a statutory mechanism that allows the termination and recapture of rights in a copyrighted work that were previously alienated. According to the Notice of Termination, Vetter sought to terminate all rights in the Song that he had granted Windsong through the Initial Assignment, and those rights would be "recaptured" by Vetter (hereinafter referred to as "Vetter's Recaptured Interest").[20] The effective date of the Notice of Termination was to be May 3, 2022.[21]

Later in 2019, Windsong informed Plaintiffs that Windsong had sold its assets to Defendant herein, Robert Resnik and/or Resnik Music Group.[22] Accordingly, Renewal Copyright Interests were held at that point by Vetter Communications (50%), Defendant (25%), and Lyresong (25%).

Plaintiffs allege that on the effective date of the Notice of Termination (May 3, 2022), Vetter "retook ownership of his authorship share" of the Song (i.e., Vetter's Recaptured Interest).[23] Later in 2022, Plaintiffs were approached by American Broadcasting Companies, Inc. ("ABC") regarding possible use of the Song on an episode of a television show to be broadcast worldwide.[24] After Plaintiffs provided ABC with a quote, ABC informed Plaintiffs that Defendant, notwithstanding the Notice of Termination, was claiming a twenty-five percent ownership interest in the Song.[25]

---

[19] *Id.* at ¶ 84. Documents indicating Windsong and Lyresong's receipt of the Notice of Termination are attached to the Complaint (*see* Rec. Docs. 6-5, 6-6), as well as the certificate of recordation of the Notice of Termination (*see* Rec. Doc. 6-7).
[20] *Id.* at ¶ 85.
[21] *Id.*
[22] *Id.* at ¶ 89.
[23] *Id.* at ¶ 92.
[24] *Id.* at ¶¶ 93–94.
[25] *Id.* at ¶¶ 95–96.

**B.  The Parties' Dispute**

The parties disagree on the geographical scope of both Vetter Communications' Renewal Copyright Interest (which it purchased from Smith's heirs) and Vetter's Recaptured Interest (through the Notice of Termination). Count One of Plaintiffs' Complaint seeks a declaration from this Court that Vetter Communications is the sole owner *throughout the world* of its Renewal Copyright Interest that it acquired from Smith's heirs.[26] In short, Plaintiffs contend that all of Windsong's rights, both domestic and foreign, in the Original Copyright derived from Smith through the Initial Assignment were cut off when Smith's Renewal Copyright Interest vested in Smith's heirs.[27] Plaintiffs argue this gave Smith's heirs a completely new property interest, which was later purchased by Vetter Communications.[28] As a result, Plaintiffs assert that Vetter Communications is the sole owner of this Renewal Copyright Interest, and that this right extends worldwide.[29]

Count Two of the Complaint seeks a declaration that Vetter is the sole owner *throughout the world* of Vetter's Recaptured Interest resulting from his Notice of Termination.[30] Plaintiffs allege that the Notice of Termination cut off all of Defendant's rights, both domestic and foreign, in the Renewal Copyright Interest derived from Vetter's transfer of same through the Initial Assignment to Windsong.[31] As a result, Plaintiffs contend Vetter's Recaptured Interest includes both domestic and foreign rights to exploit the Song.[32]

---

[26] *Id.* at ¶ 113.
[27] *Id.* at ¶¶ 108–113.
[28] *Id.*
[29] *Id.*
[30] *Id.* at ¶ 122.
[31] *Id.* at ¶ 116–119.
[32] *Id.* at ¶ 119–122.

In sum, Plaintiffs' Complaint for declaratory judgment asks this Court to find the following:

- That Vetter Communications is the sole owner of all rights and interests throughout the world in its Renewal Copyright Interest that it acquired from Smith's heirs;[33]

- That Vetter is the sole owner of all rights and interests throughout the world in Vetter's Recaptured Interest which he acquired through the Notice of Termination;[34] and

- That Defendant has no right to exploit the Song anywhere in the world.[35]

Defendant filed this *Motion to Dismiss*[36] pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendant argues that under the applicable statutes and interpreting jurisprudence, neither Vetter Communications' Renewal Interest nor Vetter's Recaptured Copyright Interest have any effect outside of the United States.[37] In other words, Defendant contends that the Notice of Termination only resulted in Vetter's recapture of domestic rights in the Song, and that Vetter Communications' Renewal Interest that it purchased from Smith's heirs is also limited to domestic rights.

In opposing Defendant's motion, Plaintiffs rely on the history, development, and purposes of United States copyright law to assert an admittedly "novel theory of recovery."[38] Defendant argues that a straightforward reading of the applicable statutory provisions and case law requires dismissal of Plaintiffs' claims.

---

[33] *Id.* at ¶ 124(i).
[34] *Id.* at ¶ 124(ii).
[35] *Id.* at ¶ 124(iii). Plaintiffs also seek to enjoin Defendant from such exploitation.
[36] Rec. Doc. 12.
[37] Rec. Doc. 12-1, pp. 1–2.
[38] Rec. Doc. 17, p. 6.

## II.   LAW AND ANALYSIS

### A.  Motion to Dismiss Under Rule 12(b)(6)

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[39] The Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[40] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[41]

In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss: "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[42] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[43] However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference" that the Plaintiff is entitled to relief.[44] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility" of entitlement to relief.[45] "Furthermore, while the court must accept well-pleaded facts as true, it will not

---

[39] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir. 2004)).

[40] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal citations omitted).

[41] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)).

[42] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and brackets omitted).

[43] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

[44] *Id*.

[45] *Id*.

'strain to find inferences favorable to the plaintiff.'"[46] On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."[47]

On a Rule 12(b)(6) motion, a court is authorized "to dismiss a claim on the basis of a dispositive issue of law."[48] As the Supreme Court explains, dismissal is warranted whenever a claim is based on an invalid legal theory:

> Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. On the contrary, if as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' ... a claim must be dismissed, without regard to whether it is based on an outlandish legal theory, or on a close but ultimately unavailing one.[49]

When a complaint fails to satisfy these principles, "this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."[50]

### B. Copyright Law in General

The dispute in this case results in large part from the parties' differing understandings of the broader concept of how a United States copyright operates with respect to foreign countries. This section is intended to summarize the parties' positions on this overarching issue, which provides needed context to the arguments under Count One and Count Two.

---

[46] *Taha v. William Marsh Rice Univ.*, 2012 WL 1576099, at *2 (S.D. Tex. 2012) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).
[47] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).
[48] *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citations omitted).
[49] *Id.* at 327 (internal citation omitted).
[50] *Cuvillier v. Sullivan,* 503 F.3d 397, 401 (5th Cir.2007) (quoting *Twombly,* 550 U.S. at 558).

