**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| | * | |
| **CYRIL VETTER** *and* **VETTER** | * | |
| **COMMUNICATIONS CORP** | * | |
| | * | |
| | * | |
| **VERSUS** | * | **CIVIL ACTION: 3:23-CV-01369-SDD-EWD** |
| | * | |
| | * | |
| **ROBERT RESNIK** *individually and* | * | |
| *d/b/a* **RESNIK MUSIC GROUP** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

<u>**EXHIBIT B**</u>

<u>**MEMORANDUM IN SUPPORT OF**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| **CYRIL VETTER** *and* **VETTER** | * | |
| **COMMUNICATIONS CORP** | * | |
| | * | |
| | * | |
| **VERSUS** | * | **CIVIL ACTION: 3:23-CV-01369-SDD-EWD** |
| | * | |
| | * | |
| **ROBERT RESNIK** *individually and* | * | |
| *d/b/a* **RESNIK MUSIC GROUP** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The plaintiffs, Cyril Vetter and Vetter Communications Corp, by and through undersigned counsel, respectfully submit this memorandum in opposition to the *Motion to Dismiss* (R. Doc. 12) filed by the defendant, Robert Resnik. While the defendant exerts considerable energy attempting to paint the legal issues at bar as "well-settled," they are anything but. Nowhere is that truer than in this Circuit, where no court has ruled, explored, or even touched upon the geographical scope of copyright renewal and reversion rights. Indeed, this Court has a blank canvas on which to evaluate the parties' respective arguments. The defendant's interpretation of the law may be popular in academic circles and publishing industry board rooms, but that does not make it correct. In fact, the position advanced by the defendant is inconsistent with the text, intent, and objectives of United States copyright law. Accordingly, it should be rejected by the Court and the *Motion to Dismiss* should be denied.

## Background

The facts of this case are unique (if not unprecedented) because they require the Court to determine both the scope of renewal rights in the 1909 Copyright Act (the "1909 Act") as well as

1

reversion rights in its statutory successor, the 1976 Copyright Act (the "1976 Act"). Both renewals and reversions were crafted by Congress as essential protections for authors who often assign or license away their rights for relatively little (or even nothing) in return. Rather than have courts police the equity of every bargain on the front end, Congress gave authors the power to later "recapture" the copyright they transferred away. At their core, the renewal system under the 1909 Act and reversion rights under the 1976 Act reflect an unparalleled commitment to "safeguarding authors against unremunerative transfers."[1]

Cyril Vetter and Don Smith made exactly the sort of unremunerative transfer that Congress sought to ameliorate. As fully detailed in the *Complaint*, in 1963, without any legal representation or understanding of the music publishing industry, Mr. Vetter and Mr. Smith were coaxed into signing an agreement (the "1963 Assignment") with Windsong Music Publishers, Inc. ("Windsong") in which they sold their copyright interest in "Double Shot (Of My Baby's Love)" ("Double Shot").[2] The purchase price paid by Windsong for the Double Shot copyright? A lonesome dollar.[3] In 1966, Windsong filed for copyright registration of Double Shot with the Copyright Office, which, pursuant to the 1909 Act, secured federal copyright protection for Double Shot for an initial 28 years (the "Original Copyright").[4] Mr. Smith died unexpectedly in 1972, but the commercial success of his work lived on.[5]

In 1994, at the conclusion of the Original Copyright's duration, Mr. Vetter along with Mr. Smith's heirs obtained a new, independent copyright for Double Shot pursuant to the renewal provisions of the 1909 Act (the "Renewal Copyright").[6] However, both Mr. Vetter and Mr. Smith

---

[1] *See* H.R. Rep. No. 94-1476, at 124 (1976), *available at* 1976 WL 14045 (hereinafter "1976 House Report").
[2] R. Doc. 1, ¶ 57.
[3] *Id.* at ¶ 59.
[4] *Id.* at ¶ 64.
[5] *Id.* at ¶ 65.
[6] *Id.* at ¶ 73.

had promised in the 1963 Assignment to transfer the Renewal Copyright to Windsong.[7] The Supreme Court's controversial decision in *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943) meant that, because Mr. Vetter was alive when the renewal period commenced, his promise to Windsong was enforceable.[8] Conversely, because Mr. Smith did not survive, his heirs received his interest in the Renewal Copyright (the "Renewal Copyright Interest") free and clear from any rights previously granted to Windsong. Vetter Communications later acquired the Renewal Copyright Interest from Mr. Smith's heirs.[9]

Congress ultimately eschewed the dual terms of copyright protection in the 1976 Act in favor of a unitary term of protection based on the life of the author. With that choice, Congress had to devise a new mechanism to provide authors with a second chance to benefit fully from the fruits of their creative labor. Sections 203 and 304(c) of the 1976 Act[10] were crafted to provide this second chance through a "termination" or "reversion" right that may be exercised by an author (or the author's heirs) to recapture a copyright previously bargained away. Section 203 applies to works created under the 1976 Act, whereas Section 304(c) applies to works, like Double Shot, created under the 1909 Act. The statutory provisions are generally analogous.[11]

Pursuant to Section 304(c), Mr. Vetter's contractually obligated transfer of the Renewal Copyright to Windsong was subject to termination 56 years after the date the Original Copyright was secured; in other words, 2022, which is 56 years from 1966. On March 20, 2019, Mr. Vetter

---

[7] *Id.* at ¶ 58.

[8] The defendant accuses the plaintiffs of citing *Fred Fisher* for a proposition for which it does not stand. R. Doc. 12-1, at n.11. The accusation is surprising for a number of reasons, but not the least of which is that the Supreme Court has expressly stated that *Fred Fisher* holds that "[a]n assignment by an author of his renewal rights made before the original copyright expires is valid against the world, *if the author is alive at the commencement of the renewal period*." *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375 (1960) (emphasis added).

[9] R. Doc. 1, ¶ 76.

[10] 17 U.S.C. §§ 203, 304.

[11] 1976 House Report, at 140.

transmitted a Section 304(c) termination notice (the "Termination Notice") to Windsong as well as Lyresong Music, Inc. ("Lyresong"), a music publisher who acquired a portion of Windsong's interest in the Renewal Copyright in 1996.[12] The Termination Notice informed Windsong and Lyresong that, effective May 3, 2022 (the "Reversion Date"), Mr. Vetter was terminating "all authorship/ownership rights originally granted and conveyed" pursuant to the 1963 Assignment (the "Terminated Copyright Interest").[13] At no point did Windsong or Lyresong challenge or contest the Termination Notice, including the scope of the Terminated Copyright Interest identified therein.[14] On August 20, 2019, the owner of Windsong informed the plaintiffs that the company and its assets had been sold to the defendant.[15] On the Reversion Date, nearly 60 years after Mr. Vetter assigned Double Shot to Windsong, he got his rights back.[16]

The celebration was short-lived, unfortunately. It quickly became clear that the defendant did not intend to relinquish claim to Double Shot. Specifically, the defendant took (and continues to take) the position that the plaintiffs may *only* exploit Double Shot within the strict confines of the United States.[17] As to the other 180 countries with which the United States has copyright relations,[18] the defendant argues that the plaintiffs have no right to control or exploit Double Shot in *any* of them. In other words, any licensing or exploitation opportunity which is not geographically limited to the United States (which describes *many* modern copyright uses) requires the defendant's continued involvement, consent, and financial participation.[19]

---

[12] R. Doc. 1, ¶¶ 80, 84.

[13] *Id.* at ¶ 85.

[14] *Id.* at ¶ 88.

[15] *Id.* at ¶ 89.

[16] *Id.* at ¶ 92.

[17] *Id.* at ¶ 100.

[18] United States Copyright Office, Circular 38A, *International Copyright Relations of the United States* (2023), *available at* http://www.copyright.gov/circs/circ38a.pdf (hereinafter "Copyright Office Circular").

[19] Including a current opportunity for a worldwide synchronization license of Double Shot for use in the television show, *Moonlighting.* R. Doc. 1, ¶¶ 93-95.

The plaintiffs have asked the Court to declare them the sole owners of the Double Shot copyright. The defendant did not answer the *Complaint*, but instead filed the *Motion to Dismiss*. Stated summarily, the defendant's position in the *Motion to Dismiss* is this: what Mr. Vetter and Mr. Smith transferred away in 1963 for a dollar can *never* be fully recaptured. As detailed herein, that result cannot be what Congress had in mind when it sought to protect authors against permanent assignments made in exchange for a pittance. Accordingly, and for the reasons below, the Court should reject the defendant's position and deny the *Motion to Dismiss*.

## Legal Standard

Motions to dismiss pursuant to Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (*citing Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)). To survive a Rule 12(b)(6) motion, a plaintiff must only plead "enough facts to state a claim to relief that is plausible on its face." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The relevant question is not whether a plaintiff is likely to succeed on the claims, but whether a complaint contains any legally cognizable claims that are plausible. *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999). In evaluating whether a plaintiff has met this threshold, a court may properly consider the complaint, its attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Franklin v. Jenn's Angels, LLC*, 2022 WL 69213, at *1 (M.D. La. Jan. 6, 2022) (Dick, C.J.) (citing *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011)). All well-pleaded facts must be accepted as true and viewed in a light most favorable to the plaintiff. *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010). However, a court is not obligated to show such favorability to a plaintiff's legal conclusions or otherwise imbue a plaintiff's legal

5

theories with a presumption of validity. *Franklin*, 2022 WL 69213, at *2 (citing *Twombly*, 550 U.S. at 555). That said, a court should be particularly reluctant to grant a Rule 12(b)(6) motion where (as here) the claim in question asserts a novel theory of recovery. Such a claim is "best tested for legal sufficiency in light of actual, rather than alleged facts." *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981) (citing *Shull v. Pilot Life Ins. Co.*, 313 F.2d 445, 447 (5th Cir. 1963)). Ultimately, "the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Jones*, 188 F.3d at 324.

