**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| **CYRIL VETTER** *and* **VETTER** | * | **CIVIL ACTION: 3:23-cv-1369** |
| **COMMUNICATIONS CORP** | * | |
| | * | |
| | * | |
| **VERSUS** | * | **Chief Judge Shelly D. Dick** |
| | * | |
| **ROBERT RESNIK** *individually and d/b/a* | * | **Magistrate Erin Wilder-** |
| **RESNIK MUSIC GROUP** | * | **Doomes** |
| | * | |
| | * | |
| | * | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**<u>MOTION TO AMEND ORDER PURSUANT TO 28 USC § 1292(b)</u>**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ........................................................................................... 1

II.  STANDARDS FOR CERTIFICATION UNDER 28 U.S.C. 1292(b) ............................... 4

III. THIS CASE INVOLVES CONTROLLING QUESTIONS OF LAW AS TO WHICH THERE IS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION................... 6

   A. There is a substantial ground for difference of opinion as to whether, under the principle of territoriality in copyright law, a work is subject to a single overarching international master copyright that each country is required to honor under its treaty obligations, or whether those treaty obligations instead require each country to grant its own copyright rights, under its own domestic law, to works from other member countries. .................... 6

      (1) Plaintiffs' Assertion that the U.S. renewal right extends worldwide (Order at 5)........................................................................................... 7

      (2) Plaintiffs' theory of how a U.S. copyright operates with respect to foreign countries (Order at 8)................................................................... 9

      (3) Plaintiffs' Assertion that grants of foreign rights beyond year 28 are contingent   on   the author's survival into the U.S. renewal term   (Order at 16)........................................................................................... 12

      (4) Plaintiff's Assertion that the Second Circuit's holding in *Itar-Tass Russian News Agency v. Russian Kurier, Inc*., 153 F.3d 82 (2d Cir. 1998) regarding questions of initial copyright ownership should be extended to questions of transfers of copyright ownership (Order at 22).............................................. 13

   B. There is a substantial ground for difference of opinion as to whether a notice of termination under 17 U.S.C. 304(c) results in the author's recapture of both domestic and foreign rights to a work. .......................................................................... 14

      (1) Plaintiff's Assertion that foreign protection of U.S. works does not "arise" from each country's domestic law, but that all protection for such works worldwide "arises under" U.S. law (Order at 30) ............................................. 14

      (2) Plaintiff's Assertion that the U.S. Supreme Court's interpretation of the phrase "lawfully made under this title" as used in 17 U.S.C. 109(a) in *Kirtsaeng v. John Wiley & Sons, Inc*., 568 U.S. 519 (2013) is determinative of the geographical meaning of the phrase "arise under this title" as used in 17 U.S.C. 304(c) (Order at 31-37)................................................................. 18

IV.  AN INTERLOCUTORY APPEAL WOULD MATERIALLY ADVANCE THE TERMINATION OF THIS LITIGATION...................................................... 20

V.   REQUEST FOR STAY .................................................................................. 20

VI.    CONCLUSION ................................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*American Well Works Co. v. Layne & Bowler Co.*,
 241 U.S. 257 (1916)................................................................................................ 16

*Ariba Ltd. v. Petroteos Mexianos*,
 962 F.2d 528 (5th Cir. 1992) .................................................................................. 21

*Atlantic City Elec. Co. v. General Elec. Co.*,
 207 F. Supp. 613 (S.D.N.Y. 1962) ........................................................................... 6

*Buechold v. Ortiz*,
 401 F.2d 371 (9th Cir.1968) .................................................................................... 16

*Corcovado Music Corp. v. Hollis Music, Inc.*,
 981 F.2d 679 (2d Cir. 1993) ................................................................................... 14

*Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*,
 2016 WL 7507757 (S.D.N.Y.  Dec. 30, 2016) ................................................. 13, 14

*Ex parte Tokio Marine & Fire Ins. Co.*,
 322 F.2d 113 (5th Cir. 1963) .................................................................................... 5

*Golan v. Holder*,
 565 U.S. 302 (2012)................................................................................................... 9

*Goodman v. Lee*,
 815 F.2d 1030 (5th Cir.1987) ................................................................................. 17

*Gully v. First Nat'l Bank in Meridian*,
 299 U.S. 109 (1936)................................................................................................. 16

*Hadjipateras v. Pacifica, S.A.*,
 290 F.2d 697 (5th Cir. 1961) ........................................................................... *passim*

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
 153 F.3d 82 (2d Cir. 1998) ............................................................................ 2, 13, 14

*Kirtsaeng v. John Wiley & Sons, Inc.*,
　　568 U.S. 519 (2013) ........................................................................................ 2, 18

*Klinghoffer v. S.N.C. Achille Lauro*,
　　921 F.2d 21 (2d Cir.1990) ................................................................................ 5, 6

*LegalJiff.com, Inc. v. LegalCPU.com, Inc.*,
　　2009 WL 10699601 (C.D. Cal. Sept. 11, 2009) .................................................. 4

*Mello v. Sara Lee Corporation*,
　　431 F.3d 440 (5th Cir. 2005) ............................................................................. 21

*Pacheco de Perez v. AT&T Co.*,
　　139 F.3d 1368 (11th Cir. 1998) ......................................................................... 16

*Rohauer v. Killiam Shows, Inc.*,
　　379 F. Supp. 723 (S.D.N.Y. 1974) .................................................................... 12

*Ryan v. Flowserve Corp.*,
　　444 F. Supp. 2d 718 (N.D. Tex. 2006) .............................................................. 5, 6

*S.E.C. v. Credit Bancorp, Ltd.*,
　　103 F.Supp.2d 223 (S.D.N.Y.2000) .................................................................... 5

*Shell v. Hensley*,
　　430 F.2d 819 (5th Cir. 1970) ............................................................................... 1