### i.    United States Copyright Law

Two mechanisms under different versions of the United States Copyright Act are at issue: renewals under the 1909 Act and terminations under the 1976 Act. The 1909 Copyright Act provides for two distinct ownership terms: the initial term and the "renewal term."[51] After the initial term ends, a renewal term can be effected and claimed by the author, if living, or by the author's heirs.[52] The renewal provision of the 1909 Act states:

> [T]he author of [a copyrighted] work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright.[53]

By establishing this right of renewal, "Congress attempted to give the author a second chance to control and benefit from his work. Congress also intended to secure to the author's family the opportunity to exploit the work if the author died before he could register for the renewal term."[54] Put another way, "[t]he renewal term permits the author, originally in a poor bargaining position, to renegotiate the terms of the grant once the value of the work has been tested."[55]

The 1976 Act became effective on January 1, 1978. For works (like the Song in this case) that were still in their original copyright term as of the effective date, the 1976 Act preserved the renewal right. For such works, the original copyright would "endure for

---

[51] *Stewart v. Abend*, 495 U.S. 207, 217 (1990).
[52] *Id.*
[53] *Id.* (quoting 17 U.S.C. § 24 (1976 ed.)). This provision was originally found at § 23 of the 1909 Act.
[54] *Id.* at 218.
[55] *Id.* at 218–219.

28 years from the date it was originally secured."[56] With respect to the renewal copyright, the 1976 Act provides that "the widow, widower, or children of the author, if the author is not living … shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years."[57]

However, for works created *after* the effective date of the 1976 Act, the "dual term" system (i.e., the division between the original term and renewal term) of the 1909 Act was abolished in favor of a unitary term based on the life of the author plus fifty (later increased to seventy) years. Unlike the 1909 Act, the 1976 Act provides authors the ability to terminate grants of rights to third parties in a copyright fifty-six years after the original copyright was secured.[58] This termination right was created to replace the renewal right as the author's "second chance" at benefitting from his work.[59] According to the legislative history of the 1976 Act, "[rights of termination] are based on the premise that the reversionary provisions of the present section on copyright renewal [in the 1909 Act] should be eliminated, and that the proposed law should substitute for them a provision safeguarding authors against unremunerative transfers."[60] Pertinent to this case, Section 304(c) of the 1976 Act provides that, "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978, … the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, … is subject to termination."[61] The reversion of rights that results from the termination is subject to several limitations in the statute, one of which is as follows:

---

[56] 17 U.S.C. § 304(a)(1)(A).
[57] 17 U.S.C. § 304(a)(1)(C).
[58] 17 U.S.C. § 304(c)(3).
[59] *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 134 (2d Cir. 2022).
[60] H.R. Rep. No. 94-1476, 124, 1976 U.S.C.C.A.N. 5659, 5740.
[61] 17 U.S.C. § 304(c).

> Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.[62]

The dispute in this case calls for a consideration of whether renewals under the 1909 Act and terminations under the 1976 Act have effect outside of the United States.

### ii.    The "Principle of Territoriality"

Both parties discuss a concept of general copyright law known as the "principle of territoriality." This principle recognizes that, "with limited exception, the 'copyright laws generally do not have extraterritorial application.'"[63] Defendant takes this principle to mean that "copyright protection in one country does not extend to or affect protection in any other country,"[64] and that "U.S. copyright law [has] no reach outside U.S. borders."[65] This, Defendant argues, supports dismissal of Plaintiffs' claims to foreign rights to the Song because the mechanisms by which Plaintiffs' interests were purportedly obtained (i.e., Notice of Termination and renewal) are functions of United States copyright law and cannot affect foreign rights that Plaintiffs previously granted away.[66]

Plaintiffs caution against "leaning too heavily" on the principle of territoriality.[67] Plaintiffs acknowledge that "[i]n copyright jurisprudence, this principle has been used to refuse application of the Copyright Act to acts of purely extraterritorial *infringement*."[68] Thus, Plaintiffs concede that United States copyright law cannot provide a remedy for an

---

[62] 17 U.S.C. § 304(c)(6)(E).
[63] *Jaso v. Coca Cola Co.*, 537 F. App'x 557, 560 (5th Cir. 2013) (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir.1988)).
[64] Rec. Doc. 12-1, pp. 6–7.
[65] *Id.* at p. 15.
[66] *Id.* at pp. 1–2, 6–7, 14–16.
[67] Rec. Doc. 17, p. 8.
[68] *Id.* (citing *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 791 (5th Cir. 2017)(emphasis added).

infringement occurring in a different country.[69] However, Plaintiffs explain that this case is not about *conduct* (i.e., infringement); rather, this case concerns *rights* (i.e., ownership) in the Song.[70] Plaintiffs argue that questions of ownership are treated differently than questions of infringement, with ownership questions being answered by the law of the country where the work was created (here, the United States).[71] Thus, Plaintiffs state that, "to the extent the defendant argues that the principle of territoriality prevents ownership events occurring in one country (*e.g.*, renewal or reversion) from having any effect or consequence in another country, that argument relies on a vast overstatement of the principle [of territoriality]."[72]

### iii.    Copyright Interests Across Multiple Countries

Based on their differing interpretations of the principle of territoriality, the parties diverge on a related issue heavily influences the outcome of this dispute. Defendant believes "the U.S. Copyright Act, together with the implementing legislation of each other member country, creates multiple and separate copyright interests in each country, rather than a single overarching international master copyright that each country is required to honor."[73] Under Defendant's reasoning, this means that Vetter Communications' Renewal Copyright Interest and Vetter's Recaptured Interest only encompass domestic rights in the Song; in other countries, the copyright interests are "separate" and thus unaffected by the termination and the renewal.[74]

---

[69] *Id.* at 9.
[70] *Id.*
[71] *Id.* (citing *Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.*, 89 F. Supp. 2d 840, 843 (E.D. Tex. 2000)).
[72] *Id.* at 10.
[73] Rec. Doc. 12-1, p. 8.
[74] *Id.* at pp. 1–2, 6–7, 14–16.

Plaintiffs acknowledge that there is no "international copyright."[75] Instead, according to Plaintiffs, domestic protections are extended to works of foreign origin by way of obligations from membership in treaties or conventions such as the Berne Convention for the Protection of Literary and Artistic Works (the "Berne Convention"). The Supreme Court has stated that the Berne Convention "is the principal accord governing international copyright relations."[76] Highlighting some of the main features of the Berne Convention, the Court further stated:

> Members of the Berne Union agree to treat authors from other member countries as well as they treat their own. Nationals of a member country, as well as any author who publishes in one of Berne's 164 member states, thus enjoy copyright protection in nations across the globe. Each country, moreover, must afford at least the minimum level of protection specified by Berne.[77]

Continuing, Plaintiffs argue that there is only a single copyright interest in a given work, granted by the issuing country (here, the United States) and then conventionally "recognized" and protected by other countries pursuant to the Berne Convention.[78] Accordingly, under Plaintiffs' reasoning, "the plaintiffs' recapture of that one copyright [through renewal or termination] leaves the defendant with nothing. In that instance, the plaintiffs' domestic rights yield to them the right to exploit [the Song] *everywhere* without interference from its former owner."[79]

With these overarching principles in mind, the Court turns to the arguments on the specific claims in the Complaint.

---

[75] Rec. Doc. 17, p. 6.
[76] *Golan v. Holder*, 565 U.S. 302, 306–07 (2012).
[77] *Id.* at 308 (citing Berne Convention, Sept. 9, 1886, as revised at Stockholm on July 14, 1967, Arts. 1, 5(1), 2(6), 3, 5(2) (hereinafter "Berne Convention")).
[78] Rec. Doc. 17, pp. 10–13, 18.
[79] *Id.* at 13.