**Analysis**

As applied here, the foregoing standard does not warrant dismissal of the *Complaint*. Count One and Count Two both state cognizable claims which are plausible, if relatively novel. The plausibility of each claim is addressed below.

### 1. International Copyright Protection and the Principle of Territoriality

Before addressing the viability of Count One and Count Two directly, however, a discussion of international copyright protection and the principle of territoriality is necessary.

#### A. International Treaties and Conventions

To begin, there is no such thing as an "international copyright."[20] Instead, jurisdictions must choose to extend domestic copyright protection to works of foreign origin. *See Golan v. Holder*, 565 U.S. 302, 332 (2012) ("Congress broke new ground when it extended copyright protection to foreign works in 1891."). Most frequently, domestic protections are extended to works of foreign origin by way of treaty and convention obligations.[21] The United States is a signatory to numerous copyright treaties, conventions, and trade agreements, including the

---

[20] *See* Copyright Office Circular, *supra* note 18.
[21] *Id.*

6

Universal Copyright Convention ("UCC"), the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"), and the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention").[22]

The Berne Convention[23] presently has 181 member states[24] and is widely considered to be "the principal accord[25] governing international copyright relations." *Golan*, 565 U.S. at 306-07. The primary functions of the Berne Convention are to ensure, first, that each member state maintains certain minimum standards of copyright protection and, second, that each member state treats authors from other member countries at least as well as they treat their own. *Golan*, 565 U.S. at 308. The Berne Convention was implemented in 1989 by Congress,[26] with subsequent legislative efforts (in response to the United States entering into TRIPS in 1994) to shore up compliance therewith. *Golan*, 565 U.S. at 309-314. While the Defendant is correct that the Berne Convention is not considered self-executing,[27] this does not render its provisions irrelevant. Among other things, its provisions can aid in the interpretation of domestic laws (including federal common law) which are intended by Congress to implement and comply with the Berne Convention's requirements. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90 (2d Cir. 1998); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 259 (S.D.N.Y. 2000).

---

[22] *Id.*

[23] Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as revised at Paris on July 24, 1971 and amended in 1979, *available at* https://www.wipo.int/wipolex/en/text/283698.

[24] *See* Copyright Office Circular, *supra* note 18.

[25] Indeed, the UCC contains a provision that explicitly recognizes the Berne Convention's supremacy where a country (*e.g.*, the United States) is a member of both agreements. *See* Universal Copyright Convention, September 6, 1952, 6 U.S.T. 2731, 216 U.N.T.S. 132, *available at* https://www.unesco.org/en/legal-affairs/universal-copyright-convention-appendix-declaration-relating-article-xvii-and-resolution-concerning.

[26] The Berne Convention Implementation Act of 1988, Pub. L. No. 100-568 § 2, 102 Stat. 2853-2861 (Oct. 31, 1988), *codified at* 17 U.S.C. §101 *et seq.* (hereafter, the "BCIA").

[27] R. Doc. 12-1, at 7. To be clear, the Supreme Court has not directly ruled on whether the Berne Convention is self-executing. However, in *Golan*, the Court recognized that the Berne Convention's implementation in the United States required legislative action, which implies that it is not self-executing per *Medellin v. Texas*, 552 U.S. 491 (2008).

B.  The Principle of Territoriality

It is often said that United States copyright law has no "extraterritorial effect." *See, e.g.*, *Impression Prod., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. 360, 379 (2017). The danger in leaning too heavily on this phrase is that "[t]he meaning of 'territorial' and hence 'extraterritorial' is purely conventional, and these words have therefore been used in different ways at different times and in different contexts."[28] One such meaning refers to the longstanding principle that "unless a contrary intent appears, [legislation of Congress] is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949). This principle acts as a presumption against applying domestic law to what is purely foreign conduct. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 439 (2007). In copyright jurisprudence, this principle has been used to refuse application of the Copyright Act to acts of purely extraterritorial infringement. *See, e.g., Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 791 (5th Cir. 2017). Some courts view this principle as a jurisdictional limitation. *See, e.g., Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004). The Fifth Circuit does not, but instead views "the reach of the Copyright Act to territorial conduct [as] a question of the merits of the claim, not the jurisdiction of the court." *Geophysical Serv., Inc.*, 850 F.3d at 791. Relatedly, the principle of territoriality has also been cited by courts within the United States as a choice of law device to select and apply foreign law to acts of infringement which occur outside of the United States. *See, e.g., Armstrong v. Virgin Recs., Ltd.*, 91 F. Supp. 2d 628, 637 (S.D.N.Y. 2000). Other times still, "territoriality" has been referred to as a "rule" that is implicated by the requirement of national treatment under the UCC and the Berne Convention. *See, e.g., Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 700-01 (9th Cir. 1995). Outside of copyright, in other areas of intellectual property law, not only

---

[28] Larry Kramer, *Vestiges of Beale: Extraterritorial Application of American Law*, 1991 Sup. Ct. Rev. 179, 181.

are the laws governing protection viewed as lacking "extraterritorial effect," but the subject matter of the protection itself is also referred to as being "territorial" to indicate that its very existence (and thus, *any* right to protection) must be independently established in each country where protection is sought. *See, e.g., Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 426 (2023) (referring to trademarks as "territorial" and thus separate and independent in each country); *Levi Strauss & Co. v. AmericanJeans.com, Inc.*, 2011 WL 1361574, at *3 (N.D. Cal. Apr. 11, 2011) ("Like patents, trademarks are territorial, as they exist in each country solely according to that country's statutory scheme.") (internal quotations omitted).[29]

Against this backdrop of differing meanings ascribed to the principle of territoriality, the defendant accuses the plaintiffs of uniquely misunderstanding the concept,[30] then goes on to state confidently (but without citation) that "the territoriality principle recognizes that copyright protection in one country does not extend to *or affect* protection in any other country."[31] To the extent that the defendant is simply observing that the rights specifically enumerated in the Copyright Act (*e.g.,* 17 U.S.C. § 106) cannot provide a remedy for infringing conduct occurring elsewhere, the plaintiffs would agree. However, the plaintiffs' claims here are not about *conduct*, they are about *rights*. As discussed in detail below, courts treat questions of copyright ownership quite differently from questions of copyright infringement. "[O]wnership is determined by the law of the country in which the work is created but infringement is governed by the law where the infringement took place." *Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.*, 89 F. Supp. 2d 840, 843 (E.D. Tex. 2000) (citing *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir.1998)). Given the distinction between claims regarding *conduct* and claims

---

[29] The "territorial" nature of patents and trademarks versus copyrights in this regard is addressed further below.

[30] R. Doc. 12-1, at 1-2. Notably, Professor Patry is upfront in acknowledging that "territoriality" is susceptible to different meanings. 7 William Patry, *Patry on Copyright* § 25:18 (2007).

[31] *Id.* at 6-7 (emphasis added).

regarding *ownership*, to the extent the defendant argues that the principle of territoriality prevents ownership events occurring in one country (*e.g.*, renewal or reversion) from having any effect or consequence in another country, that argument relies on a vast overstatement of the principle.[32]

C. <u>Single Copyright Interest vs. Multiple Copyright Interests</u>

Importantly, the principle of territoriality as applied to copyrights most certainly does not provide a basis for the defendant's posit that there are "multiple and separate copyright interests in each country" with which the United States maintains copyright relations.[33] This statement finds no support in the Copyright Act, the Berne Convention, or the jurisprudence interpreting either.

### i. *The Berne Convention*

Starting with the Berne Convention, although the text does not explicitly state that there is only a single copyright, it does distinguish between the *existence* (i.e., origination) of rights in the country of origin and the *enjoyment* of foreign protections everywhere else.[34] This is consistent with the notion that domestic protections are simply extended and made available to foreign-origin copyrights by way of national treatment obligations. Moreover, when compared to the language of the Paris Convention for the Protection of Industrial Property ("<u>Paris Convention</u>")[35] governing patents and trademarks, it seems abundantly clear that the Berne Convention does not contemplate "multiple" and "separate" copyright interests. Regarding patents, the Paris Convention states: "Patents applied for in the various countries of the Union by nationals of countries of the Union *shall be independent of patents obtained for the same invention in other countries*, whether

---

[32] Later, the defendant refers to copyright as "territorial" for the proposition that "U.S. copyright law [has] no reach outside U.S. borders." *Id*. at 15. This, too, is an overstatement of the principle, and one that has been rejected by the Supreme Court. *See Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S. 519, 532 (2013) (citing Professor Nimmer for the proposition that the territoriality principle "requires some qualification.").

[33] R. Doc. 12-1, at 8.

[34] Berne Convention, *supra* note 23, art. 5(2).

[35] Paris Convention for the Protection of Industrial Property, July 14, 1967, 21 U.S.T. 1583, T.I.A.S. No. 6923, *available at* https://www.wipo.int/wipolex/en/text/288514#P147_20484.

members of the Union or not."[36] Regarding trademarks, the Paris Convention states: "A mark duly registered in a country of the Union *shall be regarded as independent of marks registered in the other countries of the Union*, including the country of origin."[37] Clearly, then, when the nations of the world come together to craft intellectual property policy through the World Intellectual Property Organization (which oversees both the Berne Convention and the Paris Convention), they know how to make it apparent that there are "multiple" and "separate" interests in each country. This is simply not the case with the Berne Convention.[38]

### ii. *The Copyright Act*

Congress, too, knows how to make clear that separate, independent, and geographically limited rights exist for intellectual property. Consider the federal statutes that govern patent and trademark rights. Regarding trademarks, the Lanham Act explicitly states that the registration of a foreign mark in the United States "*shall be independent of the registration in the country of origin* and the duration, validity, or transfer in the United States of such registration shall be governed by the provisions of this chapter."[39] Regarding patents, the Patent Act expressly recognizes the geographical limits of a domestic patent, stating that "[e]very patent shall . . . grant to the patentee . . . the right to exclude others from making, using, offering for sale, or selling the invention *throughout the United States*."[40] There is no such distinction in the Copyright Act. *See Geophysical Serv., Inc.*, 850 F.3d at 791 ("The Copyright Act does not express its limit on territorial reach.").