*Siegel v. Warner Bros. Entertainment Inc.*,
　　542 F. Supp. 2d 1098 (C.D. Cal. 2008) ....................................................... 3, 4, 17

*Strougo v. Scudder, Stevens & Clark, Inc.*,
　　1997 WL 473566 (S.D.N.Y. Aug.18, 1997) ........................................................ 5

*T.B. Harms Co. v. Eliscu*,
　　339 F.2d 823 (2d Cir. 1964) ......................................................................... 16, 17

*Williams v. WMX Technologies, Inc.*,
　　112 F.3d 175 (5th Cir. 1997) ............................................................................... 1

**STATUTES**

17 U.S.C. § 104 ................................................................................................... 10, 16

17 U.S.C. § 106 ......................................................................................................... 11

17 U.S.C. § 109 ..................................................................................................... 2, 18

17 U.S.C. § 201 ........................................................................................................... 9

17 U.S.C. § 304 ................................................................................................... *passim*

28 U.S.C. § 1292(b) ............................................................................................ *passim*

**OTHER AUTHORITIES**

Am.Jur.2d
  *Appellate Review* § 128 (2005). .................................................................... 5

Berne Convention for the Protection of Literary and Artistic Works,
  Sept. 9, 1886  (as amended on Sept. 28, 1979), S. Treaty Doc. No. 99-27 (1986) ............ *passim*

Charles A. Wright, Arthur R. Miller, & Edward H. Cooper,
  16 FED. PRAC. & PROC. (2d ed. 1996 & Supp.2005) ......................................... 5, 20

Edward J. Ellis,
  "National Treatment Under the Berne Convention and the Doctrine of *Forum Non Conveniens*"
  https://www.ipmall.info/sites/default/files/hosted_resources/IDEA/6.Ellis.pdf ...................... 10

Lisa Alter,
  *British Reversionary Right*, "Protecting Your Musical Copyrights," https://akbllp.com/wp-content/uploads/Protecting-Your-Musical-Copyrights.pdf (accessed July 21, 2024) .............. 10

Lloyd L. Jassin,
  *Ten Common Copyright Permission Myths*,
  https://www.copylaw.com/new_articles/copy_myths.html ...................................... 11

M. Nimmer & D. Nimmer,
  3 NIMMER ON COPYRIGHT § 11.02[B][2] .......................................................... 3

Mireille M.M. van Eechoud,
  "Territoriality and the Quest for a Unitary Copyright Title," 55 *International Review of Intellectual Property and Competition Law*  (2024) ................................................................ 7

Paul Torremans,
  *Reversionary Copyright: A Ghost of the Past or a Current Trap to Assignments of Copyright?*, 2 I.P.Q. 77 (2012) ................................................................................................................ 10

U.S. Copyright Office,
  https://copyright.gov/international-issues/ ................................................................... 15

William F. Patry,
  7 PATRY ON COPYRIGHT § 25:74, ............................................................................... 3, 8

**RULES**

Federal Rule of Appellate Procedure 5(a)(3) ................................................................. 1

Defendant Robert Resnik individually and *d/b/a* Resnik Music Group (the "Defendant") move pursuant to 28 U.S.C. § 1292(b) and Federal Rule of Appellate Procedure 5(a)(3) for the Court to certify its order entered July 12, 2024 denying Defendant's motion to dismiss ("Order") for interlocutory appellate review.

## I.

## INTRODUCTION

Prior to exposing litigants and trial courts to the expenditure of resources in litigations that turn on complex, difficult and novel questions of law, the Fifth Circuit has been receptive to certifying interlocutory appeals in cases where significant, threshold issues are raised as to whether the Complaint can survive a motion to dismiss. *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697 (5th Cir. 1961) (granting petition for interlocutory appeal after denial of motion to dismiss); *Williams v. WMX Technologies, Inc.*, 112 F.3d 175 (5th Cir. 1997) (granting petition for interlocutory appeal and reversing denial of motion to dismiss); *see also Shell v. Hensley*, 430 F.2d 819 (5th Cir. 1970) (interlocutory appeal of denial of motion to dismiss).

An interlocutory appeal is particularly warranted in this case because Defendant's motion to dismiss raised the following controlling questions of law, as to which there is a substantial ground for a difference of opinion and which would result in complete termination of the litigation if resolved in Defendant's favor:

- **Controlling Question 1:** Under the principle of territoriality in copyright law, is a work subject to a single overarching international master copyright in its source country, which other countries are required to honor under their treaty obligations, or do those treaty obligations instead require each other country to grant its own copyright rights, under its own domestic law, to works from other member countries?[1]

---

[1] *See* Order at 12. This Controlling Question encompasses a number of subsidiary legal questions that the Court addressed in its Order, including (1) Does the U.S. renewal right extend worldwide?

- **Controlling Question 2:** Does a notice of termination under 17 U.S.C. 304(c) result in the author's recapture of both domestic and foreign rights to a work?[2]

Each of these threshold legal questions is not only of dispositive importance to this case, as this Court expressly recognized, Order at 12, 23, 25, but each question is also an issue as to which Fifth Circuit guidance is needed to avoid a significant waste of judicial resources, as well as the potential destabilization of long-settled business practices throughout the music publishing industry, both nationwide and worldwide.

The first Controlling Question involves the principle of territoriality under international copyright relations between nations. Specifically, as the Court articulated it, whether "there are multiple and separate copyright interests in a single work in each given country throughout the world," Order at 21, as Defendant asserts, or a single copyright in the work's source country that does not "arise under" the laws of the countries in which it is exploited. The Fifth Circuit has not addressed this question. As discussed more fully below, Defendant asserts that copyrights outside the U.S. arise under the domestic law of each country in which they are enjoyed, citing the U.S. Copyright Act, the Berne Convention and the principles of territoriality and national treatment in

---

(Order at 5); (2) How does a U.S. copyright operate with respect to foreign countries? (Order at 8); (3) Are grants of foreign rights beyond the 28th year of the U.S. copyright term contingent on the author's survival into the renewal term domestically? (Order at 19); and (4) Can the Second Circuit's holding in *Itar-Tass Russian News Agency v. Russian Kurier, Inc*., 153 F.3d 82 (2d Cir. 1998) regarding questions of initial copyright ownership be extended to questions of transfers of copyright ownership? (Order at 22) *See* discussion in Section III.A. below.