**C. Analysis of Count One: Vetter Communications' Renewal Copyright Interest**

Count One of the Complaint calls for a determination of whether Vetter Communications' Renewal Copyright Interest, which it purchased from Smith's heirs, includes rights to exploit the Song in foreign countries. Plaintiffs say that it does, and Defendant says that it does not.

Under the 1976 Act (for works created prior to its enactment) and the 1909 Act, if the author died before the end of the initial copyright term, the author's heirs could obtain the renewal copyright. The renewal copyright was understood to "provide the author's family a 'new estate' if the author died before the renewal period arrived."[80] Plaintiffs assert that the renewal right is not geographically limited to the United States and, therefore, the right encompasses the exploitation of the Song in foreign countries.

Two Supreme Court cases provide further background context to the issue in Count One. In *Fred Fisher Music Co. v. M. Whitmark & Sons*, the Supreme Court held that authors could assign away their renewal interests under the 1909 Act.[81] Later, in *Stewart v. Abend*, the Court expressed that "if the author dies before the commencement of the renewal period, the assignee holds nothing."[82] Put another way, an author's assignment of his renewal interest is "contingent" on the author's survival at the start of the renewal period.

Based on *Fred Fisher* and *Stewart*, it is not disputed in this case that Smith's Initial Assignment to Windsong of his Renewal Copyright Interest was a facially valid transfer. It is also undisputed that this transfer to Windsong was dependent upon Smith's survival

---

[80] *Stewart*, 495 U.S. at 220.
[81] 318 U.S. 643, 657 (1943).
[82] 495 U.S. at 220 (citing *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373 (1960)).

of the commencement of the renewal period; that Smith died before this time; and that, as a result, Smith's promise of his renewal interest was unenforceable by Windsong. Smith's Renewal Copyright Interest instead vested in Smith's heirs and was later purchased by Vetter Communications. The disagreement arises where Plaintiffs assert that Vetter Communications' Renewal Interest includes both domestic and foreign rights to the Song. Defendant argues he retained the foreign rights notwithstanding Vetter Communications' Renewal Copyright Interest.

The primary case Defendant relies on in moving to dismiss Count One is *Stewart v. Abend*.[83] Defendant claims that in *Stewart*, "the Supreme Court held that the heirs of a deceased author recapture *only* the unvested, contingent renewal-term rights that such author may have granted before dying prior to the vesting of those rights."[84] Defendant further argues that, unlike the domestic renewal rights, foreign rights assigned by the author are *vested* and *non*contingent.[85]

The issue in *Stewart* involved the rights of the owner of a derivative work against the rights of the successor owner (following the death of the author) of the pre-existing work during the renewal period of the pre-existing work.[86] The Court, citing its prior decision in *Miller Music Corporation v. Charles N. Daniels, Inc.*,[87] held that the successor to the pre-existing work (i.e., the author's heir or executor) had superior rights in the

---

[83] 495 U.S. 207 (1990).
[84] Rec. Doc. 12-1, p. 2 (emphasis in original).
[85] Defendant argues that: "As to the U.S. renewal term, however – and *only* as to the U.S. renewal term -- *Stewart* holds that it is only a grant of an unfulfilled expectancy. As to all other rights conveyed by the author, *i.e.,* foreign rights, the effect of the grant should remain unchanged, because the foreign rights granted are *not mere expectancies* but valid full-term rights under the copyright laws of other countries, fully vested in the author for their entire duration *ab initio.*" *Id. at 15.*
[86] *Stewart*, 495 U.S. at 211.
[87] 362 U.S. 373 (1960).

renewal period; in other words, the successor's renewal copyright trumped the rights of the assignee:

> After *Miller Music,* if the author dies before the commencement of the renewal period, the assignee holds nothing. If the assignee of all of the renewal rights holds nothing upon the death of the assignor before arrival of the renewal period, then, *a fortiori,* the assignee of a portion of the renewal rights, *e.g.,* the right to produce a derivative work, must also hold nothing.[88]

The Court pauses to note here that a literal reading of the quoted is contrary to Defendant's position. Nonetheless, Defendant says the case favors his position. Defendant points out that in *Stewart,* the Supreme Court explained that "the heirs' ownership after the author's death is not the result of the author's grant being voided, set aside, or superseded in any way, but simply the result of the contingent nature of the rights held by the author during the first term."[89] The *Stewart* Court, quoting legislative history of the 1909 Act, did make clear that "[t]he right of renewal is contingent."[90] But the decision did not indicate, as Defendant argues, that "only" the grant of U.S. rights are contingent upon the author's survival, or that "only" the U.S. rights revert to the successor unencumbered in the event of the author's death. Defendant's focus on the contingent nature of the renewal right does not confront the more central question: whether foreign exploitation rights are encompassed within that contingent renewal right. Indeed, as Plaintiffs point out, the *Stewart* decision says nothing at all about the geographical scope of a renewal copyright interest, which is the issue faced in Count One.[91] In the Court's

---

[88] *Stewart*, 495 U.S. at 220–221.
[89] Rec. Doc. 12-1, p. 13 (citing *Stewart*, 495 U.S. at 219).
[90] *Stewart*, 495 U.S. at 219 (quoting 5 Legislative History of the 1909 Copyright Act, Part K, p. 77 (E. Brylawski & A. Goldman eds. 1976) (statement of Mr. Hale)).
[91] Rec. Doc. 17, p. 17.

view, Defendant stretches the holding of *Stewart* and overstates the extent to which it aids his position.

Plaintiffs argue that much of *Stewart* supports their position. The Supreme Court was explicit in conveying that when an author dies before the renewal period commences, the author's successors "obtain the renewal copyright *free of any claim* founded upon an assignment made by the author,"[92] the renewal right "creates a *new estate* … *clear of all rights, interests or licenses* granted under the original copyright,"[93] and an assignee of those rights prior to the author's death "holds *nothing*."[94] Plaintiffs read this language to mean that:

> Applied here, given that the defendant's "claim" to foreign exploitation rights is indisputably "founded upon" the worldwide grant in the 1963 [Initial] Assignment made by Mr. Smith "during his lifetime," *Stewart* suggests that Windsong's (and thus, the defendant's) rights in Mr. Smith's interest in Double Shot were extinguished *in their entirety* when his heirs were vested with the Renewal Copyright Interest. [95]

The *Stewart* Court relied on the legislative history of the 1909 Act which provides: "If [the author] is alive at the time of renewal, then the original contract may pass it, but his widow or children or other persons entitled *would not be bound by that contract*."[96] The Court explained that "the renewal provisions [of the 1909 Act] were intended to give the author a second chance to obtain fair remuneration for his creative efforts and to provide the author's family a 'new estate' if the author died before the renewal period

---

[92] *Stewart,* 495 U.S. at 219 (quoting *Miller Music*, 362 U.S. at 375) (emphasis added).

[93] *Id.* at 218 (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir. 1951)) (emphasis added).

[94] *Id.* at 220 (emphasis added).

[95] Rec. Doc. 17, p. 18.

[96] *Stewart*, 495 U.S. at 220 (quoting 5 Legislative History of the 1909 Copyright Act, Part K, p. 77 (E. Brylawski & A. Goldman eds. 1976) (statement of Mr. Hale)) (emphasis added).

arrived."[97] Plaintiffs argue the legislative intent and the Supreme Court's interpretation are best served if all rights, domestic and foreign, revert back upon the renewal.