---

[36] Paris Convention, Article 4*bis*.

[37] *Id.*, Article 6 (emphasis added).

[38] On this point, the plaintiffs are in accord with Professor Patry's treatise. *See* Patry on Copyright § 25:18 ("[I]f one contrasts the nature of copyright with the nature of patents and trademarks, and examines the different approaches to "territoriality" found in the Berne Convention (governing copyrights) and in the Paris Convention for the Protection of Industrial Property (governing patents and trademarks), copyright does not appear to be territorially dependent.").

[39] 15 U.S.C. § 1126(f) (emphasis added)

[40] 35 U.S.C. § 154 (emphasis added).

11

The total lack of textual support,[41] together with the Patent Act and Lanham Act's explicit declarations, make it clear that imposing the defendant's "multiple" and "separate" interests theory on the Copyright Act would be wrong.

### iii.    Judicial Interpretation

Lastly, courts interpreting the Copyright Act and the Berne Convention have consistently adhered to the view that a foreign copyright owner does not maintain a separate and distinct copyright within the United States. Rather, the owner's foreign copyright is simply recognized and enforced in the United States. *See, e.g.*, *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.,* 52 F.4th 1054, 1078 (9th Cir. 2022) ("[B]ecause the United States joined the Berne Convention, it is required to afford *foreign copyright holders* the same protection as holders of domestic copyrights.") (internal quotations and alterations omitted) (emphasis added); *Vergara Hermosilla v. The Coca-Cola Co.*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010) ("[Plaintiff's] Mexican copyright then became enforceable in the United States no later than when his lyrics were published in [treaty partner] Mexico."); *Bridgeman Art Libr., Ltd. v. Corel Corp.*, 25 F. Supp. 2d 421, 425 (S.D.N.Y. 1998) ("In view of the United States' accession to the Berne Convention and the Universal Copyright Convention, a foreign national [of a treaty member state] may seek copyright protection under the Copyright Act although the source of its rights lies abroad."). Again, compare that with patent and trademark law, where court decisions expressly reinforce the notions of multiplicity. *See, e.g., Abitron Austria GmbH*, 600 U.S. at 427 (noting that the territoriality principle as reflected in trademark treaties and conventions mandates that registration of a foreign

---

[41] If anything, the Copyright Act's disparate treatment of "United States works" (defined in 17 U.S.C. § 101) and foreign works (for example, in connection with the registration requirement found at 17 U.S.C. § 114) confirms that foreign works do not receive a "United States copyright" as a basis for protection. The House Report on the BCIA also confirms this understanding. It states that the BCIA "explicitly extended" domestic protection to "Berne Convention works." H.R. Rep. No. 609, 100th Cong., 2d Sess. 1-66 (1988). There is never mention of Berne Convention works receiving a "United States copyright." *See also* U.S. Copyright Office, Compendium of U.S. Copyright Office Practices §2002.2 (3d ed. 2021).

trademark in the United States "shall be independent of the registration in the country of origin."); *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972) ("To the degree that the inventor needs protection in markets other than those of this country, [the inventor must] seek it abroad through *patents secured in countries* where his goods are being used.") (emphasis added); *W. Elec. Co. v. Milgo Elec. Corp.*, 450 F. Supp. 835, 838 (S.D. Fla. 1978) ("It is settled that patents granted by different countries represent separate and distinct legal rights which should be controlled by the country granting the right.") (citing *Boesch v. Graff*, 133 U.S. 697 (1890)). Simply put, the defendant's "multiple" and "separate" interests theory expressly applies to patents and trademarks, but it is certainly not reflected in copyright law jurisprudence.

\* \* \*

For purposes of this case, why does it matter whether there is a single copyright or "multiple" and "separate" copyrights in the same work? Because by insisting that Double Shot has 181 territorially distinct copyrights within the Berne Convention countries, the defendant can argue that a return of the "United States copyright" does not result in the return of any of the other 180. On the other hand, if there is only one copyright in Double Shot, which copyright is respected throughout the Berne Convention in accordance with the principles of national treatment, then the plaintiffs' recapture of that one copyright leaves the defendant with nothing. In that instance, the plaintiffs' domestic rights yield to them the right to exploit Double Shot *everywhere* without interference from its former owner. *Cf. PaySys Int'l, Inc. v. Atos Se*, 226 F. Supp. 3d 206, 213 (S.D.N.Y. 2016) ("[The plaintiff's] domestic copyright registrations form the basis for its foreign copyright claims…"). This, as discussed below, seems like exactly what Congress intended. More to the point, if there is a single copyright interest, the remainder of the defendant's arguments in the *Motion to Dismiss* quickly unravel.

13

## 2. Count One: Ownership of the Renewal Copyright Interest

Turning now to the claims identified in the *Complaint*. Count One of the *Complaint* asks the Court to declare Vetter Communications the sole, worldwide owner of the Renewal Copyright Interest acquired from Mr. Smith's heirs.[42] The defendant asks the Court to dismiss Count One for failure to state a claim.[43] To decide the issue, the Court must interpret the renewal provisions of the 1909 Act, as it is the direct source of the Renewal Copyright Interest.

### A. The Evolution of Renewal Rights

The provisions of the 1909 Act cannot be examined in a vacuum. Rather, appreciating the history, purpose, and policy behind renewal rights helps to understand why the plaintiffs should prevail. The concept of renewal dates back to the world's very first copyright statute, the Statute of Anne, enacted in England in 1710.[44] The Statute of Anne divided protection for a published work into two terms of 14 years each.[45] Among other similarities, this bifurcated term approach was mirrored by Congress in the first Copyright Act of 1790. *See Fred Fisher*, 318 U.S. at 650 (noting similarities between the Statute of Anne and the 1790 Act). Initially, the 14-year renewal was merely an extension of the original term which could be claimed by the author, if living, or, if the author was deceased, by the author's executors, administrators, or assigns. *Stewart v. Abend*, 495 U.S. 207, 217 (1990). The nature of renewals changed significantly, however, in the 1831 amendment to the Copyright Act. Specifically, "Congress gave the author's widow and children that which theretofore they did not possess, namely, the right of renewal to which the author would have been entitled if he had survived the original term." *Fred Fisher*, 318 U.S. at 651. Following the 1831 amendment, renewals were no longer considered a mere continuation of the original term,

---

[42] R. Doc. 1, ¶¶ 15-16.

[43] R. Doc. 12-1, at 12-16.

[44] Statute of Anne, 8 Ann. c. 19 (1710) (Gr. Brit.).

[45] *Id.* at § 11.

14

but rather, represented "an entirely new policy, completely dissevering the title, breaking up the continuance, and vesting an absolutely new title *eo nomine* in the persons designated." *Stewart*, 495 U.S. at 218 (internal quotations and alterations omitted). Almost 80 years later, over the objections of those in the publishing industries,[46] the 1909 Act retained a renewal provision which acted to grant a new copyright interest to the author (or the author's heirs) for the renewal term.

### B.   Renewal Rights in the 1909 Act

It is a common legal axiom that "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive" *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The renewal provision of the 1909 Act states as follows:

> [T]he author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright.

17 U.S.C. § 24 (1909). The right to obtain a renewal copyright is absolute and unrestricted in the text of the 1909 Act. By all recorded accounts known to the plaintiffs, there is nothing to suggest that the Congress which passed the 1909 Act viewed renewal rights as limited to the United States.[47] Nor do there appear to be any cases which declared any such geographic limitations. In

---

[46] *Revision of Copyright Laws: Hearings on H.R. 10976 before the Committees on Patents of the Senate and House of Representatives on Pending Bills*, 60th Cong., 120 (1908); *see also* H.R. Rep. No. 2222, S. Rep. No. 1108, 60th Cong., 2d Sen. (1909).

[47] No doubt, the defendant could likely come forth with evidence that, under common industry practice, publishers have long refused to return to authors the full value of the renewal copyright. But industry practice should be irrelevant in the Court's analysis, as should the apparent fact that no author prior to now has directly challenged those practices it in court. "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020).

fact, judicial decisions in the half-century following the enactment of the 1909 Act were clear in their regard for the renewal copyright as an entirely "new estate" that cut off the rights of the original copyright owner.[48] In asking the Court to dismiss Count One, the defendant relies heavily on two judicial opinions interpreting the scope and effect of the 1909 Act's renewal provisions: the Supreme Court opinion in *Stewart* and the district court opinion in *Rohauer v. Killiam Shows, Inc.*, 379 F. Supp. 723 (S.D.N.Y. 1974). Each deserves further consideration.

### i. *Stewart v. Abend*

The defendant goes as far as to say that the *Stewart* decision is binding precedent that *requires* the Court to conclude "that the renewal-term rights to the author's estate … does not affect a transferee's continued ownership of foreign rights."[49] This statement is plainly incorrect. To briefly summarize the facts of *Stewart*, in 1945, Cornell Woolrich agreed to assign the motion picture rights in his previously published story, "It Had To Be Murder," to a production company. *Stewart*, 495 U.S. at 212. This agreement included a promise to obtain a renewal copyright in the work and to assign the same motion picture rights for the 28-year renewal term. *Id*. The production company further assigned its rights to another production company co-owned by Jimmy Stewart. *Id*. Stewart's production company created a film adaptation of the work and released it in 1954. *Id*. Woolrich passed away in 1968, before the commencement of the renewal term. *Id*. Consequently, he could not transfer the renewal rights as originally promised. In 1969, since Woolrich had no surviving spouse or child, his executor renewed the copyright of the story and assigned the renewal rights to Sheldon Abend. *Id*. Two years later, the ABC television network

---

[48] Barbara A. Ringer, *Copyright Law Revision: Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the Comm. on the Judiciary: Study No. 31: Renewal of Copyright*, U.S. Sen., 86th Cong., 121 (1958) (hereinafter, the "Copyright Office Study"), at 124, n.128 (citing cases); *see also G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469 (2d Cir. 1951) (holding that the right to continue exploiting a derivative work pursuant to an agreement granting rights for "all countries in the world" was unequivocally extinguished upon renewal of the original work).