[2] *See* Order at 27. This Controlling Question encompasses a number of subsidiary legal questions that the Court addressed in its Order, including (1) Whether foreign protection of U.S. works "arise" from a multiplicity of foreign copyrights or when treaty parties agree to recognize copyrights that "arise" under U.S. law? (Order at 30); and (2) Whether the U.S. Supreme Court's interpretation of the phrase "lawfully made under this title" as used in 17 U.S.C. 109(a) in *Kirtsaeng v. John Wiley & Sons, Inc*., 568 U.S. 519 (2013) is determinative of the geographical meaning of the phrase "arise under this title" as used in 17 U.S.C. 304(c)? (Order at 31-37). *See* discussion in Section III.B. below.

international copyright law.   Plaintiff contends that the copyright law of a work's source country "extends worldwide," but cites no statute, treaty or other legal mechanism by which such worldwide extension occurs. There is thus a substantial ground for difference of opinion as to whether the Fifth Circuit will so rule. Indeed, this Court went no further in its Order than to hold that Plaintiffs' position was "plausible."  Discovery and trial of this issue would be particularly extensive and costly, likely requiring multiple experts on the relationship between U.S. and foreign copyright protection.

The second Controlling Question is a pure question of statutory interpretation: whether the copyright termination right created by Section 304(c) of the U.S. Copyright Act allows for termination of grants of foreign rights. The Fifth Circuit has not addressed this question.  As will be discussed more fully below, Defendant asserts that the termination right does not allow termination of foreign grants, citing the statutory language of Section 304(c)(6)(E)[3] and the entire body of case law that has addressed the question.  The most extensive analysis of the issue is in *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1140 (C.D. Cal. 2008). The *Siegel* case in turn cites the two leading treatises on copyright law, M. Nimmer & D. Nimmer, 3 NIMMER ON COPYRIGHT § 11.02[B][2] and W. Patry, 7 PATRY ON COPYRIGHT § 25:74, which squarely and unambiguously agree that grants of foreign rights are not terminable under Section 304(c).  These treatises have been relied on and cited for many decades by District Courts, Circuit Courts and the U.S. Supreme Court in countless copyright actions.[4]  *Siegel* and the treatises have been followed by *every* court that has resolved the issue. Defendant recognizes that these

---

[3] "Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title [Title 17 of the United States Code], and *in no way affects rights arising under any other Federal, State, or foreign laws.*"

[4] *See, e.g., LegalJiff.com, Inc. v. LegalCPU.com, Inc.*, 2009 WL 10699601, at *1 (C.D. Cal. Sept. 11, 2009) (relying on "David Nimmer's authoritative treatise").

unanimous authorities are not binding on this Court, but they establish, at the very least, a "substantial ground for difference of opinion" on the issue, which is what 28 U.S.C. 1292(b) requires.

Plaintiffs cite no contrary authority, but merely proffer an admittedly novel statutory reading that could, if accepted, upend long-settled business practice in the music publishing industry and place the U.S. in violation of its international copyright treaty obligations, because it would deprive foreign authors of termination rights that the U.S. provides for U.S. authors. There is thus a substantial ground for difference of opinion as to whether the Fifth Circuit will rule in Plaintiffs' favor on the second Controlling Question, and as under the first Controlling Question, this Court held only that Plaintiffs' novel interpretation of the Copyright Act was "plausible."

Because resolution of the foregoing controlling questions of law in Defendant's favor would result in termination of the case, and a ruling in Defendant's favor on either question would significantly simplify discovery and trial, Defendant requests that the Court certify its Order denying the motion to dismiss for immediate appellate review.

## II.

## STANDARDS FOR CERTIFICATION UNDER 28 U.S.C. 1292(b)

Section 1292(b) permits a district court to certify an order for immediate appellate review whenever the order "[i] involves a controlling question of law [ii] as to which there is substantial ground for difference of opinion and [iii] an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. 1292(b). The Fifth Circuit has historically "allowed full use of this effective device," *Ex parte Tokio Marine & Fire Ins. Co.*, 322 F.2d 113, 115 (5th Cir. 1963) (criticizing other courts' "epithets" that device is to be "sparingly applied"); *Hadjipateras*, *supra*, 290 F.2d at 702-703 (procedure was intended to provide "considerable flexibility" to courts).

With respect to the requirement that the ruling must present a controlling question of law, whether an issue of law is *controlling*:

> generally hinges upon its potential to have some impact on the course of the litigation. At one end of the continuum, courts have found issues to be controlling "if reversal of the district court's opinion would result in dismissal of the action." *Strougo v. Scudder, Stevens & Clark, Inc*., No. 96 CIV. 2136 (RWS), 1997 WL 473566, at *7 (S.D.N.Y. Aug.18, 1997) (citing *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir.1990)) (other citations omitted).

*Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 722-23 (N.D. Tex. 2006).

The *Ryan* court continued, "[i]n sum, a *controlling* question of law—although not consistently defined—at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation—thereby saving time and expense for the court and the litigants." *Id.*, citing 16 Wright & Miller, FED. PRAC. AND PROC., § 3930 at 426 & n.25 (2d ed. 1996 & Supp.2005)(citing *S.E.C. v. Credit Bancorp, Ltd.*, 103 F.Supp.2d 223, 227 (S.D.N.Y.2000)) (emphasis original). Here, reversal of this Court's opinion would result in the dismissal of the action, so the legal questions identified below are controlling.