*Stewart* does not hold or suggest that an inherited renewal is limited to domestic rights only. The Court is persuaded that *Stewart,* fairly read, supports the Plaintiffs' legal theory.

Defendant also relies on *Rohauer v. Killiam Shows, Inc.*,[98] a case from the Southern District of New York. Defendant says that the case "clearly contemplates that foreign rights do not revert to the author's estate under the principle articulated in *Stewart.*"[99] In *Rohauer*, a British author assigned worldwide rights to make a motion picture of his novel to Moskowitz.[100] The author died, and her heir later obtained a United States renewal copyright in the novel.[101] The heir subsequently transferred her interest in the renewal copyright to the plaintiff, Rohauer.[102] Later, Moskowitz's motion picture version of the novel was broadcast on television without a license from Rohauer, and Rohauer sued for copyright infringement.[103] Rohauer argued that the author's death and the heir's subsequent attainment of the renewal copyright extinguished all of Moskowitz's rights that the author had previously assigned.[104]

Defendant relies on dicta in *Rohauer* that "Rohauer was at that moment vested only with rights to the work in the United States."[105] However, Defendant fails to provide context. The court was considering an affirmative defense asserted by Moskowitz based

---

[97] *Id.*
[98] 379 F. Supp. 723 (S.D.N.Y. 1974), *rev'd on other grounds*, 551 F.2d 484 (2d Cir. 1977).
[99] Rec. Doc. 12-1, p. 14.
[100] *Rohauer*, 379 F. Supp. at 725.
[101] *Id.*
[102] *Id.*
[103] *Id.* at 726.
[104] *Id.* at 727.
[105] Rec. Doc. 12-1, p. 14 (quoting *Rohauer*, 379 F. Supp. at 735).

on the language of the agreement assigning the author's heir's renewal rights to Rohauer.[106] Specifically, the author's heir's assignment to Rohauer, by its language, conveyed "all the undersigned's right, title and interest (if any) in and to the motion picture and television rights," with a parenthetical stating, "the world motion picture rights in such literary property having been sold by [the author] in December 1925 to Joseph H. Moskowitz."[107] Moskowitz argued that inclusion of the parenthetical phrase which acknowledged the prior assignment made clear that the agreement did not convey to Rohauer the world motion picture rights that were previously assigned to Moskowitz.[108] The court disagreed, finding that the argument "ignores the principle that assignments of rights made during the original term of the copyright do not bind those who succeed to the renewal rights."[109] The court further explained that the motion picture rights in some countries would not have reverted to the heir until three years after the heir's assignment to Rohauer according to the law of those countries, and thus, "Rohauer was at that moment vested only with rights to the work in the United States; in other countries, the motion picture rights would not have reverted to [the author's heir] for at least three more years."[110]

The Court does not read *Rohauer* for the broad proposition that "foreign rights do not revert to the author's estate under the principle articulated in *Stewart*,"[111] as argued by Defendant. *Rohauer* provides no analysis of the geographical scope of renewal rights

---

[106] *Rohauer*, 379 F. Supp. at 734. The Court notes that the particulars of the agreement whereby Vetter Communications purchased Smith's heirs' Renewal Copyright Interest is not a direct point of contention in this case. Accordingly, the Court does not find this piece of *Rohauer* highly pertinent to the facts of the instant dispute.
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.* at 735.
[111] Rec. Doc. 12-1, p. 14.

themselves. In fact, the court only suggested that the rights in certain countries had not *yet* reverted back to the heir based on the laws of those countries. The court did not suggest that an heir could *never* obtain those rights. To the contrary, the court recognized that when the successor of a deceased author obtains a renewal, he receives "a new and independent right in the copyright, free and clear of any rights, interests, or licenses attached to the copyright for the initial term,"[112] and that successors to the renewal rights "'are not bound by any assignment executed by the author (or by any assigning member of a prior renewal class) so that the assignee takes nothing.'"[113] The *Rohauer* court did not restrict these principles to domestic rights. Plaintiffs also point out that *Rohauer* is factually distinguishable because the author was British, and the United States was not the novel's country of origin.[114] This, Plaintiffs argue, makes it unsurprising that "any renewal right afforded to this British work under United States law would properly be viewed as having no effect elsewhere," as the *Rohauer* court found.[115] In sum, Defendant's two-sentence presentation of *Rohauer* is a significant oversimplification and does not provide persuasive authority for his position.

Defendant urges that *Stewart*, *Rohauer*, and the principle of territoriality "require the conclusion that the reversion of U.S. renewal-term rights to the author's estate under *Stewart* does not affect a transferee's continued ownership of foreign rights."[116] As noted before, Defendant's central point in support of this position is that, unlike domestic rights, foreign rights are *vested* and *noncontingent*; as such, "[o]nly the U.S. renewal rights are

---

[112] *Rohauer*, 379 F. Supp at 727 (citations omitted).
[113] *Id.* (quoting Nimmer on Copyright, § 117.3).
[114] Rec. Doc. 17, p. 21.
[115] *Id.*
[116] Rec. Doc. 12-1, p. 14.

'expectancies' and they are therefore the only rights that fall under the reasoning of *Stewart*, by the terms of *Stewart* itself."[117]

Plaintiffs counter that Defendant's "fully vested foreign rights" theory is unsupported by the cases Defendant cites, and that it wrongly assumes that there are multiple and separate copyright interests in a single work in each given country throughout the world.[118] As explained before, Plaintiffs posit that "there is only one copyright, afforded in the work's country of origin and then recognized by the international community pursuant to treaty obligations."[119] In other words, the United States copyright carries with it the availability of protection in Berne Convention member countries. Plaintiffs contend this defeats Defendant's argument that foreign rights are vested and noncontingent because "[f]oreign recognition of the United States renewal copyright would belong to the owner thereof, meaning that foreign rights are no less an 'expectancy' than the potential second term itself."[120] To support this theory, Plaintiffs rely on *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, where the Second Circuit explained that "[c]opyright is a form of property, and the usual rule is that the interests of the parties in property are determined by the law of the state with 'the most significant relationship' to the property and the parties."[121] The Second Circuit acknowledged that in a case of *infringement*, the law of the country where the infringement occurred would govern, but stated that "the *nature of a copyright interest* is an issue distinct from the issue of whether the copyright has been *infringed*."[122] Since the work's country of origin in that case was

---

[117] *Id.* at 15.
[118] Rec. Doc. 17, p. 18.
[119] *Id.*
[120] *Id.* at pp. 18–19.
[121] 153 F.3d 82, 90 (2d Cir. 1998) (quoting Restatement (Second) of Conflict of Laws § 222).
[122] *Id.* at 91 (citing *Kregos v. Associated Press,* 937 F.2d 700, 709–10 (2d Cir.1991)) (emphasis added).

Russia, the ownership question was determined by Russian law.[123] As succintly stated by the Eastern District of Texas, "ownership is determined by the law of the country in which the work is created but infringement is governed by the law where the infringement took place."[124]

Applying *Itar-Tass*, Plaintiffs argue that Defendant "consistently conflates the law applicable to the scope of protection afforded pursuant to the principle of national treatment,[125] and the determination of *who* is entitled to receive and enforce that protection."[126] Plaintiffs argue the instant dispute concerns ownership and thus should be decided by the law of the United States, the Song's country of origin. Thus, Plaintiffs contend that by holding the United States renewal copyright, Vetter Communications is the party entitled to copyright ownership in the Song, and this singular right of ownership encompasses worldwide exploitation and protection pursuant to the Berne Convention.