[49] R. Doc. 12-1, at 14.

broadcasted the film pursuant to a license from Stewart's company. *Id*. Abend notified all relevant parties that he considered such broadcast to violate his rights in the renewal copyright. *Id*. at 212-213. Legal wrangling ensued over the next few years, but ultimately, it appears that Stewart conceded the point. That is, until the Second Circuit issued its opinion in *Rohauer v. Killiam Shows, Inc.*, 551 F.2d 484 (2d Cir. 1977). In *Rohauer*, the Second Circuit reversed the district court opinion (cited by the defendant and discussed below) to hold that renewal rights did not affect pre-renewal derivatives which were created in accordance with an assignment of the original copyright. *Id.*  In reliance on *Rohauer*, Stewart re-released the film and aggressively exploited it in all manner of media. *Stewart*, 495 U.S. at 213-214. Naturally, litigation commenced anew, eventually reaching the Ninth Circuit in *Abend v. MCA, Inc.*, 863 F.2d 1465 (9th Cir. 1988), which held the opposite of *Rohauer*. *Id*. at 227. The Supreme Court granted certiorari.

The only question presented in and answered by *Stewart* was "whether the owner of the derivative work infringed the rights of the successor owner of the pre-existing work by continued distribution and publication of the derivative work during the renewal term of the pre-existing work." *Stewart*, 495 U.S. at 211. The Supreme Court's decision rejected the *Rohauer* approach in favor of the owner of the renewal copyright holder. *Id.* at 216. The decision says *nothing* about the geographical scope of the renewal copyright interest, and thus, can in no way be said to "require" a particular result in the case at bar. That said, the discussion of renewal rights in *Stewart* is better read to support the plaintiffs here. For example, the Supreme Court regarded the renewal copyright as the author's "second chance *to control and benefit from* his work." *Id*. at 218 (emphasis added). *Stewart* further provides that even when an author agrees to assign rights in the renewal term to another, "[i]f the author dies before [the commencement of the renewal period], the next of kin obtain the renewal copyright free of *any claim* founded upon an assignment made by the author in

17

his lifetime." *Id.* at 219 (emphasis added). Applied here, given that the defendant's "claim" to foreign exploitation rights is indisputably "founded upon" the worldwide grant in the 1963 Assignment made by Mr. Smith "during his lifetime," *Stewart* suggests that Windsong's (and thus, the defendant's) rights in Mr. Smith's interest in Double Shot were extinguished *in their entirety* when his heirs were vested with the Renewal Copyright Interest.[50]

The defendant places significant weight on the Supreme Court's discussion of the "contingent" nature of the renewal estate and the "expectancy" received by an assignee of that estate. Specifically, the defendant states that, with respect to foreign rights, "the effect of the grant should remain unchanged, because the foreign rights granted are not mere expectancies but valid full-term rights under the copyright laws of other countries, fully vested in the author for their entire duration *ab initio*."[51] The defendant's argument here sits on a broken foundation. It assumes, first, that there are "multiple" and "separate" copyrights in a single work throughout the world. Second, it assumes that a foreign jurisdiction has the authority to determine ownership of a domestic asset. Third, it assumes that the term of duration of copyright in the United States is irrelevant to the duration of protection abroad. None of these assumptions are supported.

To begin, as discussed above, there is only one copyright, afforded in the work's country of origin and then recognized by the international community pursuant to treaty obligations. With that understanding, the "fully vested" argument evaporates. Foreign recognition of the United States renewal copyright would belong to the owner thereof, meaning that foreign rights are no

---

[50] In discussing *Stewart*, the defendant states that a geographically limited renewal right is consistent with "the plain statutory language" of Section 304(c)(6)(E) in the 1976 Act. As detailed below in discussing Count Two, the plaintiffs believe the defendant's interpretation of Section 304 to be incorrect. However, if the defendant is correct about Section 304(c)(6)(E), because the renewal provisions of the 1909 Act have no analogous limitation, *Stewart* would further cut against dismissing Count One. *Stewart* counsels that the limitations in Section 304(c)(6)(A)-(E) would not otherwise exist absent their including in the statute. *Stewart*, 495 U.S. at 226–27. Accordingly, if, as the defendant posits, the renewal copyright so obviously lacks international effect, there would have been no need for Congress to include Section 304(c)(6)(E) in order to expressly limit the geographic scope of any reversion of that copyright.
[51] R. Doc. 12-1, at 15.

18

less an "expectancy" than the potential second term itself. Moreover, the notion that questions of ownership of a domestic asset should be answered using foreign law is directly contrary to the principle reflected in *Itar-Tass* and its progeny, which is further discussed below.[52] Finally, the defendant's "expectancy" argument ignores the fact that many countries follow the so-called "rule of the shorter term" reflected in the UCC and the Berne Convention.[53] The "rule of the shorter term" relieves any member country from extending copyright protection to a foreign work for any longer than that work is protected in its country of origin.[54] As such, it is impossible to say that the assignee of an original copyright could "expect" to receive copyright protection abroad after the term of the original copyright expired. In sum, the defendant's "expectancy" argument, although creative, does not find support in *Stewart.*

### ii. *Rohauer v. Killiam Shows, Inc.*

Turning next to the defendant's citation to *Rohauer.* The defendant cites the district court opinion for the sweeping proposition that foreign rights are not part of the renewal estate.[55] Given the consequential effect of this statement, it is worth exploring exactly what the district court said. The facts in *Rohauer* are quite similar to those in *Stewart.* According to the district court, a British citizen named Edith Maude Hull wrote a novel entitled "The Sons of the Sheik." *Rohauer*, 379 F. Supp. at 725. In 1925, Hull assigned the motion picture adaptation rights in the work throughout the world and agreed to assign the same rights during the renewal term of protection. *Id.* The assignee then produced and released a motion picture based on Hull's novel. *Id.* at 726. Hull died in 1943, and, in 1965, her only child filed the necessary documents to obtain a renewal copyright

---

[52] *See infra* at 22-24; *see also* Restatement (Second) of Conflict of Laws § 222 (1971) ("The interests of the parties in a thing are determined, depending upon the circumstances, either by the 'law' or by the 'local law' of the state which, with respect to the particular issue, has the most significant relationship to the thing and the parties.")

[53] UCC, *supra* note 25, art. IV; Berne Convention, *supra* note 23, art. 7-8.

[54] *Id.*

[55] R. Doc. 12-1, at 14.

19

in the United States for the novel. *Id.* at 725. Hull's heir then transferred her interest in the renewal copyright to Rohauer that same year. *Id.* at 726. In 1971, the motion picture version of the novel was broadcast on television without a license from Rohauer. *Id.* Rohauer brought suit, arguing that the renewal of the copyright following Hull's death extinguished any rights which the original assignee (and any successors in interest) previously acquired. *Id.* at 727. The district court agreed with that argument, finding that Hull's heir (and thus Rohauer as assignee) had a "new and independent right in the copyright, free and clear of any rights, interests, or licenses attached to the copyright for the initial term." *Id.* The court held that the defendant's broadcast of the movie version in 1971 was an infringement on Rohauer's rights in the underlying work. *Id.*[56]

The defendant raised a plethora of affirmative defenses in the district court to mitigate the finding of infringement. One of them was that the assignment to Rohauer in 1965 had explicit recognition of Hull's prior 1925 assignment, and thus, the defendant argued, the assignment implicitly excluded the motion picture rights previously assigned. *Id.* at 734. In response, the district court made two observations. First, the court observed that the argument "ignore[d] the principle that assignments of rights made during the original term of the copyright do not bind those who succeed to the renewal rights." *Id.* Second, the court noted that, at the time of the 1925 assignment, the copyright laws in countries adhering to the Berne Convention (including Great Britain) provided for a unitary term of copyright protection based on the life of the author. *Id.* at 735. Further, the court observed that the copyright law in Great Britain provided the author's heirs a right of reversion 25 years after the author's death. *Id.* Accordingly, Hull's heir would receive a reversion under the copyright law of Great Britain in 1968. *Id.* The court concluded that the reference to the prior 1925 assignment in the 1965 assignment to Rohauer could be read as a mere

---

[56] As previously noted, the Second Circuit reversed the district court opinion, setting the stage for the Supreme Court to eventually resolve the issue in Stewart.

acknowledgment of the fact that, in 1965, Hull's heir, only possessed rights in the novel in the United States pursuant to the renewal provisions in the 1909 Act. *Id.* ("Rohauer was at that moment vested only with rights to the work in the United States.") In other countries, the court said, Hull's heir would not have any rights to assign to Rohauer until 1968. *Id.*

In seeking to dismiss Count One, the defendant cites a snippet of the district court's opinion in *Rohauer* for the proposition that the court "clearly contemplate[d] that foreign rights do not revert to the author's estate."[57] But a closer examination reveals that *Rohauer* has truly little persuasive value here. As an initial matter, this part of the district court opinion is clearly dicta which lacks anything close to full analysis on the geographical scope of renewal rights. But more importantly, the defendant's argument ignores that Hull was a British citizen and that the United States was not her novel's country of origin. With that context, it is not at all surprising that any renewal right afforded to this British work under United States law would properly be viewed as having no effect elsewhere.[58] To hold otherwise would clearly violate the choice of law rules later articulated by the Second Circuit in *Itar-Tass*, which are discussed below. Accordingly, the defendant's attempt to analogize the scope of renewal copyright afforded to Hull's foreign work to the scope of the Renewal Copyright in Double Shot under United States law is misplaced.[59]

### C. Territoriality and Renewal Rights

In the absence of any textual support in the 1909 Act for the defendant's geographically limited renewal rights theory, the defendant argues that the ordinary presumption against

---

[57] R. Doc. 12-1, at 14.