With respect to the requirement that there must be a substantial ground for a difference of opinion, "[t]his factor has been described as the least troubling for district courts," and substantial grounds for difference of opinion have been found, *inter alia*, where "the Court of Appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Id.* at 723-24, quoting 4 Am.Jur.2d *Appellate Review* § 128 (2005). Here, all of these conditions are present: the Fifth Circuit has not spoken on the questions presented in this dispute, they involve complicated questions under foreign law, as well as novel and difficult questions of first impression – Plaintiffs themselves concede that they are advancing a "novel" theory (Order at 6).

With respect to the requirement that an immediate appeal may materially advance the termination of the litigation, certification under Section 1292(b) is appropriate where reversal would terminate the action or simplify its conduct at the trial court level. *See Ryan*, 444 F. Supp. 2d at 723 (question is whether permitting an interlocutory appeal will "speed up the litigation"); *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990); *Atlantic City Elec. Co. v. General Elec. Co.*, 207 F. Supp. 613, 619-20 (S.D.N.Y. 1962) (certifying questions for review where it "affects the scope of discovery procedure, the length and complexity of ultimate trial, and the expenditure of time, money and effort which these cases will engender"). For this reason, as noted above, the courts have often granted interlocutory appeals following denial of a motion to dismiss. *Hadjipateras, supra,* 290 F.2d at 701 ("there can be no question that it presents a matter that 'may materially advance the ultimate termination of the litigation.' Indeed, if appellants-respondents are correct on the lack of admiralty jurisdiction, the whole case ends once and for all. Neither the Court nor the parties should be put to the expense in time for a trial of such a possible congenital deficiency."). As will become clear below, this case will likely require extensive expert testimony on issues of foreign law and the interplay of U.S. law and the Berne Convention, of which the U.S. is a signatory. The parties and the Court should not be required to undergo the time and expense of discovery and trial simply to test the soundness of Plaintiffs' admittedly novel theory.

## III.

### THIS CASE INVOLVES CONTROLLING QUESTIONS OF LAW AS TO WHICH THERE IS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION

**A. There is a substantial ground for difference of opinion as to whether, under the principle of territoriality in copyright law, a work is subject to a single overarching international master copyright that each country is required to honor under its treaty obligations, or whether those treaty obligations instead require each country to grant its own copyright rights, under its own domestic law, to works from other member countries.**

Plaintiffs purport to acknowledge that there is no such thing as "international copyright," Order at 13, citing Rec. Doc 17, p.6, but that is exactly what their novel theory calls for with respect to issues involving copyright ownership. There are substantial grounds on which the Fifth Circuit could disagree.

**(1) Plaintiffs' Assertion that the U.S. renewal right extends worldwide (Order at 5)**

There are substantial grounds on which the Fifth Circuit could disagree with Plaintiffs' assertion because it is premised on the false proposition that the durational peculiarities of the 1909 Copyright Act, specifically the requirement of a renewal in the 28th year and the consequences of the author's death before the commencement of such renewal, must be given effect in every country in which the work is exploited under foreign law. In fact, most countries of the world have never had any copyright renewal formalities, instead granting protection for a unitary term that lasts a fixed number of years after the death of the author.[5] Certainly no other nation imposes *U.S.* renewal formalities.

Imposing U.S. renewal formalities, and their downstream consequences for the author's grantees, on rightsholders who own and exploit the work in other countries would violate the principle of territoriality – which recognizes that copyright protection in one country does not extend to or affect protection in any other country. For a simple example of territoriality, assume the copyright in a 1909 Act U.S. work expires 95 years after publication, which is the longest possible term under current U.S. law, at a time when the author has been dead for 25 years. In the U.S. the work is no longer under copyright. In many other countries, however, copyright protection lasts for the life of the author plus 70 years. In those countries, the same work is still under copyright for another 45 years. The expiration of the U.S. term of protection does not re-set

---

[5] *See generally* Mireille M.M. van Eechoud, "Territoriality and the Quest for a Unitary Copyright Title," 55 *International Review of Intellectual Property and Competition Law*, 66-88 (2024).

the term for any other country. *Id.* Similarly, if no renewal was made at all in the 28th year of a U.S. copyright, the work would enter the public domain in the U.S., but would *not* be in the public domain in other countries.[6]

Some countries may, in their own domestic laws, choose to take account of the copyright laws of a work's source country, such as under the so-called "rule of the shorter term" ("RST"). Under the RST, if country A is the source country of a work, country B may elect to cut off protection of that work prematurely in country B once it is no longer protected in country A. *See generally* W. Patry, 7 PATRY ON COPYRIGHT § 25:69.

But that is a policy choice to be made, or not, by country B. There is no mechanism by which the U.S. can force other nations to follow U.S. copyright law, in that respect or any other. Plaintiffs assert that the U.S. renewal copyright interest "extends worldwide," Order at 5, but they fail to identify any actual *law* that effectuates this purported worldwide extension. The very fact that some countries legislate the RST into their copyright law and some do not refutes Plaintiffs' assertion that the law of a work's source country applies worldwide. Plaintiffs argue that copyright ownership is somehow different,[7] but again they fail to identify any statute or treaty that creates

---

[6] Plaintiffs repeatedly invoke a distinction between "rights" and "conduct," claiming that only the latter is governed by foreign law, *see, e.g.* Order at 11-12. The duration examples above refute that distinction; different countries can and do apply their own separate laws to determine whether or not a copyright even *exists* for a particular work within their territory at a particular time. There is no more basic question of "rights" than that - with no copyright, nobody has any "rights" in a work. If foreign law can declare that a work's copyright does or does not *exist* in a particular territory – and Plaintiffs do not dispute that foreign law can do that – by what principle is foreign law unable to determine who *owns* the copyright in that work within that territory? No principle that Plaintiffs have identified. There are thus substantial grounds on which the Fifth Circuit might disagree with Plaintiffs' proposed distinction between "rights" and "conduct." Moreover, Plaintiffs in this action demand an injunction against Defendants' *conduct*, *see* Order at 6, n.35 as well as a declaration of ownership. They are thus attacking both Defendants' conduct and their rights, but Plaintiffs' novel legal theory only concerns rights.