Defendant counters that *Itar-Tass* is inapplicable because that case is about *initial* copyright ownership, whereas this case concerns *transfers* of ownership.[127] Indeed, the *Itar-Tass* court expressly stated in a footnote: "In deciding that the law of the country of origin determines the ownership of copyright, we consider only initial ownership, and have no occasion to consider choice of law issues concerning assignments of rights."[128] Plaintiffs acknowledge this fact but point to other cases that do address ownership through assignment, including *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*[129]

---

[123] *Id.*
[124] *Edmark Indus. SDN. BHD.*, 89 F. Supp. 2d at 843 (citing *Itar-Tass*, 153 F.3d 82).
[125] The "principle of national treatment" under the Berne Convention "simply assures that if the law of the country of infringement applies to the scope of substantive copyright protection, that law will be applied uniformly to foreign and domestic authors." *Itar-Tass*, 153 F.3d at 89.
[126] Rec. Doc. 17, p. 23.
[127] Rec. Doc. 23, p. 4.
[128] *Itar-Tass*, 153 F.3d at 91 n.11.
[129] 2016 WL 7507757 (S.D.N.Y. Dec. 30, 2016). *See also* Rec. Doc. 27, p. 4.

That case involved an assignment of all rights to certain musical works throughout the world.[130] The New York district court, citing *Itar-Tass*, stated that, "[a]s a general matter, the law of the jurisdiction where an artistic work is 'created' and 'first published' governs issues concerning copyright *ownership*."[131] While noting that jurisprudence regarding *assignment* of copyright is not well developed, the court reasoned that issues of assignment are more analogous to ownership than to infringement.[132] Accordingly, the court concluded that Italian law applied to the dispute because Italy had the most significant relationship to the parties' interests.[133]

In the Court's view, the parties' arguments all lead back to the overarching integral issue of the nature of a United States copyright in a work that is exploited abroad. As discussed, Defendant believes there are "multiple and separate copyright interests in each country."[134] Plaintiffs disagree and assert that "there is only one copyright in [the Song], which copyright is respected throughout the Berne Convention."[135] The answer to this question is largely determinative because it dictates whether the renewal copyright can legally be said to encompass rights to exploit the Song in other countries.

The Plaintiffs' theory is plausible. Defendant points to no authority, and the Court has found none, that directly supports the theory that the Berne Convention creates separate copyrights in each of the member countries. The Ninth Circuit describes this country's membership in the Berne Convention as follows: "[B]ecause the United States joined the Berne Convention, it is required *to afford foreign copyright holders the same*

---

[130] *Id.* at *1.
[131] *Id.* at *3 (emphasis in original).
[132] *Id.*
[133] *Id.* at *4.
[134] Rec. Doc. 12-1, p. 8.
[135] Rec. Doc. 17, p. 13.

*protection* as holders of domestic copyrights."[136] From this language it is more plausible that protection in member countries is attendant to the U.S. copyright rather than the conclusion that each member country grants an entirely separate and new copyright by virtue of the Berne Convention. The Plaintiffs plausibly argue that the ownership question is different than the question of protection from infringement. "In cases where a foreign work is allegedly infringed in the United States, the first element of a copyright claim (whether copyright ownership exists at all) is determined by the law of the country which has the closest relationship to the work."[137] Here, it is not in dispute that the United States has the closest relationship to the Song. The ownership of the renewal copyright should therefore be determined by the United States Copyright Act, which created the renewal right to provide the author or his heirs a completely new estate, clear of any rights that the author granted away during the original copyright term.[138] The Court sees no compelling reason why these principles should not apply abroad where the author granted away worldwide rights to begin with; this gives the author's heirs a new estate clear of all rights that were granted away, as evidently intended by the legislature and as articulated by the Supreme Court in *Stewart*. Once the preliminary ownership question is answered by the country of origin, foreign law would apply to an infringement or other conduct relating to the work occurring in that foreign country.

Furthermore, Plaintiffs point out that unlike the Berne Convention, the Paris Convention (applicable to patents and trademarks) makes it express that there are

---

[136] *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1078 (9th Cir. 2022) (cleaned up) (citation omitted) (emphasis added).
[137] *Cong v. Zhao*, No. 2:21-CV-01703-TL, 2024 WL 3091187, at *3 (W.D. Wash. June 21, 2024) (citation omitted).
[138] *See Stewart*, 495 U.S. at 218–221.

multiple and separate interests in patents and trademarks in different countries. With respect to patents, the Paris Convention states: "Patents applied for in the various countries of the Union by nationals of countries of the Union shall be independent of patents obtained for the same invention in other countries, whether members of the Union or not."[139] The Paris Convention contains similar express language regarding trademarks: "A mark duly registered in a country of the Union shall be regarded as independent of marks registered in the other countries of the Union, including the country of origin."[140] Additionally, Plaintiffs note that patent legislation also directly conveys this concept: "Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention *throughout the United States*…"[141] The Court agrees with Plaintiffs' observation that this clarity regarding territorial reach is absent in the Berne Convention and copyright legislation; as the Fifth Circuit has observed, "[t]he Copyright Act does not express its limit on territorial reach."[142]

If the Defendant's "multiple and separate copyrights" theory fails, the related theory that foreign rights assigned by an author are "noncontingent" and "vested" in the assignee such that an author's early death does not result in the reversion of foreign rights to the author's successors likewise fails. At the outset, the Court notes that Defendant failed to cite any legal authority directly supporting this theory, which is the crux of his argument. Once a United States work receives a United States copyright, that work "automatically

---

[139] Paris Convention for the Protection of Industrial Property, July 14, 1967, 21 U.S.T. 1583, T.I.A.S. No. 6923, Art. 4*bis*(1).
[140] *Id.* at Art. 6(3).
[141] 35 U.S.C. § 154(a)(1) (emphasis added).
[142] *Geophysical*, 850 F.3d at 791.

'enjoy[s] copyright protection in nations across the globe' pursuant to the Berne Convention."[143] Thus, the renewal of that United States copyright is contingent,[144] and that United States copyright automatically carries with it the ability to be recognized by other Berne Convention signatories. It reasonably follows that those rights of foreign recognition are no less "contingent" than the domestic rights during the renewal period.

This result is in accordance with the *Stewart* Court's view that the renewal copyright term is "completely separate" from the original term and that the renewal term creates a "new estate" clear of any rights granted under the original copyright.[145] It also bears mentioning again that the Supreme Court, without making any mention of geographic reservations, unequivocally stated that "the assignee of all of the renewal rights holds **nothing** upon the death of the assignor before arrival of the renewal period."[146] Defendant has failed to submit sufficient authority to persuade the Court that the words "holds nothing" should be interpreted to mean "holds exclusive rights in all countries other than the United States." Accordingly, the Court finds the Plaintiffs have demonstrated more than a sheer possibility of entitlement to relief. The Plaintiffs legal theory that foreign exploitation of the Song is included in Vetter Communications' Renewal Copyright Interest is plausible. The *Motion to Dismiss* is DENIED as to Count One.