[58] Arguably, if Hull had been a citizen of the United States, Great Britain would have been required to recognize her heir's renewal rights pursuant to the material reciprocity principle. In other words, since the United States gave Hull (as a British citizen) renewal rights, Great Britain would be required to do the same for an American author.

[59] There appears an even larger hole in the defendant's citation to *Rohauer*. The court implies that, following reversion in the work's country of origin (*i.e.*, Great Britain), Hull's heir would recapture rights in the work, not just Great Britain, but also in the "*other countries*" with the Berne Convention membership. In that way, this decision not only fails to support dismissal of Count One, it also bolsters the validity of Count Two.

21

extraterritorial application of the Copyright Act (discussed at length above) means that ownership of the renewal estate cannot extend beyond the United States. To be clear, a claim is not "extraterritorial" simply because it involves foreign acts, events, rights, or parties. *See, e.g., Kirtsaeng*, 568 U.S. 519 (2013); *Quality King Distributors, Inc. v. L'anza Rsch. Int'l, Inc.*, 523 U.S. 135 (1998). While application of the Copyright Act to infringements occurring entirely abroad would be impossible to defend, questions of copyright *ownership* have never been viewed through the same lens as infringement in this regard. The leading case on this issue is *Itar-Tass*.

In *Itar-Tass*, among the plaintiffs were Russian publishers of foreign newspapers and magazines. 153 F.3d at 84. The foreign publishers brought an infringement action against a domestic Russian-language weekly newspaper distributed in New York. *Id*. The defendant did not dispute copying some works without permission. *Id.* Instead, the defendant challenged the right of the publishers to bring the infringement claim altogether, arguing that, under Russian law, the publishers were not the owners of the copyright in the works copied. *Id.* The court acknowledged that on infringement issues, "the governing conflicts principle is usually *lex loci delicti*, the doctrine generally applicable to torts."[60] But as to ownership, the court noted, "[c]opyright is a form of property, and the usual rule is that the interests of the parties in property are determined by the law of the state with the most significant relationship to the property and the parties." *Id.* at 90 (citing Restatement (Second) of Conflict of Laws § 222)). The court reasoned that, in this case, the "country of origin" as designated in the Berne Convention was the country with the most significant relationship to the works at issue. *Itar-Tass,* 153 F.3d at 90. Accordingly, even though

---

[60] Citing *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189 (2d Cir. 1985), the court then states, "[w]e have implicitly adopted that approach to infringement claims, applying United States copyright law to a work that was unprotected in its country of origin." *Id.* at 91. The defendant cites *Hasbro* for the proposition that *ownership* of a copyright is multiplicitous. R. Doc. 12-1, at 8, n.7. Clearly, the Second Circuit views *Hasbro* as a choice of law case in the context of infringement, and not as a comment on whether there are "multiple" and "separate" copyrights throughout the world as the defendant argues.

the Copyright Act was appropriate to determine the scope of protection afforded to these foreign works in the United States, Russian law would be applied to determine the ownership thereof. *Id.* at 91. The court went on to hold that, under Russian law, the publishers were not owners of the news articles alleged to have been infringed. As such, they were not proper plaintiffs in the infringement action. *Id.* at 92.[61] *Itar-Tass* has been embraced in the Fifth Circuit[62] and elsewhere.[63]

In the instant matter, the defendant consistently conflates the law applicable to the scope of protection afforded pursuant to the principle of national treatment, and the determination of *who* is entitled to receive and enforce that protection. In this way, the defendant has adopted what *Itar-Tass* referred to as Professor Nimmer's "overstatement" of the national treatment principle. In fact, "[w]hether U.S. copyright law directs U.S. courts to look to foreign or domestic law as to certain issues is irrelevant to national treatment, so long as the scope of protection would be extended equally to foreign and domestic authors." *Id.* at 90, n.8. A relatively recent district court case from the District of Nevada, *Corbello v. DeVito* reinforces that, under *Itar-Tass*, even when an infringement question involves *foreign* exploitations, if the work is of United States origin, the antecedent question of ownership must be answered under *domestic* law, without regard to national treatment obligations. *Corbello v. DeVito*, 844 F. Supp.2d 1136, 1157 (D. Nev. 2012), *rev'd on other grounds* 777 F.3d 1058 (9th Cir. 2015).

Lastly, taken to its logical conclusion, the defendant's insistence that the Court look abroad to determine the ownership of the Renewal Copyright Interest, could yield absurd results. A

---

[61] The court limited its opinion to *initial* ownership of a copyright, saving questions of ownership through assignment for another case. *Itar-Tass,* 153 at 91.

[62] *See Alameda Films SA de CV v. Authors Rts. Restoration Corp. Inc.*, 331 F.3d 472 (5th Cir. 2003).

[63] *See*, *e.g., Saregama India Ltd., v. Mosley*, 635 F.3d 1284 (11th Cir. 2011); *RCTV Int'l Corp. v. Rosenfeld*, No. 13-23611-CIV, 2016 WL 6818955, at *6 (S.D. Fla. Sept. 30, 2016); *Corbello v. DeVito*, 844 F. Supp. 2d 1136, 1156–57 (D. Nev. 2012); *New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 CIV. 6433 NRB, 2012 WL 251976, at *9 (S.D.N.Y. Jan. 11, 2012); *Rudnicki v. WPNA* 1490 AM, No. 04 C 5719, 2009 WL 4800030 (N.D. Ill. Dec. 10, 2009); *Lahiri v. Universal Music & Video Distribution, Inc.*, 513 F. Supp. 2d 1172, 1176 (C.D. Cal. 2007).

hypothetical may help illustrate the point. First, assume that the 1963 Assignment did not assign Windsong any rights in the renewal term. Mr. Vetter and Mr. Smith's heirs obtained the Renewal Copyright in 1994 as a new estate. Suppose in 1995, a bootlegger from Detroit is caught by Canadian law enforcement in nearby Windsor selling pirated copies of Double Shot on compact discs. Canada is a member of both the UCC and the Berne Convention[64] and must afford Double Shot national treatment. The owners of the Renewal Copyright file a lawsuit against the Detroit bootlegger in the District Court for the Eastern District of Michigan. Because the Copyright Act has no "extraterritorial" application to foreign infringements, the court must apply Canadian law. Section 27(1) of Part 3 of the Canadian Copyright Act provides that "[i]t is an infringement of copyright for any person to do, without the consent of the *owner of the copyright*, anything that by this Act only the *owner of the copyright* has the right to do."[65] Under the defendant's theory, the district court would have to look to the laws of Canada to determine who the "owner of the copyright" is, and since Canada uses a unitary term of protection, the Renewal Copyright would be disregarded in its entirety and Windsong must be declared the "owner of the copyright" in Canada. Hence, Windsong is the only one who can pursue a claim against the bootlegger. This result appears entirely inconsistent with and foreclosed by *Itar-Tass* and its progeny.[66] Yet, if one simply follows the defendant's argument to its natural conclusion, it is the only result available.

\*\*\*

In summary, the renewal provisions of the 1909 Act provided Mr. Smith's heirs with a completely new property interest. Upon vesting of the Renewal Copyright, all of Windsong's

---

[64] Copyright Office Circular, *supra* note 18.

[65] Canadian Copyright Act, Part 3 § 27(1) (emphasis added), *available at* https://laws-lois.justice.gc.ca/eng/acts/C-42/index.html.

[66] It would be similarly absurd to suggest that the owner of a United States work that was "made for hire" would have such ownership rejected in countries which restrict the ability of creators to divest themselves of the authorship rights in their works.

24

rights in the Original Copyright derived from Mr. Smith's prior assignment were cut off. There is no support in the 1909 Act, textual or otherwise, for the notion that the Renewal Copyright Interest is geographically limited, and the judicial decisions cited by the defendant do not counsel otherwise. Lastly, the defendant cannot invoke territoriality principles to defeat the plaintiffs' claim, as questions of ownership regarding the Renewal Copyright Interest must be decided under United States law. For all of the foregoing reasons, Count One states a cognizable claim and, accordingly, the Court should deny the *Motion to Dismiss* as to Count One.

### 3. Count Two: Ownership of the Terminated Copyright Interest

Count Two of the *Complaint* asks the Court to declare Mr. Vetter the sole, worldwide owner of the Terminated Copyright Interest which he acquired pursuant to Section 304(c) of the 1976 Act.[67] The defendant asks the Court to dismiss Count Two for failure to state a claim.[68] To decide the issue, the Court must interpret the reversion (or "termination") provisions of the 1976 Act, as it is the direct source of the Terminated Copyright Interest. However, like the renewal provisions in the 1909 Act, termination rights in the 1976 Act cannot be examined in a vacuum. Here again, appreciating the history, purpose, and policy behind those rights is critical to understanding why the plaintiffs should prevail.