[7] *See* Point III.A.(4) below.

such an exception.  There is no such exception. Copyright *ownership* is created by the substantive statutory law of each nation, just as surely as duration, remedies, and scope of protection.  *See*, e.g. 17 U.S.C. 201 (section titled "Ownership of Copyright"). There are substantial grounds on which the Fifth Circuit might disagree with Plaintiffs' novel and unsupported view on this issue.

In essence, Plaintiffs propose a mutant "rule of the shorter term" on steroids, one that would force other nations to set aside binding contracts – grants of worldwide rights – that were entered into by responsible adults, simply because a provision of a now-superseded U.S. law changed the identity of one of the parties to those contracts. It is no accident that Plaintiffs cannot identify the legal mechanism through which all this contract-busting is alleged to have occurred.

In fact, there is no such mechanism.  Nor is this Court or the Fifth Circuit required to do Plaintiffs' homework and identify or concoct a basis for disregarding the well-settled reality of international copyright relations under the Berne Convention.[8]

### (2) Plaintiffs' theory of how a U.S. copyright operates with respect to foreign countries (Order at 8)

There are substantial grounds on which the Fifth Circuit could disagree with Plaintiffs' "master U.S. copyright" theory because it is flatly contradicted by the Berne Convention, which the U.S. Supreme Court has recognized as the "principal accord governing international copyright relations." *Golan v. Holder*, 565 U.S. 302, 306-07 (2012).  Plaintiffs assert that U.S. law as to the renewal requirements for 1909 Act works "extends worldwide."  Under Berne, however, no copyright law of any country "extends worldwide." Copyright under Berne is instead subject to

---

[8] Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886 (as amended on Sept. 28, 1979), S. Treaty Doc. No. 99-27 (1986) ("Berne").

the principle of national treatment, which requires each country, in applying its own laws, to treat authors of foreign nations the same as its own authors.[9]

Therefore, without the domestic law in each other Berne Convention country, neither U.S. law nor the Berne Convention would, of its own force, protect any work outside the U.S. – any more than Berne or, say, French law would protect a French work in the U.S. *See* 17 U.S.C. 104(c) (Berne not self-executing). This Court found Plaintiffs' "master copyright" theory to be plausible because, *inter alia*, "United States copyright already gives the owner the ability exploit the work in other Berne Convention countries." (Order at 37).

That same logic would also necessarily mean that Beatles songs are subject to the "master copyright" of the UK, because UK law gives Lennon and McCartney the ability to exploit the work in the U.S. However, the law of the UK provides for certain reversionary rights, which differ materially from the U.S. termination right, but accomplish a similar result, *i.e.* the return of rights to the author after some period of years.[10] These UK reversionary rights are *not* applicable under U.S. law, even though UK copyrights may certainly be protected here under domestic U.S. law. If the U.S. does not apply the UK reversionary rights, by what *legal* mechanism should the UK, or any other country, be forced to apply the copyright reversion rules of the 1909 U.S. Copyright Act?

The result would be chaos, with copyright in each work dependent on its country of origin, rather than the orderly system that the nations of the world have in fact developed over more than

---

[9] Edward J. Ellis, "National Treatment Under the Berne Convention and the Doctrine of *Forum Non Conveniens*" https://www.ipmall.info/sites/default/files/hosted_resources/IDEA/6.Ellis.pdf.
[10] *See* generally, Paul Torremans, *Reversionary Copyright: A Ghost of the Past or a Current Trap to Assignments of Copyright?*, 2 I.P.Q. 77, 78 (2012); *see also British Reversionary Right* in Lisa Alter, "Protecting Your Musical Copyrights," https://akbllp.com/wp-content/uploads/Protecting-Your-Musical-Copyrights.pdf (accessed July 21, 2024).

a century, in which the applicable law is the law of the place "where protection is claimed." Art. 5, § 2 of Berne.

This is because copyright is not simply "an ability to exploit the work" as this Court phrased it – it is the **exclusive** *right* to do so, a "right to exclude."[11] *See, e.g.* 17 U.S.C. 106.[12] Copyright is a right, granted to an author by a government, *to keep others* from exploiting the work, within the territory controlled by that government – the place "where protection is claimed."

And the Berne Convention states in so many words that Berne member nations "*grant*" such exclusive protection under "their *respective* laws":

> "[a]uthors shall enjoy ... in [signatory countries] other than the country of origin, the rights which *their respective laws* do now or may hereafter *grant* to their nationals.

Berne Convention for the Protection of Literary and Artistic Works, Art. 5, § 1, Sept. 9, 1886 (as amended on Sept. 28, 1979), S. Treaty Doc. No. 99-27 (1986) (emphasis added).

Those "rights" that authors enjoy are not merely passively "recognized" under Berne, as Plaintiffs repeatedly assert, they are "granted" by the respective laws of the member nations. Without that grant by the foreign nation, there is no protection for the rights. For example, if a French author writes a book in France, French domestic law grants to that author the right to prevent anyone else from exploiting that work in France. That's a French copyright. If a U.S. author writes a book in the U.S., and wants to stop others from exploiting that work in France, French domestic law will *grant* him or her that same right, because France and the U.S. are both members of Berne. Just like the French author, the U.S. author has a French copyright – the right

---

[11] Lloyd L. Jassin, *Ten Common Copyright Permission Myths*, https://www.copylaw.com/new_articles/copy_myths.html ("The main benefit of copyright, for example, is the right to exclude others from making copies of a work (or any part of it) without permission").