---

[143] *Lexmark Int'l, Inc. v. Impression Prod., Inc.*, 816 F.3d 721, 762 (Fed. Cir. 2016), *rev'd on other grounds*, 581 U.S. 360 (2017) (quoting *Golan*, 565 U.S. at 309).
[144] *Stewart*, 495 U.S. at 219.
[145] *Id.* at 218 (citing *G. Ricordi & Co.*, 189 F.2d at 471).
[146] *Id.* at 220.

**D. Analysis of Count Two: Vetter's Recaptured Interest through the Notice of Termination**

Count Two presents the following question: Does a Notice of Termination under Section 304 of the Copyright Act of 1976 result in the author's recapture of both domestic and foreign rights to a work?

17 U.S.C. § 304(c) provides for the termination of previous grants of rights in a renewal copyright as follows:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination. …

Unlike the renewal right, the termination right is inalienable and can be effected "notwithstanding any agreement to the contrary."[147]

Pertinent to this dispute, Subsection (c)(6)(E) provides the following limitation on this right of termination:

> Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

Defendant contends that 17 U.S.C. § 304(c)(6)(E) unambiguously means that Vetter's Notice of Termination and resultant Recaptured Interest is limited to domestic rights in the Song and does not encompass the right to exploit it in foreign countries.[148] Again, Defendant posits that there are multiple and separate copyright interests in a work in each given country where the work is exploited, as opposed to a single overarching

---

[147] 17 U.S.C. § 304(c)(5).
[148] Rec. Doc. 12-1, p. 2.

copyright that each country is required to honor or recognize.[149] Thus, Defendant argues that "[c]opyright protection arises from the domestic law of each country in which protection is claimed."[150] Accordingly, Defendant reads Subsection (c)(6)(E) to mean that a termination only affects domestic rights (i.e., "rights covered by the grant that arise under this title"), and does not result in termination of the assignee's rights to exploit the work in other countries (i.e., "in no way affects rights arising under any other Federal, State, or foreign laws.").

Defendant primarily relies on a case from the Central District of California, *Siegel v. Warner Bros. Entertainment, Inc.*[151] The case involved an author's worldwide grant in ownership rights to his creative work.[152] The author later died. Years later, the heirs of the deceased author served notices of termination upon the assignees of the author's prior grant, made defendants in the action.[153] The defendants raised several challenges to the scope of the termination notices. One of those challenges required the court to consider "[t]he parameters of what was recaptured (and the rights flowing therefrom) through the termination notices, namely, [ ] whether plaintiffs have a right to defendants' post-termination foreign profits from the exploitation of the [ ] copyright."[154]

The *Siegel* court noted that it could not find a single case that had addressed the issue of whether a notice of termination resulted in the recapture of rights to foreign profits.[155] Nonetheless, the court decided that under Section 304(c)(6)(E),

> the statutory text could not be any clearer on this subject. Through this section, Congress expressly limited the reach of

---

[149] *Id.* at p. 8.
[150] *Id.*
[151] 542 F. Supp. 2d 1098 (C.D. Cal. 2008).
[152] *Id.* at 1107.
[153] *Id.* at 1114.
[154] *Id.* at 1116.
[155] *Id.* at 1140.

> what was *gained* by the terminating party through exercise of
> the termination right; specifically, the terminating party only
> recaptured the *domestic* rights (that is, the rights arising under
> title 17 to the United States Code) of the grant to the copyright
> in question. Left expressly intact and undisturbed were any of
> the rights the original grantee or its successors in interest had
> gained over the years from the copyright through other
> sources of law, notably the right to exploit the work abroad that
> would be governed by the copyright laws of foreign nations.
> Thus, the statute explains that termination "in no way affects
> rights" the grantee or its successors gained "under foreign
> laws."[156]

Thus, the *Siegel* court found that rights that "arise under this title" as stated in Section 304 means "domestic rights." The court found support for this conclusion from scholarly work by Professor David Nimmer, a leading commentator on copyright law, quoting him as follows:

> A grant of copyright "throughout the world" is terminable only
> with respect to uses within the geographic limits of the United
> States. Because copyright has no extraterritorial operation,
> arguably American law is precluded from causing the
> termination of rights based upon foreign copyright laws. …
> The conclusive answer to this problem lies in the text of the
> termination provisions of the Copyright Act, which expressly
> provide that statutory termination "in no way affects rights
> arising under ... foreign laws"—that is, under foreign copyright
> (not contract) laws. Thus, even if the conflicts rule of a foreign
> nation were to call for application of the American termination
> rule as a rule of contract law, that rule by its own terms excepts
> from termination the grant of those rights arising under foreign
> copyright laws.[157]

*Siegel* also quoted another commentator who stated: "Accordingly, where a U.S. author conveys worldwide rights and terminates under either section, grants in all other countries remain valid according to their terms or provisions in other countries' laws."[158]

---

[156] *Id.*
[157] *Id.* at 1140–1141 (quoting 3 Nimmer on Copyright § 11.02[B][2] at 11–19).
[158] *Id.* at 1141 (quoting Patry on Copyright § 25:74).

In addition to *Siegel*, Defendant cites two other cases where courts indicated that a Section 304 termination does not terminate an assignee's rights to foreign exploitation of a copyrighted work. In *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,[159] although it was not the issue being directly considered, the Second Circuit indicated that when the author's heirs executed a Section 304 termination, the prior assignee's "domestic rights in the song" reverted to the author's heirs, but the assignee retained the foreign rights.[160] Defendant also cites *Clancy v. Jack Ryan Enterprises, Ltd.*, where the District of Maryland relied almost exclusively on *Siegel* to determine that "the worldwide grant of copyright is only subject to termination insofar as its U.S. component is concerned, but not subject to termination in the rest of the world."[161]

Plaintiffs acknowledge that "the few courts to consider the geographical scope of termination rights have ruled contrary to the plaintiffs' position."[162] Nonetheless, Plaintiffs argue Defendant's reasoning, and that of the cases he cites, is flawed.[163] Summarily, Plaintiffs' argument is that: "Foreign protection for United States works 'arises' not from a multiplicity of foreign copyrights around the world, but rather when treaty partners agree to recognize copyrights that 'arise' in accordance with the Copyright Act."[164] Thus, Plaintiffs conclude that under Section 304(c)(6)(E), the termination results in the recapture of foreign rights because they, like domestic rights, "arise under" the United States Copyright Act.

---

[159] 155 F.3d 17 (2d Cir. 1998).
[160] *Id.* at 20.
[161] No. CV ELH-17-3371, 2021 WL 488683, at *46 (D. Md. Feb. 10, 2021).
[162] Rec. Doc. 27, p. 2.
[163] Rec. Doc. 17, pp. 32–35.
[164] Rec. Doc. 1, ¶ 33.