### A. The Evolution of Termination Rights

Congress began the process of overhauling the 1909 Act in the late 1950s.[69] One of the principal issues Congress sought to address was the duration of copyright protection.[70] Although previous efforts had failed,[71] many still favored adopting a unitary term to bring the United States

---

[67] R. Doc. 1, at 16-17.
[68] R. Doc. 12-1, at 5-12.
[69] Jessica Litman, *Copyright, Compromise, and Legislative History*, 72 Cornell L. Rev. 857, 872 (1987).
[70] *Id.* at 865, 888.
[71] *See* Copyright Office Study, *supra* note 48, at 191-202 (discussing various bills to revise the 1909 Act).

in general accord with international laws on duration.[72] One of the most troublesome issues surrounding the adoption of a unitary term stemmed from the fact that the elimination of the renewal term threatened to undermine the protections for authors against unremunerative transfers.[73] The idea of a reversion right took hold with authors and their representatives at the negotiating table. If there was to be a unitary term, the author should be able to recapture rights alienated through assignment. The opposition from the publishing and motion picture industries to such a reversion right was fierce.[74] However, after years of negotiation between authors and the affected industries, they were able to agree on a reversion structure that would protect authors while "recognizing the problems and legitimate needs of all interests involved."[75]

The 1976 Act would maintain the dual-term renewal structure for works created prior to January 1, 1978. To lengthen the duration of protection for such works, Congress created a new property interest dubbed an "extended renewal copyright," which would provide 19 years of additional protection.[76] For all works created on and after January 1, 1978, such works would be protected for a term based on the life of the author plus 50 years.[77] As for reversion of rights, Congress added Section 203 for works governed by the unitary term, and Section 304(c) for works governed by the renewal structure. The provisions are analogous in most respects, but function somewhat differently. Section 203 permits authors to terminate the transfer or license of their copyright within a window commencing 35 years after the date of the grant and closing five years thereafter. Section 304 allows for the termination of transfers during the extended renewal term of

---

[72] *Id*. at 202-220.

[73] Litman, *supra* note 69, at 866, n.56.

[74] *Id*. at 891.

[75] 1976 House Report, *supra* note 1, at 124.

[76] *Id*. at 141.

[77] *Id*. at 133. This duration was extended to the life of the author plus 70 years in 1998. *See Eldred v. Ashcroft*, 537 U.S. 186, 193 (2003).

26

the renewal copyright within a window commencing 56 years after the date the original copyright was secured and closing five years thereafter. The legislative history provides additional insight as to the intentions of Congress. "[Rights of termination] are based on the premise that the reversionary provisions of the present section on copyright renewal [in the 1909 Act] should be eliminated, and that the proposed law should substitute for them a provision safeguarding authors against unremunerative transfers."[78] Notably, Congress considered the "arguments for granting rights of termination [as] even more persuasive under section 304 than they are under section 203; [principally because] the extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it." To avoid a repeat of *Fred Fisher*, Congress made the termination right exercisable "notwithstanding any agreement to the contrary."[79]

In a nod to publishers and motion picture companies, in addition to requiring the author or the author's heirs to undertake affirmative steps to effect termination (instead of being automatic as some early proposals had provided), Congress created certain limitations on the termination right. There were two major limitations included which paved the way for passage of the 1976 Act. The first involved works made for hire. To begin, Congress exempted works made for hire from termination. This exemption was hotly contested by authors' groups. Even more controversial was the expansion of the scope of works that could be considered works made for hire. Beginning in the 1976 Act, in addition to works made for an employer by an employee, works could be considered "made for hire" even absent an employment relationship provided that there was a written agreement to that effect.[80] However, those provisions were only applicable to certain

---

[78] 1976 House Report, *supra* note 1, at 124.
[79] 17 U.S.C. §§ 203(a)(5), 304(c)(5).
[80] 17 U.S.C. § 101 (definition of "work made for hire").

types of works, contributions to a motion picture being one of them. The second major concession to the industries involved derivative works. As established in *Stewart*, under the 1909 Act, once a copyright was renewed, any rights to exploit a derivative work created under the original copyright were cut off. Not so for terminations. Under the express limitations in the 1976 Act, derivative works could continue to be exploited in accordance with the terms of the initial grant. It is not hyperbole to state that these two concessions represented a "historic compromise" which finally allowed the proposed bill to move forward. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 746 (1989). In addition to these limitations, the defendant interprets the statute to also exclude a return of any right to exploit the work outside of the United States. For the reasons discussed below, the plaintiffs believe this interpretation is outdated and wrong.

### B.  Termination Rights in the 1976 Act

As before, interpretation of the reversion provisions in the 1976 Act must begin with the text itself. Section 304(c) provides, in relevant part, that:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978 . . . is subject to termination . . ..[81]

The parties do not appear to be in disagreement regarding the general effect of the foregoing, nor whether Mr. Vetter timely served and recorded the Termination Notice. Where the parties depart in their view of the text is regarding one of the six enumerated limitations on termination rights identified in the 1976 Act. Specifically, Section 304(c)(6)(E) provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title,

---

[81] 17 U.S.C. § 304(c). Given the lack of substantive differences for purposes of this case, the plaintiffs will not distinguish between Sections 203 and 304(c) unless meaningful to do so.

and in no way affects rights arising under any other Federal, State, or foreign laws."[82] According to the defendant, the foregoing limitation "can only result in the recapture of U.S. rights, not foreign rights."[83] The plaintiffs respectfully disagree.

As an initial matter, despite the defendant's professions of clarity, the text of Section 304(c)(6)(E) is not free from ambiguity. At the very least, the phrase "under this title" has been deemed ambiguous (and without geographic significance) in connection with the 1976 Act:

> One difficulty is that neither "under" nor any other word in the phrase means "where." It might mean "subject to," but as this Court has repeatedly acknowledged, the word evades a uniform, consistent meaning. "[U]nder" is a chameleon with many dictionary definitions and must draw its meaning from its context.

*Kirtsaeng*, 568 U.S. at 531(internal quotations and citations omitted). Consequently, both the rights covered by the grant that "arise *under this title*," which are subject to termination, and the rights that "aris[e] *under any other* Federal, State, or foreign laws" which are not subject to termination, present issues of facial ambiguity.  In light of this ambiguity, the meaning must be drawn from context, and it is proper to employ interpretive canons of statutory construction. *See Vielma v. Eureka Co.*, 218 F.3d 458, 464 (5th Cir. 2000). To that end, the text of the subject limitation must be given its ordinary, contemporary, common meaning. *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 408 (2017). However, the Court need not isolate its consideration of the subject limitation to the text of Section 304(c)(6)(E). "[I]nterpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." *Maracich v. Spears*, 570 U.S. 48, 65 (2013). Instead, the Court should "look to the provisions of the whole law" to determine the meaning of Section 304(c)(6)(E). *Star Athletica,* 580 U.S. at 408.

---

[82] 17 U.S.C. § 304(c)(6)(E). Identical language is found in Section 203(b)(3).
[83] R. Doc. 12-1, at 6.

29

The legislative history of a statute may be instructive and used to clear up ambiguity. *Bostock*, 140 S. Ct. at 1749. However, "it is ultimately the provisions of [the] legislative commands rather than the principal concerns of our legislators by which we are governed." *Id.* Moreover, "even in its secondary role legislative history must be used cautiously." *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*, 286 F.3d 803, 805-06 (5th Cir. 2002). Relevant here, it has been observed that much of the legislative history in connection with the 1976 Act is not particularly reliable. *Stewart*, 495 U.S. at 226 [84] This is due in no small part to the long, winding road it took to enactment. *Id.* Still, what can reasonably be gleaned from the 1976 House Report supports the plaintiffs.

First, Congress recognized that "[c]opyrighted works move across national borders faster and more easily than virtually any other economic commodity, and with the techniques now in common use this movement has in many cases become instantaneous and effortless."[85] One of the principal goals of the 1976 Act was to "provide certainty and simplicity in international business dealings."[86] In this vein, the Supreme Court has described the 1976 House Report as reflecting a clear desire to "enhanc[e] predictability and certainty of copyright ownership." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989).[87] Regarding the termination provisions in the 1976 Act, these new rights were intended to "substitute" for renewal rights under the 1909 Act as a means of "safeguarding authors against unremunerative transfers."[88] Congress viewed "the arguments for granting rights of termination [as] even more persuasive under section 304 than they are under section 203."[89] "[A]lthough affirmative action is needed to effect a termination, the right

---

[84] Citing Litman, *supra* note 69.
[85] 1976 House Report, *supra* note 2, at 135.
[86] *Id.*
[87] Citing 1976 House Report, *supra* note 2, at 129.
[88] 1976 House Report, *supra* note 2, at 124.
[89] *Id.* at 140.

to take this action cannot be waived in advance or contracted away."[90] Congress intended the scope of the right to extend to both nonexclusive licenses and any "transfer of copyright ownership" as defined in the 1976 Act.[91] In turn, a "transfer of copyright ownership" is defined as an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, *whether or not it is limited in* time or *place of effect…*"[92] Congress believed the effect of termination to mean that "ownership of the *rights covered by the terminated grant* reverts to everyone who owns termination interests on the date the notice of termination was served."[93]

As to the exclusions and limitations on termination rights, Congress expressly recognized that "[t]he right of termination would not apply to 'works made for hire,' which is one of the principal reasons the definition of that term assumed importance in the development of the bill."[94] Additionally, "[a]n important limitation on the rights of a copyright owner under a terminated grant" can be found in Sections 203(b)(1) and 304(c)(6)(A), both of which provide that, "notwithstanding a termination, a derivative work prepared earlier may continue to be utilized under the conditions of the terminated grant."[95] Congress was explicit, however, in clarifying that such "privilege is not broad enough to permit the preparation of other derivative works."[96] Principally relevant here, Congress also limited termination to "rights covered by an existing grant," leaving "other Federal, State, or foreign laws" unaffected.[97]

---

[90] *Id* at 124-125.

[91] *Id.* at 125.

[92] 17 U.S.C. § 101 (emphasis added).

[93] *Id.* at 127 (emphasis added).

[94] *Id.* at 125.

[95] *Id.* at 127.