[12] "Subject to sections 107 through 122, the owner of copyright under this title has the *exclusive rights* to do and to authorize any of the following…" (emphasis added).

to exclude others from engaging in certain conduct in France.  It arises under the *grant* made by French domestic law; it does not arise under U.S. law.[13] At the very least, there are substantial grounds on which the Fifth Circuit may disagree with Plaintiffs' contrary theory.

This Court found Plaintiffs' theory to be plausible notwithstanding *Rohauer v. Killiam Shows, Inc.*, 379 F. Supp. 723 (S.D.N.Y. 1974), which Defendant cited in its motion to dismiss. The Court's own detailed discussion of *Rohauer* in the Order, however, flatly refutes Plaintiffs' argument that the U.S. copyright renewal "extends worldwide."  In the Order, at 19, the Court summarizes *Rohauer* as explaining that rights "in some countries would not have reverted to the heir until three years after the heir's assignment to Rohauer, *according to the law of those countries*, and thus 'Rohauer was at that moment vested only with rights to the work in the United States; in other countries, the motion picture rights would not have reverted to [the author's heir] for at least three more years.'" (Emphasis added).  Of course the very idea that the laws of foreign countries would determine the reversion of rights in those countries is correct, but it is exactly the opposite of Plaintiffs' novel "master copyright" theory, under which the reversion of rights in a work's source country "extends worldwide."

### (3) Plaintiffs' Assertion that grants of foreign rights beyond year 28 are contingent on the author's survival into the U.S. renewal term (Order at 16)

There are substantial grounds on which the Fifth Circuit could disagree with Plaintiffs' assertion because (a) Plaintiffs cite no judicial authority of any kind that has ever so held; (b) Plaintiffs cite no treatise or commentary of any kind in support of such a proposition; (c) the

---

[13] *See* discussion at Section III.B. *infra* concerning the meaning of "arise under."  This Court concluded (Order at 24) that it was "more plausible that protection in member countries is attendant to the U.S. copyright rather than the conclusion that each member country *grants* an entirely separate and new copyright by virtue of the Berne Convention" (emphasis added). Respectfully, Art. 5, § 1 of Berne specifically states that each signatory's domestic law is the source of the "grant" of rights "enjoyed" by foreign authors.

assertion contradicts the principle of territoriality, *see supra*, because it would make the U.S. the ultimate arbiter of domestic copyright law within non-U.S. countries; and (d) the assertion contradicts the principle of national treatment under Berne, Art. 5, § 1 of Berne, because it would grant U.S. authors *greater* rights in foreign countries than the native authors of those countries are entitled to receive under their own domestic laws. That is, U.S. authors would have an opportunity to recapture their rights in foreign countries, but the native authors in those countries would not be given that opportunity. This Court found Plaintiffs' assertion plausible, but it is a proposition of law, and as such the Fifth Circuit does not have to accept as true.

**(4) Plaintiff's Assertion that the Second Circuit's holding in *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir. 1998) regarding questions of initial copyright ownership should be extended to questions of transfers of copyright ownership (Order at 22)**

There are substantial grounds on which the Fifth Circuit could disagree with Plaintiffs' reliance on *Itar-Tass*. First, *Itar-Tass*, which concerned ownership of copyright in newspaper articles created and first published in the USSR, expressly limited its holding to questions of initial ownership, as this Court recognized. Order at 22 (quoting footnote 22 from *Itar-Tass*). The issue in this case does not concern initial ownership, therefore *Itar-Tass* is not apposite.

As a fallback, Plaintiffs cite to *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, 2016 WL 7507757 (S.D.N.Y. Dec. 30, 2016), another out-of-circuit decision in which a New York court applied Italian law to interpret a contract between a composer and a music publisher that was negotiated and performed in Italy. The court specifically adopted a choice-of-law analysis tailored for "contractual disputes," *Id.*, at *4. This case is not a contractual dispute, therefore the analysis undertaken in *Creazioni Artistiche Musicali* is not apposite.

Even in the context of contractual disputes, moreover, the law of the place of contracting and performance are not consistently applied, even when that country is also source country of the

work.  In *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679 (2d Cir. 1993), for example, the Second Circuit applied United States law to a resolve a copyright dispute over Brazilian songs, stemming from a songwriter's contract negotiated and executed in Brazil, between Brazilians, in Portuguese. Under the theory of Plaintiffs here, the work's "master copyright" would presumably have been Brazilian, and yet the law of the U.S.— the country of exploitation – was held to govern the dispute about renewal rights – the very rights that Plaintiffs claim are determined for the whole world by the law of the source country.  Brazilian law did not "extend worldwide," as Plaintiffs' theory would require.

Accordingly, there are substantial grounds on which the Fifth Circuit could disagree as to whether *Itar-Tass* and its progeny, including *Creazioni Artistiche Musicali,* support Plaintiffs' theory.

**B. <u>There is a substantial ground for difference of opinion as to whether a notice of termination under 17 U.S.C. 304(c) results in the author's recapture of both domestic and foreign rights to a work.</u>**

**(1) Plaintiff's Assertion that foreign protection of U.S. works does not "arise" from each country's domestic law, but that all protection for such works worldwide "arises under" U.S. law (Order at 30)**

Section 304(c)(6)(E) of the 1976 Act, which governs the Plaintiffs' Termination Notice, provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title [Title 17 of the United States Code], and *in no way affects rights arising under any other Federal, State, or foreign laws.*" (Emphasis added).  Plaintiffs claim that U.S. rights are merely "recognized" by foreign nations, but that they only actually "arise under" U.S. law.  Plaintiffs are wrong, and there are substantial grounds on which the Fifth Circuit could so find.

As Defendant argued in its motion to dismiss, Copyright protection arises from the domestic law of each country in which protection is claimed. *See, e.g.,* Article 36 of the Berne Convention (Paris text, 1971):

> (1) Any country party to this Convention undertakes to *adopt,* in accordance with its constitution, *the measures necessary to ensure the application of this Convention.*

> (2) It is understood that, at the time a country becomes bound by this Convention, it will be in a position *under its domestic law* to give effect to the provisions of this Convention.