Plaintiffs note that the *Siegel* court cited no judicial authority for its decision on the termination issue, apparently considering the question as a matter of first impression.[165] Plaintiffs caution that the job of statutory interpretation should not be outsourced to scholars such as Professors Nimmer and Patry and note the minimal analysis of the *Siegel* court apart from citing the scholars' opinions.[166] Furthermore, while the *Siegel* court cited "the longstanding rule 'that the copyright laws [of this country] have no application beyond the U.S. border,'"[167] Plaintiffs argue this rule should not have been controlling on the ownership question under the reasoning of the Second Circuit in *Itar-Tass*, discussed *supra.*

Turning to the statute itself, Plaintiffs contend the language of Section 304(c)(6)(E) is not free from ambiguity on this issue. Specifically, Plaintiffs assert that the phrase "under this title" in the Copyright Act has been deemed ambiguous and lacking geographic significance.[168] In this regard, Plaintiffs rely on the Supreme Court's opinion in *Kirtsaeng v. John Wiley & Sons, Inc.*,[169] which was decided after *Siegel*. The Supreme Court considered the meaning of the words "lawfully made under this title" in the context of the "first sale doctrine," located at Section 109(a) of the Copyright Act.[170] The first sale doctrine allows the owner of a copy of a work "lawfully made under this title" (i.e., the Copyright Act) to resell that copy without the authority of the copyright owner.[171] The Court specifically considered whether the words "under this title" restricted the first sale doctrine

---

[165] Rec. Doc. 17, p. 33.
[166] *Id.*
[167] *Siegel*, 542 F. Supp. 2d at 1141 (quoting *Los Angeles News Serv. v. Reuters Tv. Intern.*, 340 F.3d 926, 931 (9th Cir. 2003)).
[168] Rec. Doc. 17, p. 29.
[169] 568 U.S. 519 (2013).
[170] *Id.* at 528.
[171] 17 U.S.C. § 109(a).

geographically.[172] The Court decided that the phrase "lawfully made under this title" did not restrict the first sale doctrine geographically; instead, the Court found that "'lawfully made under this title' means made 'in accordance with' or 'in compliance with' the Copyright Act. The language of § 109(a) says nothing about geography."[173] Thus, the Court concluded that the doctrine applies to copies manufactured abroad and brought into the United States. The Court reasoned that "the nongeographical reading is simple, it promotes a traditional copyright objective (combatting piracy), and it makes word-by-word linguistic sense."[174] Additionally, the Court suggested that "the principle that 'copyright laws do not have any extraterritorial operation' 'requires some qualification.'"[175]

Plaintiffs urge that the Court's reasoning in *Kirtsaeng* should be applied in this case to require that a Section 304(c) termination results in the recapture of both domestic and foreign rights. Plaintiffs argue, "given that identical words used in different parts of the same statute are generally regarded to have the same meaning, *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932), following *Kirtsaeng*, one must assume that 'rights that arise *under this title*' as used in Section 304(c)(6)(E) lacks any geographical implications."[176]

Defendant argues that *Kirtsaeng* is inapplicable because the case only addressed the first sale doctrine (an affirmative defense to infringement) and did not address initial ownership or transfers of ownership of copyrights.[177] Defendant continues, "as Plaintiffs themselves point out (Pl. Opp. at 9), conduct and ownership are two very different things.

---

[172] *Kirtsaeng*, 568 U.S. at 529.
[173] *Id.* at 530.
[174] *Id.*
[175] *Id.* at 532 (quoting 4 M. Nimmer & D. Nimmer, Copyright § 17.02, pp. 17–18, 17–19 (2012)).
[176] Rec. Doc. 17, p. 36.
[177] Rec. Doc. 23, p. 4.

*Kirtsaeng* deals with conduct, *i.e.* the manufacturing of physical copies of a book, not with ownership, and with the applicability of an affirmative defense, not the scope of a limitation on the termination of transfers of ownership."[178]

Although acknowledging that the facts of *Kirtsaeng* are not "on all fours," Plaintiffs reiterate the relevance of the case because "there is a presumption that a given term is used to mean the same thing throughout a statute."[179] Since the Supreme Court directly addressed the meaning of "under this title" under the Copyright Act, albeit in a different section, Plaintiffs say the case is applicable with respect to the meaning of the phrase in Section 304.[180] Plaintiffs conclude that,

> following *Kirtsaeng*, it is impossible to presume, as the *Siegel* court did, that the phrase "rights that arise under this title" in Section 304(c)(E) imposes an inherent geographical limitation on the scope of rights returned to the author following termination. To the contrary, following *Kirtsaeng*, there is a presumption that "under this title" *lacks* geographical significance when used in the Copyright Act.[181]

For this reason, Plaintiffs say that the holding of *Siegel* is "called into serious doubt" by *Kirtsaeng*.[182]

In conjunction with *Kirtsaeng*, Plaintiffs offer four overarching reasons why their reading of Section 304(c)(6)(E) is correct: 1) it is simple; 2) it supports a traditional copyright objective; 3) it makes linguistic sense; and 4) it narrowly construes a limitation of a broader right.[183] Plaintiffs argue their view is simple because it means that all rights under copyright law that the assignee received must be returned, and there is "no need

---

[178] *Id.* at 5.
[179] Rec. Doc. 27, p. 2 (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)).
[180] *Id.*
[181] *Id.* at pp. 2–3.
[182] Rec. Doc. 17, p. 41.
[183] *Id.* at p. 36.

to look to the laws of other countries to determine the scope of the reversion and whether they would honor the same."[184]

Plaintiffs argue their view accomplishes one of the important goals of termination rights, evidenced by the legislative history of the 1976 Act: to give authors a second chance to benefit from their creative labor in order to ameliorate the effect of unremunerative transfers.[185] Plaintiffs explain, "[i]f the goal of Section 304(c) is to ameliorate the effect of unremunerative transfers, and the right returns to the author the ability to exploit the reverted work in only *one* of the 181 countries in the Berne Convention, [Defendant's view of] Section 304(c) simply does not achieve that goal."[186] Plaintiffs also state that their view would enhance predictability and certainty of copyright ownership, another goal of Congress in creating the 1976 Act.[187]

Plaintiffs continue that their reading of Section 304(c)(6)(E) makes word-by-word linguistic sense, giving meaning to every word in the sentence.[188] For ease of reference, the sentence in that section is repeated here:

> Termination of a grant under this subsection affects only those rights covered by the grant that *arise under this title*, and in no way affects rights *arising under any other* Federal, State, or *foreign laws*.[189]

Plaintiffs note that the phrase "rights that arise under this title" is qualified by the subsequent phrase "other Federal, State, or foreign rights."[190] Plaintiffs read this qualification to indicate that "rights that arise under this title" encompasses more than just

---

[184] *Id.*
[185] *Id.* at p. 37 (quoting H.R. Rep. No. 94-1476, 124, 1976 U.S.C.C.A.N. 5659, 5740).
[186] *Id.*
[187] *Id.* (citing *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989)).
[188] *Id.*
[189] 17 U.S.C. § 304(c)(6)(E) (emphasis added).
[190] Rec. Doc. 17, pp. 37–38.

the specific rights enumerated in the United States Copyright Act; otherwise, there would be no need for the qualifying phrase.[191] The Defendant's contrary reading, according to Plaintiffs, renders the latter phrase superfluous, which is disfavored in statutory interpretation.[192] Plaintiffs further assert that Defendant and *Siegel* ignored the word "other" in the qualifying phrase, "other Federal, State, or foreign rights."[193] Plaintiffs argue that the qualifying phrase beginning with the word "other" is a "distinction between categories of 'rights' rather than territories."[194] Based on their reading, giving meaning to the word "other," Plaintiffs conclude:

> [T]he limitation makes clear that termination rights are not intended to extinguish *all* of the grantee's rights under an assignment agreement, rather only those related to a perpetual copyright assignment. Section 304(c)(6)(E) ensures that any of Mr. Vetter's obligations, representations, warranties, or covenants made in the [Initial] Assignment that do not pertain to copyright ownership remain intact. Conversely, Mr. Vetter's agreement to assign the Double Shot copyright interest in perpetuity is unenforceable and is subject to termination.[195]

Fourth, Plaintiffs cite case law for the proposition that a limitation of a broadly applicable termination right such as Section 304(c)(6)(E) should be construed narrowly in a way that does not frustrate the purpose of the right.[196] Since the goal of the termination right is to "relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value

---

[191] *Id.*
[192] *Id.* (citing *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992)).
[193] *Id.*
[194] *Id.*
[195] *Id* at 38–39.
[196] *Id.* at 39.

of his work product," Plaintiffs assert that it should not be given the broad geographic interpretation urged by Defendant.[197]

After a careful review of applicable law, the Court finds that Plaintiffs' argument that foreign rights to the Song in this case "arise under" the United States Copyright Act, as opposed to the domestic laws of each individual country where the Song may be exploited, is plausible. This Court respectfully declines to follow the reasoning of the California district court in *Siegel*. The legislative history of the Copyright Act indicates that when an author exercises his right of termination, "ownership of the rights *covered by the terminated grant* reverts to everyone who owns termination interests on the date the notice of termination was served."[198] In this case, the "terminated grant" was the Initial Assignment of *worldwide* rights from Vetter to Windsong. It plausibly and logically follows that a termination of a worldwide grant results in the recapture of worldwide rights; in other words, worldwide rights were covered by the terminated grant, so worldwide rights revert upon termination. Furthermore, as with Count One, this result effectuates the Congressional intent to provide the author a second chance to enjoy the benefits of his work and to mitigate the effects of early unremunerative transfers.

The Court also finds support for the Plaintiffs' legal theory in the statutory text. The Court acknowledges Plaintiffs' reliance on *Kirtsaeng* but further notes that the *Kirtsaeng* Court did not have occasion to address the meaning of "*arise* under this title" under Section 304(c)(6)(E); the section of the statute at issue in *Kirtsaeng* addressed works "*lawfully made* under this title." One of the dictionary definitions of "arise" is "to originate

---

[197] *Id.* (quoting *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172 (1985)).
[198] H.R. REP. 94-1476, 127, 1976 U.S.C.C.A.N. 5659, 5742.

from a source."[199] Applied here, in the Court's view, both domestic and foreign rights to exploit the Song originated from the United States Copyright Act; once the United States copyright was obtained, the owner of that copyright had the ability to exploit the Song abroad. Although, as the court in *Siegel* explained, foreign exploitation "*would be governed by* the copyright laws of foreign nations,"[200] the Court is unconvinced that the *claim* to such foreign rights "arises under" or "originates from" foreign law because the acquisition of the United States copyright already gives the owner the ability to exploit the work in other Berne Convention countries.

Like in Count One, the Court's conclusion here is that it is entirely plausible that there is only one copyright in the Song which is recognized by other countries pursuant to the Berne Convention. The Southern District of New York reasoned that: "In view of the United States' accession to the Berne Convention and the Universal Copyright Convention, a foreign national [of a treaty member state] may seek copyright protection under the Copyright Act *although the source of its rights lies abroad*."[201] "The Berne Convention 'provides that the law of the country where protection is claimed defines what rights are protected, the scope of the protection, and the available remedies; the treaty does not supply a choice of law rule for determining ownership.'"[202]

The Plaintiffs plausibly argue that the following Berne Convention text recognizes that the "existence" of protection in the work's country of origin is separate from the "enjoyment" of the availability of protection in other member countries:

---

[199] *Arise*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/arise (last visited July 1, 2024).
[200] *Siegel*, 542 F. Supp. 2d at 1140 (emphasis added).
[201] *Bridgeman Art Libr., Ltd. v. Corel Corp.,* 25 F. Supp. 2d 421, 425 (S.D.N.Y. 1998) (emphasis added).
[202] *Itar-Tass*, 153 F.3d at 91 (quoting Jane C. Ginsburg, *Ownership of Electronic Rights and the Private International Law of Copyright,* 22 Colum.–VLA J.L. & Arts 165, 167–68 (1998)).

> The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.[203]

Defendant quotes the following text of the Copyright Act which addresses the Berne Convention: "No right or interest in a work eligible for protection under this title may be claimed by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto."[204] Without significant explanation or analysis, Defendant posits that this supports his "multiple and separate copyright interests in each country" view, and it defeats Plaintiffs' entitlement to foreign rights. The Court disagrees. Plaintiffs do not claim an interest in foreign rights "by virtue of" the Berne Convention; rather, they argue that those foreign exploitation rights flow from the United States copyright. The Berne Convention alleviates the burden of seeking separate copyrights in other countries. [205] The Court finds that Plaintiffs have stated a plausible claim that their rights arise "by virtue of" the Copyright Act, rights which the members of the Berne Convention agree to recognize. Accordingly, Section 104(c) does not defeat Plaintiffs' position.

---

[203] Berne Convention, Art. 5(2) (Paris Text 1971).

[204] 17 U.S.C. § 104(c).

[205] As the District of Delaware has explained: "The overarching purpose of the Berne Convention is to provide protection to authors whose works will be published in many countries … Berne's proscription of mandatory formalities is a rational response to the difficulty of complying (and maintaining compliance) with differently administered formalities that may have been, absent the Convention, imposed in dozens of national systems, some with registries, some without, and none of which shares information." *Moberg v. 33T LLC*, 666 F. Supp. 2d 415, 422 (D. Del. 2009) (quoting Christopher Sprigman, *Reform(aliz)ing Copyright*, 57 Stan. L. Rev. 485, 544 (2004)).

In further asserting that "[c]opyright protection arises from the domestic law of each country in which protection is claimed," Defendant quotes the following Berne Convention text: "It is understood that, at the time a country becomes bound by this Convention, it will be in a position *under its domestic law* to give effect to the provisions of this Convention."[206] However, the Court finds that this argument conflates the scope of protection with the question of who is entitled to receive that protection. This case concerns the latter. Plaintiffs tenably reason that the copyright owner is the party entitled to the protection, and the question of who owns the copyright is answered by the law of the country of origin (here, the United States). The copyright owner then enjoys the availability of protection abroad pursuant to the Berne Convention under each country's domestic law.

For the foregoing reasons, Plaintiffs have advanced a legally plausible claim that the right to exploit the Song in foreign countries does not "arise under" the domestic law of each individual country where the work may be exploited, but instead "arises under" the Copyright Act, which is recognized and protected by the domestic law of other countries pursuant to the Berne Convention. Plaintiffs plausibly support the legal theory that Vetter's Recaptured Interest includes both domestic and foreign rights. The *Motion to Dismiss* is DENIED as to Count Two.

---

[206] Rec. Doc. 12-1, p. 8 (quoting Berne Convention, Art. 36) (Paris Text 1971)).

III.    **CONCLUSION**

For the reasons set forth above, the Court finds that Plaintiffs have stated a plausible claim for relief. Accordingly, Defendant's *Motion to Dismiss* is DENIED.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 12th day of July, 2024.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**