[96] *Id.*

[97] *Id.*

Unfortunately, the 1976 House Report did not expand upon what "other laws" Congress had in mind when it pronounced them unaffected by termination. Prior to *Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008), courts interpreting this phrase appear to have focused on contractual rights. For example, in *Walthal v. Rusk*, the Seventh Circuit observed that "state contract laws pertain to the transfer of interests under the Copyright Act. Section 203(b)(5) itself specifically provides that termination of a grant under the statute 'in no way affects rights arising under any other Federal, State, or foreign laws.'" 172 F.3d 481, 485 (7th Cir. 1999); *see also Capture Eleven LLC v. Otter Prod., LLC*, 2022 WL 5192763, at *2 (D. Colo. Oct. 5, 2022). The plaintiffs' view of *Siegel* is fully detailed below, but they acknowledge that, as a matter of first impression, the district court interpreted the limitation identified in Section 304(c)(6)(E) as a geographical one. Suffice it to say, the result in *Siegel* is called into serious doubt by *Kirtsaeng*, also discussed below.

### i. *Siegel v. Warner Bros. Entertainment, Inc.*

The district court in *Siegel* held that the reversion provisions of the 1976 Act exclude the return of any rights arising under foreign law.

> Although the Court can locate no case that has specifically addressed the issue of accounting profits from the foreign exploitation of a copyright that is subject to a valid termination notice, the statutory text could not be any clearer on this subject. Through this section, Congress expressly limited the reach of what was gained by the terminating party through exercise of the termination right; specifically, the terminating party only recaptured the domestic rights (that is, the rights arising under title 17 to the United States Code) of the grant to the copyright in question. Left expressly intact and undisturbed were any of the rights the original grantee or its successors in interest had gained over the years from the copyright through other sources of law, notably the right to exploit the work abroad that would be governed by the copyright laws of foreign nations. Thus, the statute explains that termination "in no way affects rights" the grantee or its successors gained "under foreign laws."

32

*Siegel*, 542 F. Supp. 2d at 1140. Notably, this statement is without any citation to judicial authority, apparently because the court considered the question as a matter of first impression. *Id.* In the absence of precedent on point, the district court chose to rely heavily on the opinions of two highly respected copyright scholars, Professors Nimmer and Patry. While the credentials of Professors Nimmer and Patry are unassailable, their opinions are not. *See, e.g., Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005); *Itar-Tass*, 153 F.3d at 89 (Nimmer "somewhat overstates the national treatment principle"); *McClatchey v. Associated Press*, 2007 WL 1720080, at *1 (W.D. Pa. June 8, 2007); *Bouchat v. Champion Prod., Inc.*, 327 F. Supp. 2d 537, 553 (D. Md. 2003); *Bridgeman Art Library v. Corel Corp.*, 36 F. Supp. 2d 191, 193 (S.D.N.Y. 1999) ("Professor Patry's contention that the United States may not apply foreign law less restrictive than its own with respect to originality may be too narrow."). In fact, Professor Nimmer's views on territoriality have been rejected in this District as recently as 2016 by Judge deGravelles in *Mapp v. UMG Recordings*, Inc., 208 F. Supp. 3d 776, 793–94 (M.D. La. 2016) (deGravelles, J.).[98] And, of course, one can respect the expertise of Professors Nimmer and Patry without outsourcing the job of statutory interpretation to them. Nor should interpretation of the law be outsourced to the views of the industries purposely disfavored by the termination provisions. *Cf. Kirtsaeng*, 568 U.S. at 550 (declining to ascertain the best reading of the 1976 Act by dissecting the remarks of industry representatives at congressional meetings held 10 years before the statute was enacted).

Apart from the citations to Professor Nimmer and Professor Patry's respective treatises, there is little analysis from the district court on this point. The court does reference "the longstanding rule that the copyright laws of this country have no application beyond the U.S. border." *Siegel*, 542 F. Supp. 2d at 1141 (citing *Los Angeles News Serv. v. Reuters Tv. Intern.*, 340

---

[98] Order vacated in part on other grounds, No. CV 15-602-JWD-RLB, 2017 WL 3675419 (M.D. La. May 3, 2017).

F.3d 926, 931 (9th Cir. 2003)) (internal quotations omitted). But here again, there is no real explanation as to why the court considered this rule to be controlling in light of *Itar-Tass* and its progeny. The decision continues:

> If Congress contemplated the ability to attach or otherwise force the accounting of foreign profits to which the original grantee or its successors are legally entitled under the copyright laws of other nations through the backdoor of applying state law tenant in common principles, one would have expected such an intention to have been made expressly, and certainly with some explanation given the incongruity that arises from the statutory language's notation that termination did not affect another's rights under "foreign laws."

*Id.* This passage can be criticized on multiple grounds. First, given that "[o]rdinarily, Congress' silence is just that—silence," the conclusion drawn by the court is debatable. *See Reid*, 490 U.S. at 749. Second, given that Section 304(c)(6)(E) is a limitation on an otherwise broadly applicable termination right, it should have been construed more narrowly. Third, the court omits the word "other" from the "foreign rights" in discussing what is unaffected by termination, which omission changes the entire meaning of the limitation. These criticisms are equally applicable to the defendant's arguments to dismiss Count Two and are addressed fully below.[99]

Lastly, it is not surprising that a court within the Ninth Circuit viewed this matter through an "extraterritorial" lens. Indeed, prior to the Supreme Court's decision in *Kirtsaeng*, the Second and Ninth Circuits interpreted the ordinary meaning of the phrase "under this title" to naturally restrict geographic scope when used in the 1976 Act. *See Kirtsaeng*, 568 U.S. at 528. This may also explain why the Second Circuit has also stated (in dicta) that exercising termination rights only results in a return of the "domestic copyright interests." *Fred Ahlert Music Corp. v.*

---

[99] *See infra* at 37-42.

34

*Warner/Chappell Music, Inc.*, 155 F.3d 17, 18 (2d Cir. 1998).[100] Given that these decisions predate *Kirtsaeng* and are from the Circuits that "lost" in that case, they would seem to have little persuasive value to support the defendant's argument here.

### ii.    *Kirtsaeng v. John Wiley & Sons, Inc.*

The facts in *Kirtsaeng are* not particularly important and can be quickly summarized. Supap Kirtsaeng, a student from Thailand studying in the United States, imported and sold over 600 copies of English-language textbooks published by John Wiley & Sons' Asian subsidiary without authorization. John Wiley sued Kirtsaeng for copyright infringement. The central issue was whether the first sale doctrine,[101] which allows the resale of lawfully made copies without the copyright owner's permission, applies to goods manufactured abroad and imported into the United States. The district court and the Second Circuit sided with John Wiley, holding that the first sale doctrine does not apply to foreign-made goods. The Supreme Court granted certiorari and reversed, ruling that the first sale doctrine does apply to foreign-made goods lawfully purchased abroad and imported into the United States.

To reach this result, the Supreme Court was required to interpret what the 1976 Act means by "lawfully made under this title" in connection with the first sale provisions of the statute. Specifically, the Court needed to "decide whether the words 'lawfully made under this title' restrict the scope of [the] 'first sale' doctrine geographically." *Kirtsaeng*, 568 U.S. at 528. Against much protest from the dissenters regarding the "extraterritorial" reach of domestic copyright law, the majority held that, in fact, "under this title" did not have any geographical significance in this context. *Id.* at 530. Instead, "under this title" simply meant "in accordance with" or "in compliance

---

[100] The defendant also cites *Clancy v. Jack Ryan Enterprises, Ltd.*, 2021 WL 488683 (D. Md. Feb. 10, 2021) in support. However, the district court in *Clancy* relied exclusively on *Siegel* without any broader considerations. *Clancy*, 2021 WL 488683 at *46.
[101] 17 U.S.C. § 109.

35

with" the Copyright Act. *Id.* This non-geographic reading of the provision, said the Supreme Court, was "simple," "promoted a traditional copyright objective," and made "word-by-word linguistic sense." The decision dismissed the notion that a non-geographical reading was an "extraterritorial" application of the Copyright Act, noting that "the principle that copyright laws do not have any extraterritorial operation requires some qualification." *Kirtsaeng*, 568 U.S. at 532 (internal quotations and citation omitted).

***

Returning to the broader discussion of Section 304(c)(E)(6), given that identical words used in different parts of the same statute are generally regarded to have the same meaning, *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932), following *Kirtsaeng*, one must assume that "rights that arise *under this title*" as used in Section 304(c)(6)(E) lacks any geographical implications.[102] Properly construed, the limitation should be read to distinguish between, on the one hand, copyright ownership, and, on the other hand, all *other* rights that may come by way of "Federal, State, or foreign law." *Kirtsaeng* supports the plaintiffs' reading because it is simple, supports a traditional copyright objective, makes word-by-word linguistic sense, and narrowly construes a limitation on a broader right. Each of the foregoing is discussed below.

First, the plaintiffs' reading is simple. All rights under copyright law that the grantee received must be returned to the author through reversion. Full stop. There is no need to look to the laws of other countries to determine the scope of the reversion and whether they would honor the same. Moreover, it completely removes the grantee from decisions regarding the author's

---

[102] The fact that Section 304(c)(6)(E) has been long viewed by some as restricted in geographic effect is of no great moment. *Kirtsaeng* itself noted that federal courts had been interpreting Section 109 to have geographic restriction for nearly 30 years prior. *Kirtsaeng*, 568 U.S. at 543.

36

recaptured right to exploit the work. As such, there is no need for the author to, like in *Fred Ahlert*, seek the input or consent of the grantee for a license with international scope.[103]

Second, it promotes traditional copyright objectives. As previously established, like renewal rights in the 1909 Act, termination rights were and continue to be in furtherance of giving the *author* a second chance. Such is even more the case with Section 304(c) since termination of the extended renewal term does not invade or even touch the grantee's benefit of the initial bargain. If the goal of Section 304(c) is to ameliorate the effect of unremunerative transfers, and the right returns to the author the ability to exploit the reverted work in only *one* of the 181 countries in the Berne Convention, Section 304(c) simply does not achieve that goal. Accepting the defendant's interpretation would allow a scorned, absent, or merely dilatory grantee to prevent or lose any exploitation opportunity that is not strictly confined to the United States. That possibility is inconsistent with the fundamental goal of termination rights. Moreover, another goal of Congress in the 1976 Act was to enhance the predictability and certainty of copyright ownership. *Reid*, 490 U.S. at 749. The plaintiffs' reading of Section 304(c)(6)(E) does just that.