(emphasis added).[14]

Consequently, and as discussed in Section III.A, *supra*, copyright protection in a Berne member country "arises under" the *domestic* law of each member country. Copyright in France, for example, does not arise under the Berne convention itself, but under French law – certainly it does not arise under U.S. law.[15] Therefore, the language of the copyright termination provision in Section 304(c)(6)(E) really does mean what it says: "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title[, Title 17 of the United States Code], and *in no way affects rights arising under any other Federal, State, or foreign laws.*" Because the foreign rights in the Song here do not arise under Title 17 of the U.S. Code, but under the domestic laws of each Berne member country, the termination of U.S. rights under Section 304 "in no way affects" those foreign rights, and Plaintiffs' Count Two fails as a matter of law.

---

[14] *See* U.S. Copyright Office, https://copyright.gov/international-issues/: "Original works of expression that are eligible for copyright protection are protected under national copyright laws. Protection against unauthorized use in a particular country depends on the national laws of that country; in other words, copyright protection depends on the national laws where protection is sought."

[15] Plaintiffs' tortured argument of this point at ¶33 of the Complaint would yield the absurd result that *no* right in a U.S. work could ever actually "arise" under "foreign" law, in which case Congress' express language in Section 304 (c)(6)(E) to address such rights would be a nullity. That cannot be the case, courts must not interpret a statute in a way that renders any of its language meaningless.

It is clear in any event that no rights arise under Berne itself. The Eleventh Circuit in *Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368 (11th Cir. 1998) addressed – and rejected – a proposition virtually identical to the one that Plaintiffs make here, namely that a substantive right created by a state "arises under" federal law merely because a federal law or treaty provides the claimant with:

> a procedural right of access to the courts that is antecedent to, and separate from, the plaintiffs' state-based substantive cause of action. *See Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 116, 57 S.Ct. 96, 99, 81 L.Ed. 70 (1936) ("Here the right to be established is one created by the state. If that is so, it is unimportant that federal consent is the source of state authority."); *cf. Buechold v. Ortiz*, 401 F.2d 371, 372 (9th Cir.1968) (holding that a similar *treaty* granting access to United States courts but *not establishing substantive rights does not create a right "arising under" the treaties of the United States* for purposes of 28 U.S.C. § 1331).

(Emphasis added).

In this case, the Berne Convention is a treaty that does not "establish substantive rights," *see* 17 U.S.C. 104(c), but merely provides U.S. authors with "a procedural right of access to the courts" in other Berne countries, which right of access is "antecedent to, and separate from," the substantive rights granted by the laws of those other Berne countries. This layer of treaty connection between the U.S. and another sovereign is "unimportant" for purposes of determining the law under which a right arises. The "arising under" inquiry looks to the substantive right, not the procedural right provided by the treaty. As Justice Holmes wrote in *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916), "A suit arises under the law that creates the cause of action."

In the copyright context, the courts have consistently so held. In *T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 824 (2d Cir. 1964) (Friendly, *J.*), the Second Circuit established a "landmark" test for determining when a claim "arises under" the Copyright Act. Under *T.B. Harms* a claim "arises under" the Copyright Act:

> if and only if the complaint is for a remedy expressly granted by the Act, e.g., a suit for infringement or for the statutory royalties for record reproduction [citation omitted] or asserts a claim requiring construction of the Act, as in De Sylva, or, at the very least and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim. The general interest that copyrights, like all other forms of property, should be enjoyed by their true owner is not enough to meet this last test.

*Id.* at 828. *See also Goodman v. Lee*, 815 F.2d 1030, 1031 (5th Cir. 1987) (adopting *T.B. Harms* test).

As explained in Section III.A, *supra*, a U.S. copyright owner's exclusive rights in, say, France – that is, his or her right to exclude others from using the work in that territory without permission – arise under French law, under the *T.B. Harms* test.[16] To vindicate those exclusive rights, the copyright owner would seek the remedies expressly granted by the French copyright law, and would ask the court to construe the French copyright law. The "French copyright" is nothing more or less than the right to do these things. That copyright arises under French law, whether the author is from France, the U.S. or any other Berne member.

Thus under the termination provision involved here, Section 304(c)(6)(E), the French copyright is a right "arising under foreign law" and is not "affected" by the "[t]ermination of a grant under this subsection [304(c)]."

Therefore, the California District court in *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1140 (C.D. Cal. 2008) was correct to hold at 1144 that a U.S. copyright termination notice "affects only the *domestic* portion of [the] worldwide grant," but is "*not*

---

[16] Plaintiffs here cannot avail themselves of the third and "more doubtful[ ]" basis identified in the *T.B. Harms* test, that "the distinctive policy of the [Copyright] Act requires that federal principles control the disposition of the claim," because *T.B. Harms* itself cautions that "[t]he general interest that copyrights, like all other forms of property, should be enjoyed by their true owner is not enough to meet this last test." That is Plaintiffs' demand here, that they be declared the true owner of the disputed rights. Moreover, if the invocation of the termination right under Section 304(c) were itself sufficient to qualify as a "distinctive policy of the Act," then *no* rights would ever "arise under" foreign law – and Congress' carve-out of those rights in Section 304 (c)(6)(E) from the sweep of Section 304(c) would be meaningless.

effective as to the remainder of the grant, that is, Defendant's exploitation of the work abroad under the aegis of foreign copyright laws") (emphasis in original).