Third, the plaintiffs' reading of the statute makes word-by-word linguistic sense. If a "transfer of copyright ownership" is defined in the 1976 Act as being without regard to "place of effect,"[104] a termination of that transfer should be equally regarded.[105] Even more telling, the plaintiffs' non-geographic reading gives meaning to every word in the sentence.[106] By contrast, the defendant's reading does not. If, as the defendant argues, "rights that arise under this title"

---

[103] *Fred Ahlert Music Corp.*, 155 F.3d at 18.

[104] 17 U.S.C. § 101.

[105] The 1976 Act explicitly distinguishes between the "copyright" as an asset and the exclusive rights "comprised in" that asset. 17 U.S.C. § 101 (defining "transfer of copyright ownership"). The defendant's assertion that a termination of a "transfer" can only return the enumerated rights afforded to copyright owners in the 1976 Act is inconsistent with this distinction.

[106] Without question, courts should disfavor interpretations of statutes that render any part of the language superfluous. *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992).

37

means only the "specific rights enumerated in the U.S. copyright statute," what need would there be to include the qualification that all "other Federal, State, and foreign laws" remain unaffected? In other words, under the defendant's reading, the phrase "rights that arise under this title" already tells one all that needs to be known about the rights that revert. Any right that is *not* enumerated in the 1976 Act would be inherently excluded from the scope. There is no need to qualify further. But, of course, Congress *did* provide further qualification in stating that termination does not affect "other Federal, State, or foreign rights." The defendant's interpretation simply cannot be squared with that circle. Moreover, as previously mentioned, the *Siegel* interpretation urged by the defendant ignores the word "other" appearing before "Federal, State, and foreign laws," thereby giving "foreign" unqualified breadth. But that ignores the "ordinary understanding of how adjectives work." *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018). "Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality." *Id.* When a modifier such as "other" precedes a list of nouns separated by commas, it is presumed that the modifier applies to them all. *See Facebook, Inc. v. Duguid*, 592 U.S. 395, 403 (2021) (observing the "series-qualifier canon"). "The typical way to break the series is to insert a determiner." *United States ex rel. Vaughn v. United Biologics, L.L.C.*, 907 F.3d 187, 195 (5th Cir. 2018). Without a determiner, "other" naturally applies to "State" and "foreign" laws as well. When "other" applies to the entire series, the plaintiffs' reading of the limitation as a distinction between categories of "rights" rather than territories makes far more linguistic sense. In other words, the limitation makes clear that termination rights are not intended to extinguish *all* of the grantee's rights under an assignment agreement, rather only those related to a perpetual copyright assignment.[107] As applied here, Section 304(c)(6)(E) ensures that any of Mr. Vetter's obligations,

---

[107] This is reinforced by the provisions making the termination right inalienable "notwithstanding any agreement to the contrary." *See* 17 U.S.C. §§ 203(a)(5), 304(c)(5)

38

representations, warranties, or covenants made in the 1963 Assignment that do not pertain to copyright ownership remain intact. Conversely, Mr. Vetter's agreement to assign the Double Shot copyright interest in perpetuity is unenforceable and is subject to termination.

Finally, the plaintiffs emphasize something that *Siegel* skipped over without consideration. As a limitation on an otherwise broadly applicable termination right, Section 304(c)(6)(E) should be construed narrowly and not interpreted in such a way as to frustrate the purpose of such right. *Cf. Fame Pub. Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975) ("We begin by noting that the compulsory license provision is a limited exception to the copyright holder's exclusive right [and a]s such, it must be construed narrowly, lest the exception destroy, rather than prove, the rule."). In that regard, it is clear that the principal purpose of Section 304 "was to provide added benefits to authors." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172 (1985); *see also Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008) (termination rights are meant to award the author, not the assignee). "More particularly, the termination right [in Section 304(c)] was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music*, 469 U.S. at 172–73. Thus, the Court should interpret the limitation in Section 304(c)(6)(E) in a narrow manner so as not to frustrate the author's full enjoyment of the reverted rights. As is evident from this lawsuit, a sweeping geographic interpretation of Section 304(c)(6)(E) has frustrated and will continue to frustrate Mr. Vetter's full enjoyment of his recaptured rights in Double Shot.

There is one last interpretive canon to mention. That is, any interpretation of a statute that would lead to absurd results should be discarded. *See Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982). The defendant's interpretation would do just that. Consider the following

39

hypothetical. There is no dispute that the statute expressly prohibits the creation of additional derivative works[108] based on a work once the original grant has been terminated.[109] Now, suppose the defendant is correct, and he retains the right to exploit the work in all countries but the United States. This being the case, the defendant could make or authorize the creation of as many new derivative versions of Double Shot as he saw fit in any or all of the other 180 countries in the Berne Convention without any involvement or consent from Mr. Vetter. Moreover, given that *Kirtsaeng* expressly recognizes that foreign copies of the work may find their way into the United States without violating the Copyright Act, Mr. Vetter would be powerless to prohibit copies of such derivative works from being sold in the United States through secondary markets. Can this really be what Congress meant when it insisted that all rights to prepare new derivatives would be "cut off"?[110] There is nothing to suggest that Congress intended to countenance the natural result of the defendant's interpretation. By declaring Section 304(c)(6)(E) to be without geographic restriction, the Court can eliminate the possibility of such an absurd result occurring.

### C. Territoriality and Termination Rights:

The defendant states that Section 304(c)(6)(E) "recognizes the principles of territoriality and national treatment, which the U.S. and its treaty partners worldwide have recognized since the dawn of international copyright relations."[111] The defendant's view on territoriality rings familiar to the dissent in *Kirtsaeng*: "[I]ntellectual property law is territorial in nature, which means that creators of intellectual property may hold a set of parallel intellectual property rights under the laws of different nations." *Kirtsaeng*, 568 U.S. at 573 (Ginsburg, J., dissenting) (internal quotations

---

[108] A derivative work is defined as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

[109] 17 U.S.C. §§ 203(b)(1), 304(c)(6)(A).

[110] 1976 House Report, *supra* note 1, at 127.

[111] R. Doc 12-1, at 6.

and citations omitted). But this strict approach to territoriality was rejected by the majority in *Kirtsaeng* and should be here as well. Moreover, like with questions of initial ownership, questions regarding licenses and ownership through assignment have routinely been answered using the laws of the country with the most significant relationship[112] to the work concerned. *See, e.g., Mapp*, 208 F. Supp. 3d at 793–94 (regarding licenses); *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, 2016 WL 7507757, at *3 (S.D.N.Y. Dec. 30, 2016); *Dish Network L.L.C. v. TV Net Sols.*, LLC, 2014 WL 6685351, at *3 (M.D. Fla. Nov. 25, 2014). In this case, there can really be no dispute as to which country has the most significant relationship with Double Shot. The United States is the country of origin for the copyright therein, the parties to the 1963 Assignment are American, the 1963 Assignment was executed in the United States and provides that all disputes will be resolved under New York law.[113] Accordingly, the United States is the *only* country with any relationship to Double Shot and the 1963 Assignment, including the transfer of copyright ownership therein. As such, reversion thereof should be given full effect without regard to any other country's laws.

***

In summary, the 1976 Act provided Mr. Vetter with an inalienable right to terminate the transfer of copyright ownership in the 1963 Assignment. Upon reversion of the Terminated Copyright Interest, all of the defendant's rights in the Renewal Copyright derived from Mr. Vetter's prior assignment were cut off. There is no support in the 1976 Act, textual or otherwise, for the notion that the Terminated Copyright Interest is geographically limited, and the judicial decisions cited by the defendant have been called into serious doubt by the Supreme Court's decision in *Kirtsaeng*. Lastly, the defendant cannot invoke territoriality principles to defeat the

---

[112] Courts have looked to the Restatement (Second) of Conflict of Laws § 6 (1971) to make this determination.

[113] *See* R. Doc. 1-2, at 2, ¶16 (noting New York law will govern); This supports a finding that the parties expected United States law to govern issues relating to ownership and assignment. *See Creazioni*, 2016 WL 7507757, at *4.

plaintiffs' claim, as questions of ownership regarding the Terminated Copyright Interest must be decided under United States law. For all of the foregoing reasons, Count Two states a cognizable claim and, accordingly, the Court should deny the *Motion to Dismiss* as to Count Two.

## Conclusion

As the Court no doubt appreciates, the issue presented in this case is of vital importance to authors and their heirs. The plaintiffs certainly appreciate the unprecedented nature of their request. But the mere fact that seemingly no one has challenged objectionable interpretations of the Copyright Act does not detract from the strength of the plaintiffs' arguments. As established herein, the history and text of the Copyright Act, as well as the policy considerations that come with it, favor the plaintiffs. The defendant and his predecessors have enjoyed the fruits of Mr. Smith and Mr. Vetter's creative labor long enough. The Copyright Act ensures that those fruits are eventually returned to the plaintiffs to enjoy in full and without the defendant's participation or interference. Accordingly, the *Motion to Dismiss* should be denied.

Respectfully submitted,

**WELLS & KAPPEL, LLP**

/s/ Timothy Kappel
Timothy R.W. Kappel, LA Bar No. 32881 (Lead Attorney)
1615 Poydras Street, Suite 900
New Orleans, Louisiana 70112
Telephone: (504) 905-2012
Email: tkappel@wellskappel.com

*Counsel for Cyril Vetter and Vetter Communications Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2024, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be served upon all counsel of record by operation of the Court's electronic filing system.

/s/ Timothy Kappel