> **(2) Plaintiff's Assertion that the U.S. Supreme Court's interpretation of the phrase "lawfully made under this title" as used in 17 U.S.C. 109(a) in *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013) is determinative of the geographical meaning of the phrase "arise under this title" as used in 17 U.S.C. 304(c) (Order at 31-37)**

There are substantial grounds on which the Fifth Circuit could disagree with Plaintiffs' assertion because it ignores the difference between the words "arise under" in Section 304(c) and the words "lawfully made under" in Section 109(a). Section 304(c) addresses rights that "arise under this title," while Section 109(a) creates a defense for re-selling physical copies "lawfully made under this title." If there is indeed a meaningful distinction to be made between "rights" and "conduct" as Plaintiffs repeatedly assert, Section 304(c) and Section 109(a) are on opposite sides of that line. Section 109(a), addressed in *Kirtsaeng*, is a statutory defense to certain *conduct* – the making of copies of a copyrighted work – that would be infringing if not for the statutory defense. *Kirtsaeng* held that the defense was available to an alleged infringer who acquired licensed textbooks in foreign countries (*i.e.,* conduct) and re-sold them in the U.S. (*i.e.*, conduct). Section 304(c), by contrast, limits the reach of the termination right by stating that it only applies to grants of rights that "arise under this title."

The Supreme Court in *Kirtsaeng* did not hold that the words "under this title," in isolation, have no geographic significance, as this Court recognized. There are substantial grounds on which the Fifth Circuit could reject Plaintiffs' attempt to fragment and distort the statutory language with this argument.

The Fifth Circuit would also have a substantial basis to reject the other arguments made by Plaintiffs' in reliance on *Kirtsaeng*, *see* Order at 33-36. First, Plaintiffs argue that their parsing of the language in 109(a) and 304(c) is "simple," but an interpretation that is simple and wrong is still

wrong.  Second, Plaintiffs argue that the "goal" of the termination provision would be undermined by limiting its geographic reach, but this falsely assumes that the "goal" is the broadest possible termination right.  Had that been the goal of the enacting Congress, they could easily have added words to that effect, or simply omitted the limiting language from the last sentence of the provision. Because Congress included limiting language, it is unreasonable to posit that they intended the reach of the statute to be unlimited.

Third, Plaintiffs propose a reading of the statutory language that defies logic. The statutory text is as follows:

> Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

Plaintiffs argue that "rights that arise under this title" must mean "more than the specific rights enumerated in the United States Copyright Act" or there would be "no need for the qualifying phrase" that begins "and in no way affects…" Order at 35.  But by that reasoning, if a statute said "only X and not Y," Plaintiffs would be forced to argue that "only X" means *more* than X – otherwise "and not Y" would be unnecessary. That reading is absurd. "Only X" does not mean "more than X" and "only rights . . . that arise under this title" does not encompass other unnamed rights that do not "arise under this title."

Fourth, Plaintiffs argue that the limiting language in the provision should be construed narrowly, to avoid frustrating the "purpose" of the termination statute. As with their argument about preserving the "goal" of the provision, this argument presupposes that the purpose of the section is to provide an unlimited recapture right for authors.  The statute itself refutes this argument, because it is loaded down with formalities and timing limitations that make the termination right difficult to exercise, and tightly restricts the universe of persons who may avail themselves of termination, even if they successfully jump through the statutory hoops.  Plaintiffs

offer no explanation as to why the geographic limitation is any more inconsistent with the alleged "purpose" of the termination right than any of these other limitations.

Accordingly, there are substantial grounds on which the Fifth Circuit could reject Plaintiffs' analysis of the statutory language.

## IV.

## AN INTERLOCUTORY APPEAL WOULD MATERIALLY ADVANCE THE TERMINATION OF THIS LITIGATION

If Defendant is correct on both of the Controlling Questions, then all claims would be dismissed, and the case would be terminated, avoiding further expense of litigation. If Defendant is correct on either of them, trial preparation and time for trial would be shortened substantially. The requirement that an interlocutory appeal advance the disposition of the litigation is satisfied if the resolution of the issue could eliminate the need for trial or eliminate complex issues. *See Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 701 (5th Cir. 1961)("Indeed, if appellants-respondents are correct . . . the whole case ends once and for all"); 16 Wright & Miller, FED. PRAC. AND PROC. § 3930 at 432 (2d ed. 1996) (immediate appeal may be considered to advance the ultimate termination of the litigation if appeal promises to "shorten the time required for trial."). Neither the Court nor the parties should be required to expend the considerable time and expense involved in fact discovery, foreign law expert discovery, summary judgment and trial, when there are threshold controlling questions of law over a novel theory, the resolution of which could well require dismissal.

## V.

## REQUEST FOR STAY

This Court should also grant a stay of all proceedings pending the outcome of an interlocutory appeal. Section 1292(b) permits the Court to order a stay of proceedings pending

interlocutory appeal. *See, e.g. Mello v. Sara Lee Corporation,* 431 F.3d 440, 443, n.2 (5th Cir. 2005) (reviewing order certified pursuant to § 1292(b) where district court stayed proceedings); *Ariba Ltd. v. Petroteos Mexianos,* 962 F.2d 528, 530 n.1 (5th Cir. 1992) (same). A stay of proceedings would limit the expenditure of resources sought to be avoided by an interlocutory appeal.

## VI.

## CONCLUSION

Defendant respectfully requests that this Court certify its July 15, 2024 Order denying Defendant's Motion to Dismiss for immediate appellate review under Section 1292(b), by amending the Order to include findings that it resolves controlling questions of law, as stated in Point I herein, as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of the litigation.

**PROVOSTY & GANKENDORFF, LLC**

*/s/ Edgar D. Gankendorff*
Edgar D. Gankendorff (LA Bar #20550)
Christophe B. Szapary (LA Bar #25890)
650 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone: 504-410-2795
Facsimile: 504-410-2796
*Attorneys for Defendants*

AND

**REITLER KAILAS & ROSENBLATT LLP**
Robert W. Clarida (admitted *pro hac vice*)
Brian D. Caplan (admitted *pro hac vice*)
885 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 209-3059
bcaplan@reitlerlaw.com
rclarida@reitlerlaw.com

*Attorneys for Defendants*